## 4IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

| | |
|---|---|
| In re: ) | Chapter 11 |
| ) | |
| LAKEPOINT LAND, LLC, ) | Case No. 18- 41337-bem |
| LAKEPOINT LAND III, LLC, ) | |
| LAKEPOINT LAND IV, LLC, ) | Joint Administration Requested |
| LAKEPOINT SERVICES, LLC, ) | |
| LAKEPOINT SPORTS SOUTH, LLC, ) | |
| LP HOUSING LLC, LAKEPOINT ) | |
| HOSPITALITY, LLC, and ) | |
| LAKEPOINT MERCHANDISE, LLC, ) | |
| ) | |
| Debtors. ) | |
| ) | |

**DEBTORS' EMERGENCY MOTION PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507 FOR INTERIM AND FINAL ORDERS A) AUTHORIZING: (1) THE DEBTORS TO OBTAIN POST-PETITION FINANCING; AND (2) USE OF CASH COLLATERAL; (B) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (C) GRANTING ADEQUATE PROTECTION; (D) MODIFYING AUTOMATIC STAY; (E) SCHEDULING A FINAL HEARING; AND (F) GRANTING RELATED RELIEF**

LakePoint Land, LLC, LakePoint Land III, LLC, LakePoint Land IV, LLC, LakePoint Services, LLC, LakePoint Sports South, LLC, LP Housing LLC, LakePoint Hospitality, LLC, and LakePoint Merchandise, LLC (collectively, the "Debtors" or the "Borrowers") debtors-in-possession in the above-captioned Chapter 11 bankruptcy cases, pursuant to Sections 105, 361, 362, 363 and 364 of title 11 of the United States Code (the "Bankruptcy Code"), hereby move this Court (the "Motion") for entry of interim and final orders (A) authorizing the Debtors to obtain post-petition financing, (B) authorizing the Debtors to use cash collateral of the Prepetition Lender (as defined below), (C) granting liens and superpriority administrative expense status to the DIP Lender (as defined below) (D) granting adequate protection to the Prepetition Lender, (E) modifying the automatic stay, and (F) scheduling a final hearing pursuant

12272874v4

to Rules 4001(b) and 4001(c) of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules"). In support of the relief requested in the Motion, the Debtors respectfully represent as follows:

## SUMMARY OF RELIEF REQUESTED

1. Among other things, the Debtors seek authority to obtain post-petition secured loans equal to up to $5 million, subject to the terms and conditions of the DIP Loan Agreement (as defined below) and the related loan documents. In accordance with Rule 4001 of the Bankruptcy Rules, below is a summary of the terms of the proposed DIP Facility (as defined below) and the Debtors' proposed use of cash collateral of the Prepetition Lender:[1]

(a) Borrowers. LakePoint Land, LLC, LakePoint Land III, LLC, LakePoint Land IV, LLC, LakePoint Services, LLC, LakePoint Sports South, LLC, LP Housing LLC, LakePoint Hospitality, LLC, and LakePoint Merchandise, LLC.

(b) Prepetition Lender. Rimrock High Income Plus (Master) Fund, LTD (the "Prepetition Lender").

(c) DIP Lender. LP Investments I, LLC, which is an affiliate of the Prepetition Lender (the "DIP Lender").

(d) Borrowing Limits. $5,000,000.

(e) Interest Rate. 12%. The default interest rate is 14%.

(f) Fees and Expenses. There is no commitment fee. The Borrowers shall pay all (i) reasonable and documented out-of-pocket fees, costs, disbursements and expenses of the DIP Lender (including all reasonable fees, costs, disbursements and expenses of the DIP Lender's outside counsel, King & Spalding, and its financial advisor, GlassRatner), in connection with the negotiations, preparation, execution and delivery of the DIP Loan Documents and the funding of all Loans under the DIP Facility, and (ii) without duplication, reasonable and documented (in summary form) out-of-pocket fees, costs, disbursements and expenses of the DIP Lender (including all reasonable fees, costs, disbursements and expenses of the DIP Lender's outside counsel, King & Spalding, and its financial advisors, GlassRatner) in connection with the enforcement of any rights and remedies under the DIP Loan Documents. (DIP Loan Agreement § 13.)

---

[1] Terms not defined in the summary are defined herein or in the DIP Loan Agreement.

12272874v4

(g) <u>Maturity Date</u>. The earliest of (i) one hundred thirty (130) days after the Petition Date, (ii) the consummation of any sale of all or substantially all of the assets of the Debtors pursuant to Section 363 of the Bankruptcy Code, (iii) if the Final Order has not been entered, the date that is thirty-five (35) calendar days after the Petition Date, (iv) the date of the acceleration of the Loans and/or the termination of the Commitments, and (v) the Effective Date. (DIP Loan Agreement § 1.)

(h) <u>Acceptable Plan</u>. It shall be an Event of Default under the DIP Loan Agreement for the Debtors to file any plan without the DIP Lender's consent. (DIP Loan Agreement § 9(g).)

(i) <u>Purpose</u>. The DIP Facility shall be used for: (i) working capital and general corporate purposes of the Borrowers, and (ii) payment of the costs of administration of the Chapter 11 Cases, including, without limitation, the costs, fees and expenses incurred (A) in connection with the DIP Facility, and (B) by the Prepetition Lender or the DIP Lender in connection with the Chapter 11 Cases, in each case, to the extent such costs, fees, and expenses are reimbursable pursuant to the terms of the applicable loan documents. (DIP Loan Agreement § 2(e).)

(j) <u>Priority and Liens</u>. Subject to the Carve-Out, all obligations under the DIP Facility shall, at all times: (i) pursuant to Section 364(c)(1) of the Bankruptcy Code, be entitled to super-priority claim status in the chapter 11 cases to the extent of any diminution in the DIP Collateral (the "<u>DIP Superpriority Claim</u>"); (ii) pursuant to Sections 364(c)(2), (c)(3) and (d)(1) of the Bankruptcy Code, be secured by perfected liens (the "<u>DIP Liens</u>") on all or substantially all of the Debtors' assets (including claims or causes of action arising under sections 544, 545, 547, 548, 550 or 553 of the Bankruptcy Code (collectively, the "<u>Avoidance Actions</u>")) (the "<u>DIP Collateral</u>"). The DIP Liens shall be senior in priority and superior to any security, mortgage, collateral interest, lien or claim to any of the Collateral, except that the DIP Liens shall be junior only to (a) the Prior Permitted Liens solely to the extent that such Prior Permitted Liens constitute valid, perfected, and non-avoidable Liens as of the Petition Date; and (b) the Carve-Out. (DIP Loan Agreement § 11(a).)

(k) <u>Use of Cash Collateral</u>. Cash collateral of the Prepetition Lender will be used by the Debtors pursuant to the terms of the Approved Budget until a Termination Event. The Prepetition Lender has consented to the use of Cash Collateral pursuant to the terms of the Interim Order.

(l) <u>Events of Default</u>. The DIP Loan Agreement contains standard Events of Default for a loan of this nature. (DIP Loan Agreement § 9.)

(m) <u>Adequate Protection</u>. As adequate protection of the interests of the Prepetition Lender in the Prepetition Collateral against any diminution in value on account of, among other things, the granting of the DIP Liens; the Debtors' use of Cash Collateral; the use, sale or lease of any other Prepetition Collateral; market value decline of collateral; the priming of the Prepetition Liens; and the imposition of the automatic stay, the Prepetition Lender shall receive perfected post-petition security interests and liens on the DIP Collateral (the "<u>Prepetition Adequate Protection Liens</u>") to the extent of any diminution in value of the Prepetition

12272874v4

Collateral. The Prepetition Adequate Protection Liens shall be junior only to: (A) the Prior Permitted Liens; (B) the Carve-Out; and (C) the DIP Liens. As further adequate protection against the diminution in value described above, the Prepetition Lender will be provided, to the extent of any diminution in value, a superpriority administrative expense claim pursuant to Section 507(b) of the Bankruptcy Code (the "<u>Prepetition Superpriority Claim</u>"). The Prepetition Superpriority Claim shall be junior only to the DIP Obligations, the Superpriority DIP Claim, the Carve-Out and, with respect to the DIP Collateral, any validly perfected secured claim, and be payable from and have recourse to all assets and property of the Debtors. As further adequate protection for the Prepetition Lender, the Debtors shall pay all reasonable and documented (insummary form) out-of-pocket fees, costs, and expenses of the Prepetition Lender (including all reasonable fees, costs, disbursements, and expenses of its outside counsel, King & Spalding LLP, and financial advisor, GlassRatner Advisory & Capital Group LLC). The Debtors shall provide the Prepetition Lender with access to the Debtors' books and records and such financial reports as are provided to the DIP Lender pursuant to Section 8(g) of the DIP Loan Agreement. (Interim Order ¶ 13.)

(n) <u>Section 506(c) Waiver</u>. As a further condition of the DIP Loan Agreement and any obligation of the DIP Lender to make credit extensions pursuant to the DIP Loan Agreement, upon entry of the Final Order, the Debtors and their estates, shall be deemed to have waived any claim to surcharge the DIP Collateral under Section 506(c) of the Bankruptcy Code for the benefit of the DIP Lender and the Prepetition Lender. (Interim Order ¶ 40.)

(o) <u>Carve-Out</u>. The DIP Facility provides for a "Carve-Out" from the DIP Collateral for the sum of: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a) plus interest pursuant to 31 U.S.C. § 3717; (ii) to the extent allowed by the Bankruptcy Court at any time, but strictly limited to the line item amounts set forth in the Approved Budget applicable to such professionals, the accrued and unpaid fees, costs, and expenses incurred by any professional or professional firm retained by the Borrowers or any Committee (the "<u>Professionals</u>") before the date and time of the delivery by the DIP Lender of a Carve-Out Trigger Notice; and (iii) after the delivery by the DIP Lender of a Carve-Out Trigger Notice, to the extent allowed by the Bankruptcy Court at any time, all unpaid fees, disbursements, costs, and expenses incurred by Professionals in an aggregate amount not to exceed $50,000. As more fully described in the DIP Loan Agreement, the Carve-Out shall not be used to pay any fees or expenses incurred in the prosecution of any litigation or the assertion of any claims raised against or with respect to the Prepetition Lender, the DIP Lender, the Prepetition Collateral or the DIP Collateral. (DIP Loan Agreement § 1.)

(p) <u>Indemnification</u>. The Debtors shall indemnify and hold harmless each of the DIP Lender and its affiliates, and each their respective officers, directors, employees, attorneys, agents and representatives from various indemnified liabilities set forth in the DIP Loan Agreement; <u>provided</u>, that the Debtors shall not be liable for any indemnification to an Indemnified Person to the extent that any such claim, damage, loss, liability or expense is found in a final non-appealable judgment by a court of competent jurisdiction to have resulted from the bad faith, gross negligence or willful misconduct of such Indemnified Party or any of such Indemnified Party's affiliates or their respective principals, directors, officers, employees, representatives, agents, attorneys or third party advisors. (DIP Loan Agreement § 12.)

12272874v4

(q)     Release.  The Debtors agree to forever waive and release any and all claims and causes of action against the DIP Lender and/or the Prepetition Lender, whether at law or in equity, arising under or relating to the DIP Facility and/or the Prepetition Loan Documents, Section 105 and chapter 5 of the Bankruptcy Code and under any other similar provisions of applicable state or federal law.  (Interim Order ¶ 44.)

(r)     Conditions to Borrowing.  The conditions to the effectiveness of the DIP Loan Agreement are set forth in Section 4 of the DIP Loan Agreement.  The conditions to all extensions of credit are set forth in Section 5 of the DIP Loan Agreement.

(s)     Milestones.  Exhibit C to the DIP Loan Agreement sets forth various milestones that the Debtors must satisfy.

(t)     Rights and Remedies Upon Default and Modification of Automatic Stay.  Upon the occurrence of an Event of Default, the DIP Lender may deliver written notice to the Court that the automatic stay provisions of Section 362 of the Bankruptcy Code have been vacated and modified to the extent necessary to permit the DIP Lender to exercise all rights and remedies provided for in the DIP Loan Documents, and to take any or all of the following actions without further order of or application to the Court (as applicable):

　　i.　declare (with notice to the Borrowers, the United States Trustee and counsel to any Committee) the Commitment terminated whereupon the Commitment shall be immediately terminated;

　　ii.　declare (with notice to the Borrowers, the United States Trustee and counsel to any Committee) the unpaid principal of and any accrued interest in respect of all Loans and any and all other indebtedness or obligations of any and every kind owing by a Borrower to the DIP Lender to be due whereupon the same shall be immediately due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrowers;

　　iii.　enforce any and all rights against the DIP Collateral in the possession of the DIP Lender, including, without limitation, disposition of the DIP Collateral solely for application towards the Obligations;

　　iv.　immediately terminate the Debtors' use of any cash collateral;

　　v.　freeze monies or balances in the Debtors' accounts and sweep and transfer all funds in the Controlled Account to the DIP Lender;

　　vi.　immediately set-off any and all amounts in accounts maintained by the Debtors with the DIP Lender against the Obligations, or otherwise enforce any and all rights against the DIP Collateral in the possession of the DIP Lender, including, without limitation, disposition of such DIP Collateral solely for application against the Obligations; and/or

12272874v4

    vii.    take any other actions or exercise any other rights or remedies permitted under the DIP Financing Orders, the DIP Loan Documents or applicable Law to effectuate the repayment of the Obligations;

provided, however, that prior to the exercise of any right in clauses (iv), (v), (vi) or (vii) of this paragraph, the DIP Lender shall be required to provide three (3) calendar days written notice to the Borrowers and the Committee of the DIP Lender's intent to exercise its rights and remedies; provided, further, that neither the Borrowers, the Committee nor any other party-in-interest (other than the Prepetition Lender or the DIP Lender) shall have the right to contest the enforcement of the remedies set forth in the DIP Financing Orders and the DIP Loan Documents on any basis other than an assertion that an Event of Default has not occurred or has been cured within the cure periods expressly set forth in the applicable DIP Loan Documents.[2]  (DIP Loan Agreement § 9.)

## JURISDICTION AND VENUE

2.    This Court has jurisdiction over these cases and this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A).  Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409(a).

## BACKGROUND

3.    On June 6, 2018 (the "Petition Date") the Debtors each commenced voluntary cases (the "Bankruptcy Cases") under the Bankruptcy Code.

4.    The Debtors have continued in possession of their properties and have continued to operate and manage their respective businesses as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

5.    As of the date of these filings, no official committee of unsecured creditors has been appointed in these cases, and no request has been made for the appointment of a trustee or examiner.

---

[2]    The description contained in this Motion of the terms of the DIP Facility is intended as a summary of certain terms expressly stated in the DIP Loan Agreement.  The summary of the terms contained in this Motion is qualified in its entirety by the DIP Loan Agreement.  To the extent there is any discrepancy between this summary and the DIP Loan Agreement, the terms of the DIP Loan Agreement shall control.

12272874v4

6. On the Petition Date, each Debtor filed a substantially similar motion with this Court seeking to have its bankruptcy case jointly administered with the other Debtor's case pursuant to Rule 1015(b) of the Bankruptcy Rules.

7. Additional information about the Debtors' businesses and the events leading up to the commencement of the Bankruptcy Cases can be found in the Declaration of Robert Zurcher Chief Financial Officer of the Debtors and Sole Manager of LakePoint Land, LLC in Support of Chapter 11 Petitions and First-Day Orders [Docket No. 5] (the "Zurcher Declaration"), which was filed contemporaneously with this Motion, and is incorporated herein by reference.

### RELIEF REQUESTED

8. The Debtors seek authority, pursuant to Sections 105, 361, 362, 363, and 364 of the Bankruptcy Code and Bankruptcy Rules 4001(b) and (c), the entry of an interim and final order, *inter alia,* authorizing the Debtors to obtain a post-petition secured loan (the "DIP Facility") in a principal amount of up to $5 million pursuant to that certain Debtor in Possession Credit and Security Agreement (the "DIP Loan Agreement") by and between the Debtors and the DIP Lender substantially in the form attached hereto as Exhibit A.[3]

### DEBTORS' PRE-PETITION DEBT STRUCTURE AND HISTORY

9. As of the Petition Date, LakePoint Land, LLC, LakePoint Land III, LLC, LakePoint Land IV, LLC, and certain other non-debtor affiliates owed the Prepetition Lender approximately $22,401,250.00, secured by the Prepetition Collateral and all or substantially all of the assets of the non-debtor entities.

---

[3] Capitalized terms used but not defined in this Motion shall have the meanings ascribed to such terms in the DIP Loan Agreement.

12272874v4

10. The applicable Debtors are currently in default under the provisions of the Prepetition Loan Documents. The Debtors will be unable to operate their businesses in Chapter 11 without access to the Prepetition Lender's Cash Collateral and access to the DIP Facility. Given the Debtors' remaining assets and their capital and debt structure, the Debtors have been unable to identify an alternative source of funding other than the Prepetition Lender and the DIP Lender.

11. Additional information about the Debtors capital and debt structure and their secured obligations to the Prepetition Lender are set forth in the Zurcher Declaration.

## THE DEBTORS' POST-PETITION FINANCING ARRANGEMENTS

12. Without adequate post-petition financing, the Debtors will not have sufficient available sources of working capital to operate their businesses in the ordinary course for a period of time sufficient to maximize the value of their assets for the benefit of all stakeholders. The uncertainty concerning the Debtors' financial condition has curtailed the Debtors' availability of credit and acceptable credit terms. More specifically, the Debtors' ability to finance their operations and administer these bankruptcy cases is dependent on their ability to obtain the funds made available under the DIP Facility and to use the cash collateral of the Prepetition Lender.

13. The inability of the Debtors to obtain sufficient liquidity and to make payments on certain obligations on a timely basis may result in, *inter alia*, the Debtors' inability to continue the operation of their businesses and to pursue the restructuring set forth in the Restructuring Support Agreement (which is attached to and discussed in the Zurcher Declaration). If any of these events were to occur, the impact on the Debtors' bankruptcy estates could be catastrophic and would result in material harm to all of the Debtors' creditors, investors,

12272874v4

employees, and other constituents. In light of the foregoing, the Debtors have determined, in the exercise of their sound business judgment, that a post-petition credit facility, which permits the Debtors to obtain up to $5,000,000 in financing, and to use such credit to finance the operation of their businesses as they attempt to reorganize, is critical to their ongoing operations and stability during their bankruptcy process.

14. The Debtors believe that the debtor in possession financing offered by the DIP Lender presents the best option available to them and would enable the Debtors to preserve their value as a going concern. The Debtors have engaged in good-faith and extensive, arm's-length negotiations with the DIP Lender. These negotiations culminated in an agreement by the DIP Lender to provide post-petition financing on the terms and subject to the conditions set forth in the DIP Loan Agreement and the interim order substantially in the form attached to this Motion as <u>Exhibit B</u> (the "<u>Interim Order</u>"). The significant elements of the proposed DIP Facility and the Interim Order are set forth above.

## LEGAL BASES FOR REQUESTED RELIEF

**A.** **<u>The Proposed DIP Facility</u>**

15. Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under Section 503(b)(1) of the Bankruptcy Code, then the court may authorize the debtor to obtain credit or incur debt (i) with priority over any and all administrative expenses as specified in Sections 503(b) or 507(b) of the Bankruptcy Code, (ii) secured by a lien on property of the estate that is not otherwise subject to a lien, or (iii) secured by a junior lien on property of the estate that is subject to a lien. *See* 11 U.S.C. § 364(c).

16. Section 364(d)(1) of the Bankruptcy Code provides that the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt if:

> (A) the trustee is unable to obtain such credit otherwise; and
>
> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

*See* 11 U.S.C. § 364(d)(1); *see also In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[T]he court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

17. The credit provided under the DIP Facility will enable the Debtors to finance their business operations, including the ability to operate their businesses in an orderly and reasonable manner to preserve and enhance the value of their assets and enterprise for the benefit of all creditors and parties in interest. It is expected that the availability of credit under the DIP Facility will provide the Debtors with the necessary liquidity to continue their ordinary course business operations in order to maximize the return available to the Debtors' creditors in these bankruptcy cases. Finally, the implementation of the DIP Facility will be viewed favorably by the Debtors' employees, vendors, and customers and thereby permit the Debtors to continue to operate their businesses during the bankruptcy process.

### 1. **The Debtors Do Not Have An Alternative to the DIP Facility**

18. Given the Debtors' remaining assets and their capital and debt structure, the Debtors are unable to obtain unsecured credit or debt allowable as an administrative expense under Section 503(b)(1) of the Bankruptcy Code in an amount sufficient and readily available to maintain ongoing operations, nor have the Debtors been able to obtain post-petition financing

from an alternative prospective lender on more favorable terms and conditions than those for which approval is sought in this Motion.

19. A working capital facility of the type needed in these bankruptcy cases could not have been obtained on an unsecured basis. Moreover, potential sources of the proposed DIP Facility for the Debtors were at best extremely limited. It is well established that the appropriateness of a proposed post-petition financing facility must be considered in light of current market conditions. *See, e.g.*, *In re Lyondell Chem. Co.*, No. 09-10023, Transcript of Record at 734-35:24-1 (Bankr. S.D.N.Y. Mar. 5, 2009) (recognizing "the terms that are now available for DIP facilities in the current economic environment aren't as desirable" as they have been in the past); *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (noting that a debtor is not required to seek credit from every possible lender before determining such credit is available). Indeed, where there are few lenders likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct . . . an exhaustive search for financing." *See, e.g.*, *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd*, 99 B.R. 117 (N.D. Ga. 1989).

20. The Debtors have been looking for an alternative source of funding to the Prepetition Lender since at least early 2015, and have been unable to find alternative or better financing on the terms and of the type and magnitude required in these chapter 11 cases on an unsecured basis, or without offering terms substantially similar to those of the DIP Facility. The terms and conditions of the DIP Facility are fair and reasonable, and were negotiated by the parties in good faith and at arm's length. Based on this, as well as the foregoing factors, the DIP Facility is the only feasible financing option for the Debtors and is in the best interests of the Debtors' respective bankruptcy estates.

### 2. **Application of the Business Judgment Standard**

21. As described above, after appropriate investigation and analysis and given the exigencies of the circumstances, the Debtors' management has concluded that the DIP Facility is the only alternative available in the circumstances of these Chapter 11 bankruptcy cases. Bankruptcy courts routinely defer to the debtor's business judgment on most business decisions, including the decision to borrow money. *See, e.g.*, *Group of Institutional Investors v. Chicago, Mil., St. P., & Pac. R.R. Co.*, 318 U.S. 523, 550 (1943); *In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same). "More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

22. In general, a bankruptcy court should defer to a debtor's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious. *In re Curlew Valley Assocs.*, 14 B.R. 506, 511–13 (Bankr. D. Utah 1981). Courts generally will not second-guess a debtor's business decisions when those decisions involve "a business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the Code." *Id*. at 513–14 (footnotes omitted).

23. The Debtors have exercised sound business judgment in determining that a post-petition credit facility is appropriate, and have satisfied the legal prerequisites to borrow under the DIP Facility. The terms of the DIP Facility are fair and reasonable, are the result of arms-length negotiations and are in the best interests of the Debtors' bankruptcy estates. Accordingly,

the Debtors should be granted authority to enter into the DIP Facility and borrow funds from the DIP Lender on the secured, administrative superpriority basis described above, pursuant to Sections 364(c) and (d) of the Bankruptcy Code, and take the other actions contemplated by the DIP Loan Agreement and as requested in this Motion.

**3.    The DIP Facility is Necessary to Effectively Preserve the Assets of the Debtors' Estates and to Operate Their Businesses**

24.    As with most other large businesses, the Debtors have significant cash needs. Accordingly, access to substantial credit is necessary to meet the day-to-day costs associated with financing the operation of the Debtors' businesses. In the absence of access to cash and credit, the Debtors may be unable to operate their businesses or to complete the bankruptcy process. In turn, without the DIP Facility, the Debtors' prospects for a successful reorganization will be impractical and the Debtors' creditors, estates, and other parties in interest will be materially harmed.

25.    Given the Debtors' constrained liquidity, the DIP Facility is of critical importance to operating the Debtors' businesses and preserving the value of the Debtors' assets, thereby providing a greater recovery to the Debtors' creditors than would be realized if the Debtors were forced to convert their bankruptcy cases to chapter 7 cases – which would invariably result in the Prepetition Lender exercising its rights and remedies under applicable non-bankruptcy law. Accordingly, the Debtors submit that the availability of post-petition credit under the DIP Facility is necessary to preserve and enhance the value of their bankruptcy estates for the benefit of all stakeholders in these chapter 11 bankruptcy cases.

12272874v4

### 4. Adequate Protection

26. Section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of post-petition debt secured by senior or "priming" liens, provides that the Court may, after notice and a hearing:

> authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if–
>
> (A) the trustee is unable to obtain credit otherwise; and
>
> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

*See* 11 U.S.C. § 364(d)(1).

27. The determination of adequate protection is a fact-specific inquiry to be decided on a case-by-case basis. *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996). "Its application is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process." *Id.* (quoting *In re Beker Indus. Corp.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986)). Examples of adequate protection are provided for in section 361 of the Bankruptcy Code and include, but are not limited to: (i) making a cash payment or periodic cash payments to a secured creditor to the extent that the estate's use of property will result in a decrease in the value of such creditor's interest in the property; (ii) provisions for an additional or replacement lien to the extent that the use of such property will cause a decrease in the value of such entity's interest in the property; and (iii) granting such other relief as will result in the realization by the creditor of the indubitable equivalent of such creditor's interest in the property. *See In re C.G. Chartier Constr., Inc.*, 126 B.R. 956, 960 (E.D. La. 1991).

28. In accordance with Section 364(d), and consistent with the purposes underlying the provision of adequate protection, the proposed Interim Order provides that adequate protection will be provided to the Prepetition Lender in connection with the Prepetition Liens to the extent of any diminution in value of their Prepetition Collateral, as follows: (1) replacement liens on all assets of the Debtors' estates, immediately junior to the DIP Liens, the Carve-Out, and the Prior Permitted Liens; and (2) a superpriority claim, junior only to the DIP Obligations, the Superpriority DIP Claim, the Carve-Out and, with respect to the DIP Collateral, any validly perfected secured claim, and be payable from and have recourse to all assets and property of the Debtors. As further adequate protection for the Prepetition Lenders, the Debtors shall pay all reasonable and documented (in summary form) out-of-pocket fees, costs and expenses of the Prepetition Lender (including all reasonable fees, costs, disbursements, and expenses of its outside counsel, King & Spalding LLP, and financial advisor, GlassRatner Advisory & Capital Group LLC). The Debtors also shall provide the Prepetition Lender with access to the Debtors' books and records and such financial reports as are provided to the DIP Lender pursuant to Section 8(g) of the DIP Loan Agreement. In addition, the Prepetition Lender has consented to the proposed priming liens.

**5.** **The Terms of the DIP Facility Are Fair, Reasonable, and Appropriate**

29. The proposed terms of the DIP Facility are fair, reasonable, and adequate in that its terms neither (a) tilt the conduct of these cases and prejudice the powers and rights that the Bankruptcy Code confers for the benefit of all creditors, nor (b) prevent motions by parties in interest from being decided on their merits. The purpose of the DIP Facility is to enable the Debtors to meet their ongoing operational expenses and allowed Chapter 11 administrative

Document      Page 16 of 20

bankruptcy expenses, thereby enabling the Debtors to maximize the return available to all of the Debtors' creditors and stakeholders, including employees.

30. The proposed DIP Facility provides that the security interests granted to the DIP Lender are subject to the Carve-Out. Bankruptcy courts generally find that such "carve-outs" are not only reasonable, but are necessary to insure that official committees and the debtor's estate will be assured of the assistance of counsel. *See, e.g.*, *In Ames Dep't Stores, Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990).

31. The DIP Loan Agreement and the DIP Facility should be approved pursuant to Section 364(e) of the Bankruptcy Code. Section 364(e) was designed to "encourage the extension of credit to debtors" by allowing lenders to "rely on a bankruptcy court's authorization of the transaction." *See In re EDC Holding Co.*, 676 F.2d 945, 947 (7th Cir. 1982) (the purpose of section 364(e) is "to overcome people's natural reluctance to deal with a bankrupt firm whether as purchaser or lender by assuring them that so long as they are relying in good faith on a bankruptcy judge's approval of the transaction that they need not worry about their priority merely because some creditor is objecting to the transaction and is trying to get the district court or the court of appeals to reverse the bankruptcy judge."); *see also In re North Atlantic Millwork Corp.*, 155 B.R. 271, 279 (Bankr. Mass. 1993) ("The purpose of section 364(e) is to allow good-faith lenders to rely upon conditions as the time they extend credit and to encourage lenders to lend to bankrupt entities.").

32. The DIP Loan Agreement was the result of good faith and arm's length negotiations, with all parties represented by counsel. As set forth above, the Debtors believe that the terms of the DIP Loan Agreement are fair and reasonable under the circumstances, and that

the DIP Lender is entitled to the benefits and protections of Section 364(e) of the Bankruptcy Code.

### 6. Request for Modification of Automatic Stay

33. As set forth more fully in the proposed Interim Order, the proposed DIP Loan Agreement contemplates a modification of the automatic stay established pursuant to Section 362 of the Bankruptcy Code to permit the DIP Lender to take certain actions required or permitted by the Interim Order. More specifically, the Interim Order provides the DIP Lender with relief from the automatic stay upon the occurrence of specified events of default, and after the Debtors' failure to cure or contest same successfully, to allow the DIP Lender, *inter alia*, to enforce the remedies available to it under the DIP Loan Agreement. The Interim Order provides that prior to the exercise of certain rights, the DIP Lender shall be required to provide three (3) calendar days written notice to the Borrowers and the Committee of the DIP Lender's intent to exercise its rights and remedies; provided, further, that neither the Borrowers, the Committee nor any other party-in-interest (other than the Prepetition Lender or the DIP Lender) shall have the right to contest the enforcement of the remedies set forth in the Interim Order or the Final Order and the DIP Loan Documents on any basis other than an assertion that an Event of Default has not occurred or has been cured within the cure periods expressly set forth in the applicable DIP Loan Documents.

34. Stay modification provisions of the sort requested in this Motion are ordinary and usual features of post-petition debtor-in-possession financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances. Accordingly, the Court should modify the automatic stay to the extent contemplated by the DIP Loan Agreement and the Interim Order.

**B.**     **Cash Collateral**

35.     The Debtors seek to use cash collateral of the Prepetition Lender commencing immediately following the entry of the Interim Order. The cash collateral will be used by the Debtors to the extent necessary to meet their working capital needs and only as set forth in the Approved Budget (defined below).

36.     Section 363(c)(2) of the Bankruptcy Code provides that a debtor may not use, sell, or lease cash collateral unless: "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." *See* 11 U.S.C. § 363(c)(2).

37.     Additionally, Section 363(e) of the Bankruptcy Code provides that "on request of an entity that has an interest in property. . . proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale or lease as is necessary to provide adequate protection of such interest." *See* 11 U.S.C. § 363(e).

38.     In addition to the approval of the DIP Facility, the Debtors are also requesting authority to use the full amount of the cash collateral, for the purposes and amounts set forth in the agreed-upon budget, which is attached to this Motion as Exhibit C (the "Approved Budget").

39.     For the foregoing reasons, the Debtors believe that granting the relief requested in this Motion is appropriate and in the best interests of their bankruptcy estates.

40.     To the extent the fourteen (14) day stay of Rule 6004(h) of the Bankruptcy Rules may be construed to apply to the subject matter of this Motion, the Debtors request that such stay be waived.

12272874v4

## NOTICE

41. Notice of this Motion has been given to the following parties, or in lieu thereof, to their counsel: (a) the Office of the United States Trustee for Northern District of Georgia; (b) counsel for Rimrock High Income Plus (Master) Fund, LTD, the Debtors' prepetition senior secured creditor; (c) counsel for the DIP Lender; (d) the Debtors' twenty (20) largest unsecured creditors on a consolidated basis; (e) all applicable tax authorities; and (f) all other parties required to receive service under Rule 2002 of the Bankruptcy Rules. In light of the nature of the relief requested, the Debtors respectfully submit that no further notice is necessary.

## CONCLUSION

WHEREFORE, the Debtors respectfully request that the Court:

(a)     grant the Motion;

(b)     enter the Interim Order substantially in the form attached hereto as <u>Exhibit B</u>; and

(c)     grant the Debtors such other and further relief as is just and proper.

Respectfully submitted this 11th day of June, 2018.

        ARNALL GOLDEN GREGORY LLP

        /s/ Sean C. Kulka
        Sean C. Kulka
        Georgia Bar No. 648919
        Darryl S. Laddin
        Georgia Bar No. 460793
        Michael F. Holbein
        Georgia Bar No. 360070
        171 17th Street, N.W., Suite 2100
        Atlanta, Georgia 30363-1031
        Phone: (404) 873-8500
        Fax: (404) 873-8683
        Email: sean.kulka@agg.com

        *Proposed Attorneys for Debtors and Debtors in Possession*

12272874v4