This is not a solicitation of votes to accept or reject the Plan in accordance with section 1125 of the Bankruptcy Code and within the meaning of section 1126 of the Bankruptcy Code. 11 U.S.C. §§ 1125, 1126.  This Disclosure Statement is being submitted for approval but has not been approved by the Bankruptcy Court.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ROME DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| **LAKEPOINT LAND, LLC,** | ) | **Case No. 18-41337-bem** |
| **LAKEPOINT LAND III, LLC,** | ) | |
| **LAKEPOINT LAND IV, LLC,** | ) | **Jointly Administered** |
| **LAKEPOINT SERVICES, LLC,** | ) | |
| **LAKEPOINT SPORTS SOUTH, LLC,** | ) | |
| **LP HOUSING LLC,** | ) | |
| **LAKEPOINT  HOSPITALITY, LLC, and** | ) | |
| **LAKEPOINT MERCHANDISE, LLC,** | ) | |
| | ) | |
| Debtors. | ) | |
| | ) | |

**DISCLOSURE STATEMENT FOR**
**JOINT CHAPTER 11 PLAN OF REORGANIZATION**
**OF LAKEPOINT LAND, LLC AND ITS AFFILIATED DEBTORS**

**DATED JULY 31, 2018**

**ARNALL GOLDEN GREGORY LLP**

/s/ Sean C. Kulka
Sean C. Kulka
Georgia Bar No. 648919
Michael F. Holbein
Georgia Bar No. 360070
171 17th Street, N.W., Suite 2100
Atlanta, Georgia 30363-1031
Phone: (404) 873-8500
Fax: (404) 873-8683
Email: sean.kulka@agg.com

*Attorneys for Debtors and*
*Debtors in Possession*

12491187v1

THE VOTING DEADLINE TO ACCEPT OR REJECT THE JOINT CHAPTER 11 PLAN OF REORGANIZATION OF LAKEPOINT LAND, LLC AND ITS AFFILIATED DEBTORS (THE "PLAN") IS 5:00 P.M., PREVAILING EASTERN TIME, ON OCTOBER 5, 2018, UNLESS EXTENDED BY THE DEBTORS.  THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS OR INTERESTS MAY VOTE ON THE PLAN IS AUGUST 31, 2018 (THE "VOTING RECORD DATE").

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE AND SHOULD CONSULT WITH THEIR OWN ADVISORS BEFORE VOTING ON THE PLAN.

THE ISSUANCE AND THE DISTRIBUTION UNDER THE PLAN OF THE NEW MEMBERSHIP INTERESTS WILL BE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT") AND ANY OTHER APPLICABLE SECURITIES LAWS PURSUANT TO SECTION 1145 OF THE BANKRUPTCY CODE.

THE NEW MEMBERSHIP INTERESTS TO BE ISSUED ON THE EFFECTIVE DATE HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC, GOVERNMENTAL, OR REGULATORY AUTHORITY, AND NEITHER THE SEC NOR ANY SUCH AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.  ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING STATEMENTS INCORPORATED BY REFERENCE, PROJECTED FINANCIAL INFORMATION, AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS.  CERTAIN OF THESE FORWARD-LOOKING STATEMENTS CAN BE IDENTIFIED BY THE USE OF WORDS SUCH AS "BELIEVES," "EXPECTS," "PROJECTS," "INTENDS," "PLANS," "ESTIMATES," "ASSUMES," "MAY," "SHOULD," "WILL," "SEEKS," "ANTICIPATES," "OPPORTUNITY," "PRO FORMA," "PROJECTIONS," OR OTHER SIMILAR EXPRESSIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS HEREIN ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE, BUT ARE SUBJECT TO A WIDE RANGE OF RISKS IDENTIFIED IN THIS DISCLOSURE STATEMENT.  IMPORTANT ASSUMPTIONS AND OTHER IMPORTANT FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY FROM THOSE EXPECTED INCLUDE, BUT ARE NOT LIMITED TO, THOSE FACTORS, RISKS, AND UNCERTAINTIES DESCRIBED IN MORE DETAIL UNDER THE HEADING "RISK FACTORS" AND ELSEWHERE IN THE ANNUAL AND QUARTERLY REPORTS OF THE COMPANY (AS DEFINED BELOW), INCLUDING AMENDMENTS THERETO.      DUE TO THESE

UNCERTAINTIES, READERS CANNOT BE ASSURED THAT ANY FORWARD-LOOKING STATEMENTS WILL PROVE TO BE CORRECT.  THE DEBTORS ARE UNDER NO OBLIGATION TO (AND EXPRESSLY DISCLAIM ANY OBLIGATION TO) UPDATE OR ALTER ANY FORWARD-LOOKING STATEMENTS WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.

HOLDERS OF ALLOWED GENERAL UNSECURED CLAIMS ARE NOT IMPAIRED BY THE PLAN AND, AS A RESULT, THEIR RIGHT TO RECEIVE PAYMENT IN FULL OR BE TREATED IN THE ORDINARY COURSE ON ACCOUNT OF VALID OBLIGATIONS IS NOT ALTERED BY THE PLAN.

NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE FINANCIAL PROJECTIONS OR THE LIQUIDATION ANALYSIS HEREIN.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED.  THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN OR IN CONNECTION WITH CONFIRMATION OF THE PLAN.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PARTY FOR ANY OTHER PURPOSE.

ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................................... 1

II. OVERVIEW OF THE COMPANY'S OPERATIONS ........................................... 9
    A.    FORMATION AND BUSINESS ................................................................ 9
    B.    PREPETITION CAPITAL STRUCTURE ............................................... 14
    C.    EVENTS LEADING TO AND CIRCUMSTANCES SURROUNDING THE
         CHAPTER 11 FILING ............................................................................. 17

III. SIGNIFICANT DEVELOPMENTS IN THE CHAPTER 11 CASES ................... 23
    A.    "FIRST DAY" ORDERS AND RETENTION OF PROFESSIONALS ............. 23
    B.    APPOINTMENT OF COMMITTEE ....................................................... 23
    C.    DEBTOR-IN-POSSESSION FINANCING ............................................ 23
    D.    SCHEDULES AND CLAIMS BAR DATE ............................................ 23

IV. SUMMARY OF THE PLAN ................................................................................. 23
    A.    ADMINISTRATIVE EXPENSE AND PRIORITY TAX CLAIMS ................... 24
    B.    CLASSIFICATION OF CLAIMS AND INTERESTS ............................ 25
    C.    TREATMENT OF CLAIMS AND INTERESTS .................................... 26
    D.    MEANS FOR IMPLEMENTATION ...................................................... 32
    E.    DISTRIBUTIONS ................................................................................... 38
    F.    PROCEDURES FOR DISPUTED CLAIMS .......................................... 42
    G.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES ................. 43
    H.    CONDITIONS PRECEDENT TO CONFIRMATION OF PLAN AND
         EFFECTIVE DATE ................................................................................ 44
    I.    EFFECT OF CONFIRMATION .............................................................. 47
    J.    RETENTION OF JURISDICTION ......................................................... 51
    K.    MISCELLANEOUS PROVISIONS ....................................................... 53

V. FINANCIAL INFORMATION AND PROJECTIONS ......................................... 58

VI. VALUATION ANALYSIS ................................................................................... 60

VII. TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL
     SECURITIES LAW .................................................................................... 61

VIII. UNITED STATES FEDERAL INCOME TAX CONSEQUENCES ................... 62

IX. CERTAIN RISK FACTORS TO BE CONSIDERED .......................................... 62
    A.    CERTAIN BANKRUPTCY LAW CONSIDERATIONS ...................... 62
    B.    FACTORS RELATING TO SECURITIES TO BE ISSUED UNDER PLAN
         GENERALLY .......................................................................................... 64
    C.    ADDITIONAL FACTORS ...................................................................... 65

X. VOTING PROCEDURES AND REQUIREMENTS ............................................ 65
    A.    VOTING INSTRUCTIONS AND VOTING DEADLINE ................... 65
    B.    PARTIES ENTITLED TO VOTE .......................................................... 67
    C.    AGREEMENTS UPON FURNISHING BALLOTS .............................. 67
    D.    CHANGE OF VOTE .............................................................................. 67
    E.    WAIVERS OF DEFECTS, IRREGULARITIES, ETC. .......................... 67
    F.    MISCELLANEOUS ............................................................................... 68

XI. CONFIRMATION OF PLAN ............................................................................68

    A.    CONFIRMATION HEARING .............................................................68
    B.    OBJECTIONS TO CONFIRMATION .................................................68
    C.    REQUIREMENTS FOR CONFIRMATION OF PLAN.......................70

XII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN..............73

    A.    ALTERNATIVE PLAN OF REORGANIZATION...............................73
    B.    SALE UNDER SECTION 363 OF BANKRUPTCY CODE............................73
    C.    LIQUIDATION UNDER CHAPTER 7 OR APPLICABLE NON-
        BANKRUPTCY LAW ......................................................................74

XIII. CONCLUSION AND RECOMMENDATION.................................................................74

**EXHIBIT A: Plan**
**EXHIBIT B: Restructuring Support Agreement**
**EXHIBIT C: Legal Descriptions**
**EXHIBIT D: Financial Projections**
**EXHIBIT E: Liquidation Analysis**

# I.
## INTRODUCTION

LakePoint Land, LLC ("LPL"), LakePoint Land III, LLC ("LPL III"), LakePoint Land IV, LLC ("LPL IV"), LakePoint Services, LLC ("LP Services"), LakePoint Sports South, LLC ("LP Sports"), LP Housing LLC ("LP Housing"), LakePoint Hospitality, LLC ("LP Hospitality"), and LakePoint Merchandise, LLC ("LP Merchandise"), the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors" or the "Company"), hereby submit this Disclosure Statement pursuant to section 1125(b) of the Bankruptcy Code and Rule 3017 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), in connection with the Plan, which was filed by the Debtors on July 31, 2018. A copy of the Plan is attached hereto as Exhibit A.[1]  All capitalized terms used but not defined in this Disclosure Statement shall have the respective meanings ascribed to such terms in the Plan, unless otherwise noted.  In the event of any inconsistency between this Disclosure Statement and the Plan, the terms of the Plan shall govern and control.

After extensive arms-length negotiations, on May 21, 2018, the Debtors executed a restructuring support agreement (the "Restructuring Support Agreement", a copy of which is attached hereto as Exhibit B) with Rimrock High Income Plus (Master) Fund, LTD ("Rimrock" or "Prepetition Lender"), LP Investments I, LLC ("Rimrock Investor"), LakePoint Investors, LLC ("LPI"), LakePoint Sports Development Group, LLC ("LSDG"), certain holders of the Preferred Membership Interests, the holder of 100% of the Affiliate Notes, the holders of 100% of the Executive Compensation Claims, and holders of 94% in amount and more that 85% in number of the MOU Claims.  Under the terms of the Restructuring Support Agreement, the parties agreed to a restructuring of the obligations and ownership of the Debtors to be implemented through a joint chapter 11 plan of reorganization for the Debtors on the terms and conditions set forth in the plan term sheet attached as Exhibit A to the Restructuring Support Agreement.

The Plan is structured as a joint plan.  Notwithstanding the combination of separate plans of reorganization for the Debtors that are set forth in the Plan for purposes of economy and efficiency, the Plan constitutes a separate chapter 11 plan for each Debtor.

The Plan classifies all Claims against and Interests in the Debtors into eleven (11) separate Classes.  As described more fully below, the Plan generally provides for the following:

- The formation of New HoldCo, which will hold 100% of the equity interests in Reorganized LPL upon the Effective Date.

- On the Effective Date (or as soon as reasonably practicable thereafter), in exchange for the complete settlement, release, discharge, cancellation (as applicable), and extinguishment (as applicable) of the Prepetition Lender Claims, the Affiliate Note Claims, the MOU Claims, the Executive Compensation Claims, the Preferred Membership Interests, and Common Member Interests, the holders of such Claims and Interests will receive New Membership Units issued by New HoldCo.

- The cancellation, extinguishment, and discharge of the Rimrock Investor Membership Interests in LPL.

- Intercompany Claims are unimpaired and shall be (i) reinstated, in full or in part, and treated in the ordinary course of business, or (ii) cancelled and discharged, as determined by the Debtors with the consent of the Prepetition Lender.

---

[1]     All capitalized terms not defined herein shall have the meaning ascribed to such term in the Plan.

- All Other Secured Claims, Other Priority Claims, and General Unsecured Claims are unimpaired by the Plan and will be satisfied in full.

- Contribution by Rimrock Investor of the Exit Equity Contribution.

- Entry by the Reorganized Debtors into the Exit Facility.

Accomplishing an efficient resolution of the restructuring and the Chapter 11 Cases is essential to maximizing value and successfully reorganizing the Company.  Under the Restructuring Support Agreement, the Debtors are obligated to meet certain milestones.  Specifically, the Restructuring Support Agreement may be terminated by certain of the parties thereto if, among other things, the Debtors fail to satisfy the following milestones:

| Milestone | Deadline |
|---|---|
| Commence Solicitation | August 31, 2018 |
| Confirmation Hearing | October 12, 2018 |
| Entry of Confirmation Order | October 15, 2018 |
| Effective Date | October 29, 2018 |

> **THE DEBTORS URGE ALL HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT THE PLAN. THE DEBTORS BELIEVE THAT THE PLAN PROVIDES THE HIGHEST AND BEST RECOVERY FOR ALL STAKEHOLDERS.**

**Summary of Plan Classification and Treatment of Claims and Interests**

Under the Bankruptcy Code, only holders of claims or interests in "impaired" Classes are entitled to vote on the Plan (unless, for reasons discussed in more detail below, such holders are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code).  Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

Holders of Claims and Interests in the following Classes are being solicited and entitled to vote on the Plan:

> Prepetition Lender Claims
> Affiliate Note Claims
> MOU Claims

> Executive Compensation Claims
> Preferred Member Interests
> Common Member Interests

The following table summarizes (i) the treatment of Claims and Interests under the Plan, (ii) which Classes are impaired by the Plan, (iii) which Classes are entitled to vote on the Plan, and (iv) the estimated recoveries for holders of Claims and Interests. The table is qualified in its entirety by reference to the full text of the Plan. For a more detailed summary of the terms and provisions of the Plan, see Section IV (Summary of the Plan) below. A detailed discussion of the analysis underlying the estimated recoveries, including the assumptions underlying such analysis, is set forth in the Valuation Analysis in Section VI hereof.

| Class | Description | Class Treatment | Class Status | Class Voting Rights | Estimated Percentage Recovery |
|---|---|---|---|---|---|
| 1 | Other Secured Claims | Shall receive (i) reinstatement of its Allowed Other Secured Claim in accordance with section 1124(2) of the Bankruptcy Code (including any cash necessary to satisfy the requirements for reinstatement), such that such claim is rendered unimpaired; (ii) either (A) cash in the full amount of such Allowed Other Secured Claim, including any postpetition interest accrued pursuant to section 506(b) of the Bankruptcy Code, (B) the proceeds of the sale or disposition of the collateral securing such Allowed Other Secured Claim, to the extent of the value of such holder's secured interest in such collateral, (C) the collateral securing such Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, or (D) such other distribution as necessary to satisfy the requirements of section 1129 of the Bankruptcy Code; or (iii) such other treatment as mutually may be agreed to by and among such holder and the Debtors or the Reorganized Debtors. Any cure amount that the Debtors may be required to pay pursuant to section 1124(2) of the Bankruptcy Code on account of any such reinstated Other Secured Claim shall be paid on, or as soon as practicable after, the latest of (x) the Effective Date, (y) the date on which such Other Secured Claim becomes Allowed, or (z) such other date as mutually may be agreed to by and among such holder and the Debtors or the Reorganized Debtors as applicable. Any distributions due pursuant to clause (ii) above shall be made either on, or as soon as practicable after, the latest of (I) the Effective Date, (II) the date on which such Other Secured Claim becomes Allowed, (III) the date on which such Other Secured Claim becomes due and payable, and (IV) such other date as mutually may be agreed to by such holder and the Debtors or the Reorganized Debtors as applicable. | Unimpaired | Deemed to accept Plan; not entitled to vote | 100% |

| Class | Description | Class Treatment | Class Status | Class Voting Rights | Estimated Percentage Recovery |
|-------|-------------|-----------------|--------------|---------------------|-------------------------------|
| 2 | Other Priority Claims | Shall receive (i) reinstatement of its Allowed Other Priority Claim in accordance with section 1124(2) of the Bankruptcy Code (including any cash necessary to satisfy the requirements for reinstatement), such that such Claim is rendered Unimpaired or (ii) such other treatment as mutually may be agreed to by and among such holder and the Debtors (with the consent of the Prepetition Lender) or the Reorganized Debtors as applicable. Any cure amount that the Debtors may be required to pay pursuant to section 1124(2) of the Bankruptcy Code on account of any such reinstated Other Priority Claim shall be paid on, or as soon as practicable after, the latest of (w) the Effective Date, (x) the date on which such Other Priority Claim becomes Allowed, (y) the date on which such Other Priority Claim otherwise is due and payable, and (z) such other date as mutually may be agreed to by and among such holder and the Debtors or the Reorganized Debtors as applicable. | Unimpaired | Deemed to accept Plan; not entitled to vote | 100% |

| Class | Description | Class Treatment | Class Status | Class Voting Rights | Estimated Percentage Recovery |
|---|---|---|---|---|---|
| 3 | Prepetition Lender Claims | The Prepetition Lender (or its designee) shall receive Class A Membership Units, Class B-1 Membership Units, and Class B-2 Membership Units issued by New HoldCo.<br><br>The number of Class A Membership Units issued to the Prepetition Lender (or its designee) shall be based on a capital contribution to New HoldCo equal to $4,552,000 (based on a pre-money valuation of New HoldCo equal to $50 million). The Class A Membership Units issued to the Prepetition Lender (or its designee) shall constitute 100% of the Class A Membership Units issued as of the Effective Date. The holders of Class A Membership Units shall be entitled to a return of capital and other distributions in accordance with the terms and priorities set forth in the Waterfall.<br><br>The number of Class B-1 Membership Units issued to the Prepetition Lender (or its designee) shall be based on a capital contribution to New HoldCo equal to $60,000,000. Together with the Class B-1 Membership Units issued to the DIP Lender (or its designee) in satisfaction of the obligations under the DIP Facility, the Class B-1 Membership Units issued to the Prepetition Lender (or its designee) shall constitute 100% of the Class B-1 Membership Units issued as of the Effective Date. The holders of Class B-1 Membership Units shall be entitled to a return on capital, a return of capital, and other distributions in accordance with the terms and priorities set forth in the Waterfall.<br><br>The number of Class B-2 Membership Units issued to the Prepetition Lender (or its designee) shall be based on a capital contribution to New HoldCo equal to $10,000,000, and shall represent 100% of the Class B-2 Membership Units issued as of the Effective Date. The holders of Class B-2 Membership Units shall be entitled to a return of capital and other distributions in accordance with the terms and priorities set forth in the Waterfall. | Impaired | Yes | Undetermined Equity Return |

| Class | Description | Class Treatment | Class Status | Class Voting Rights | Estimated Percentage Recovery |
|-------|-------------|-----------------|--------------|---------------------|-------------------------------|
| 4 | General Unsecured Claims | Shall receive (i) reinstatement pursuant to section 1124(2) of the Bankruptcy Code (including any Cash necessary to satisfy the requirements for reinstatement), such that such Claim is rendered unimpaired, (ii) payment in full in Cash on, or as soon as practicable after, the latest of (A) the Effective Date, (B) the date on which such General Unsecured Claim becomes Allowed, (C) the date on which such General Unsecured Claim otherwise is due and payable, and (D) such other date as mutually may be agreed to by and among such holder and the Debtors, or (iii) such other treatment as mutually may be agreed to by and among such holder and the Debtors or the Reorganized Debtors as applicable. Any cure amount that the Debtors may be required to pay pursuant to section 1124(2) of the Bankruptcy Code on account of any such reinstated General Unsecured Claim shall be paid on, or as soon as practicable after, the latest of (w) the Effective Date, (x) the date on which such General Unsecured Claim becomes Allowed, (y) the date on which such General Unsecured Claim otherwise is due and payable, and (z) such other date as mutually may be agreed to by and among such holder and the Debtors or the Reorganized Debtors as applicable. | Unimpaired | Deemed to accept Plan; not entitled to vote | 100% |
| 5 | Affiliate Note Claims | Each holder of an Allowed Affiliate Note Claim will receive Class E Membership Units issued by New HoldCo.  Each holder of an Allowed Affiliate Note Claim shall receive a number of Class E Membership Units based on a capital contribution to New HoldCo equal to the Allowed outstanding principal amount of the Affiliate Notes held by such holder as of the Effective Date, adjusted to reflect the Membership Interest of LSDG as discussed in Class 10 of the Plan and as set forth in the Waterfall.  The holders of Class E Membership Units shall be entitled to a return on capital (including interest accrued on the Affiliate Notes as of the Effective Date), a return of capital, and other distributions in accordance with the terms and priorities set forth in the Waterfall. | Impaired | Yes | Undetermined Equity Return |
| 6 | MOU Claims | Each holder of an Allowed MOU Claim will receive Class F Membership Units issued by New HoldCo.  Each holder of an Allowed MOU Claim shall receive a number of Class F Membership Units based on a capital contribution to New HoldCo equal to the Allowed principal amount of such holder's Claim against the Debtors as of the Effective Date pursuant to the terminated MOU to which such holder is a counterparty, adjusted to reflect the Membership Interest of LSDG as discussed in Class 10 of the Plan and as set forth in the Waterfall.  The holders of Class F Membership Units shall be entitled to a return on capital, a return of capital, and other distributions in accordance with the terms and priorities set forth in the Waterfall. | Impaired | Yes | Undetermined Equity Return |

| Class | Description | Class Treatment | Class Status | Class Voting Rights | Estimated Percentage Recovery |
|---|---|---|---|---|---|
| 7 | Executive Compensation Claims | Each holder of an Allowed Executive Compensation Claim will receive Class F Membership Units issued by New HoldCo.  Unless otherwise specifically assumed by the Debtors in accordance with the terms of the Plan, all executive employment agreements will be rejected by the Debtors prior to or in connection with the occurrence of the Effective Date.  Notwithstanding the rejection of any employment agreement by the Debtors, any and all provisions thereof running in favor of the Debtors (including, without limitation, any non-compete, non-solicit or confidentiality provisions) that would otherwise survive a termination of such agreement by the Debtors shall continue to be binding on the employee after the Effective Date (and shall not be released pursuant to Section 10.4(a) of the Plan). Each holder of an Allowed Executive Compensation Claim shall receive a number of Class F Membership Units based on a capital contribution to New HoldCo equal to the Allowed amount of deferred compensation owed to such holder by the Debtors as of the Effective Date, adjusted to reflect the Membership Interest of LSDG as discussed in Class 10 of the Plan and as set forth in the Waterfall.  The holders of Class F Membership Units shall be entitled to a return on capital, a return of capital, and other distributions in accordance with the terms and priorities set forth in the Waterfall. | Impaired | Yes | Undetermined Equity Return |
| 8 | Intercompany Claims | Each Intercompany Claim shall, on the Effective Date, (i) be reinstated, in full or in part, and treated in the ordinary course of business or (ii) be cancelled and discharged, as determined by the Debtors, with the consent of the Prepetition Lender.    Holders of Intercompany Claims shall not receive or retain any property on account of such Intercompany Claim to the extent that such Intercompany Claim is cancelled and discharged. | Unimpaired | No | 100% |
| 9 | Preferred Member Interests | Each holder of a Preferred Member Interest will receive Class C Membership Units issued by New HoldCo. Each holder of an Allowed Preferred Member Interest shall receive a number of Class C Membership Units based on a capital contribution to New HoldCo equal to the principal amount of the capital account held by such holder against LPL on account of its Allowed Preferred Member Interest as of the Effective Date, adjusted to reflect the Membership Interest of LSDG as discussed in Class 10 of the Plan and as set forth in the Waterfall.  The holders of Class C Membership Units shall be entitled to a return on capital (including preferred returns accrued on the Preferred Member Interests as of the Effective Date), a return of capital, and other distributions in accordance with the terms and priorities set forth in the Waterfall. | Impaired | Yes | Undetermined Equity Return |

| Class | Description | Class Treatment | Class Status | Class Voting Rights | Estimated Percentage Recovery |
|---|---|---|---|---|---|
| 10 | Common Member Interests | (i) LPI, as a holder of Allowed Common Member Interests with respect to additional capital contributions made in 2015, shall receive Class D-1A Membership Units issued by New HoldCo, (ii) LPI, as a holder of Allowed Common Membership Interests with respect to original capital contributions made in 2011 through 2013, shall receive Class D-1B Membership Units issues by New HoldCo, and (iii) LSDG, as a holder of Allowed Common Member Interests, will receive Class D-2 Membership Units issued by New HoldCo. For the sake of clarity, LPI and LSDG are receiving different tranches of Class D units as a matter of administrative convenience due to the fact that LPI has paid in capital with respect to its Common Member Interests (which is entitled to priority as set forth in the Waterfall) and LSDG did not make any capital contributions.

LPI, as holder of an Allowed Common Member Interest shall receive a number of Class D-1A Membership Units based on a capital contribution to New HoldCo equal to the principal amount of the capital account held by such holder against LPL on account of its Allowed Common Member Interest as of the Effective Date with respect to additional capital contributions made in 2015, adjusted to reflect the Membership Interest of LSDG as discussed below and as set forth in the Waterfall. The holders of Class D-1A Membership Units shall be entitled to a return on capital (including preferred returns accrued on the Common Member Interests as of the Effective Date), a return of capital and other distributions in accordance with the terms and priorities set forth in the Waterfall (with it being understood that only holders of Class D-1A and D-1B Membership Units will have capital accounts on the Effective Date).

LPI, as holder of an Allowed Common Member Interest shall receive a number of Class D-1B Membership Units based on a capital contribution to New HoldCo equal to the principal amount of the capital account held by such holder against LPL on account of its Allowed Common Member Interest as of the Effective Date with respect to the original capital contributions made in 2011 through 2013, adjusted to reflect the Membership Interest of LSDG as discussed below and as set forth in the Waterfall. The holders of Class D-1B Membership Units shall be entitled to a return on capital (including preferred returns accrued on the Common Member Interests as of the Effective Date), a return of capital, and other distributions in accordance with the terms and priorities set forth in the Waterfall (with it being understood that only holders of Class D-1A Membership Units and Class D-1B Membership Units will have capital accounts on the Effective Date).

LSDG, as holder of an Allowed Common Member Interest shall receive a number of Class D-2 Membership Units proportional to the number of D-1A Membership Units and D-1B Membership Units received by LPI, determined by dividing the capital account of LPI by 51.5825% (percentage of LPI's Existing Ownership of LPL) and multiplying the result by 25.6361% (percentage of LSDG's Existing Ownership of LPL). The holders of Class D-2 Membership Units shall be entitled to distributions in accordance with the terms and priorities set forth in the | Impaired | Yes | Undetermined Equity Return |

| Class | Description | Class Treatment | Class Status | Class Voting Rights | Estimated Percentage Recovery |
|---|---|---|---|---|---|
| 11 | Rimrock Investor Member Interests | The Rimrock Investor Member Interests shall be cancelled, extinguished, and discharged, and Rimrock Investor shall not receive or retain any property or interest on account of such interest of capital and other distributions in accordance with the terms and priorities set forth in the Waterfall. | Impaired | Deemed to reject Plan; not entitled to vote | 0% |

Pursuant to section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims (including Professional Fee Claims and DIP Facility Claims) and Tax Claims against the Debtors are not classified for purposes of voting on, or receiving Distributions under, the Plan. Holders of such Claims are not entitled to vote on the Plan. All such Claims are instead treated separately in accordance with Article II of the Plan and in accordance with the requirements set forth in sections 1129(a)(9)(A) and (C) of the Bankruptcy Code. A more complete description of the treatment of Administrative Expense Claims and Tax Claims is set forth in Article II of the Plan and Section IV.A of this Disclosure Statement.

**II.**
**OVERVIEW OF THE COMPANY'S OPERATIONS**

**A.     FORMATION AND BUSINESS**

    **1.   LakePoint Land, LLC**

LPL, a Georgia limited liability company, was formed on December 14, 2010, by the filing of Articles of Organization with the Georgia Secretary of State. On August 16, 2011, LSDG,[2] and LPI, a Georgia limited liability company,[3] entered into that certain Operating Agreement of LakePoint Land, LLC

---

[2]     LSDG, a Georgia limited liability company, who was formed on December 27, 2010, by a filing of Articles of Organization with the Secretary of State of Georgia. LSDG was formed to be the Managing Member of LPL. As of August 16, 2011, LSDG entered in that certain Operating Agreement of LakePoint Land, LLC, as a member and manager thereof. Also as of August 16, 2011, the members of LSDG entered into that certain Operating Agreement of LakePoint Sports Development Group, LLC, dated August 16, 2011 (the "LSDG Operating Agreement"). Pursuant to the LSDG Operating Agreement LSDG had five (5) members and two (2) managers. Pursuant to Section 5.1.1.1 of the LSDG Operating Agreement one (1) of such LSDG managers was to be appointed by Consortium Realty Advisors II, LLC (the "Consortium Manager"), and one (1) of such LSDG managers was to be appointed by Sport Parks of Georgia, LLC (the "Sports Park Manager"). Mr. W. Neal Freeman, a resident of the State of Georgia ("Mr. N. Freeman"), was appointed as the Consortium Manager of LSDG, and Mr. Earl Ehrhart, a resident of the State of Georgia ("Mr. Ehrhart"), was appointed as the Sports Park Manager of LSDG. As of the Petition Date, Mr. N. Freeman and Mr. Ehrhart were the co-managers of LSDG.

[3]     LPI, a Georgia limited liability company, was formed on July 11, 2011, by the filing of Articles of Organization with the offices of the Secretary of State of Georgia. LPI was formed for the purpose of holding an equity interest in LPL. As of August 16, 2011, LPI entered in that certain Operating Agreement of LakePoint Land, LLC, as a member thereof. Also as of August 16, 2011, the Managers and Members of LPI entered into that certain Operating Agreement of LakePoint Investors, LLC, effective as of July 11, 2011 (the "Original LPI Operating Agreement"). Pursuant to Section 5.2 of the Original LPI Operating Agreement, LPI was required to have two (2) managers (the "LPI Managers"), at all times.

(the "Original LPL Operating Agreement").   At such time LSDG was designated as the "Manager" of
LPL,[4] and became a "Member" in and the owner of 45% of the membership interests of LPL, and LPI
became a "Member" in and the owner of 55% of the membership interest of LPL.[5]  Pursuant to a Joint
Written Consent of the Members and the Manager of LakePoint Land, LLC dated March 13, 2018, LSDG
resigned as the Manager of LPL and the Members of LPL elected Robert Zurcher as the new Manager
of LPL.

As of December 31, 2012, LSDG and LPI entered into that certain First Amendment to Operating
Agreement of LakePoint Land, LLC (the "First Amendment to LPL Operating Agreement"), pursuant to
which LPI made an optional, further Initial Capital Contribution to LPL in the amount of $1.555 million
and the respective Ownership Interests of the Members were adjusted so that LSDG had a 43.1163%
Ownership Interest in LPL and LPI had a 56.8837% Ownership Interest in LPL.  Based upon such
optional Initial Capital Contribution the total amount of Initial Capital Contribution to LPL made by
LSDG was $0.00, and the total amount of Initial Capital Contribution to LPL made by LPI was
$17.155 million.

As of June 30, 2013, LSDG and LPI entered into that certain Second Amendment to Operating
Agreement of LakePoint Land, LLC (the "Second Amendment to LPL Operating Agreement"), pursuant
to which LPI made an optional, further Initial Capital Contribution of $8,431,300 to LPL and the
respective Ownership Interests of the Members were adjusted so that LSDG had a 35.1301% Ownership
Interest in LPL and LPI had a 64.8699% Ownership Interest in LPL.  Based upon such optional Initial
Capital Contributions the total amount of Initial Capital Contributions to LPL made by LSDG was $0.00,
and the total amount of Initial Capital Contributions to LPL made by LPI was $25,986,300.

As of June 18, 2014, LSDG, LPI, and the Rimrock Investor, a Delaware limited liability company, an
affiliate of Rimrock, entered into that certain Joinder and Amendment to the Operating Agreement of
LakePoint Land, LLC (the "Joinder to LPL Operating Agreement"), pursuant to which the Rimrock
Investor was admitted as a Member in LPL with an Ownership Interest of 10% in LPL, as a result of
which LSDG's Ownership Interest in LPL was adjusted to 31.6171%, and LPI's Ownership Interest in
LPL was adjusted to 58.3829%.  The Rimrock Investor made a $0.00 Initial Capital Contribution to LPL,

---

One of such LPI Mangers (the "CMS Manager") was to be appointed by CMS LakePoint, LLC, a Georgia
limited liability company ("CMS"), and the other of such LPI Managers (the "SSGI Manager"), was to be
appointed by SSG Investments, LLC, a Georgia limited liability company (the "SSGI").  Mr. Fernando
Nasmyth, a resident of the State of Georgia ("Mr. Nasmyth"), was designated as the CMS Manager, and
Mr. N. Freeman was designated as the SSGI Manager.  Effective as of January 1, 2012, Mr. Lee Freeman
("Mr. L. Freeman") a resident of the State of Georgia, was designated to replace Mr. N. Freeman as the
SSGI Manager, and Mr. N. Freeman resigned as SSGI Manager.  Effective May 11, 2018, CMS replaced
Mr. Nasmyth as the CMS Manager and SSGI replaced Mr. L. Freeman as the SSGI Manager.  As of the
Petition Date, CMS and SSGI were the co-managers of LPI.

[4]       Under Section 5.01 of the Original LPL Operating Agreement, the business and affairs of LPL
were to be managed by LSDG as "Manager," except for situations in which the approval of "Members"
was expressly required by the Original LPL Operating Agreement or by non-waivable provisions of
applicable law.

[5]       Pursuant to Section 8.01 of the Original LPL Operating Agreement, LSDG made an Initial
Capital Contribution of $0.00 to LPL, and LPI make an Initial Capital Contribution of $16 million to
LPL.  Under Article I of the Original LPL Operating Agreement LSDG had a forty-five percent 45%
"Ownership Interest" in LPL and LPI had a fifty-five percent (55%) "Ownership Interest" in LPL
(the "Ownership Interests").

and was admitted as a Member in LPL as a condition precedent to Rimrock's disbursement of $22 million Loan B (defined below).

As of March 31, 2016, LSDG, LPI, Rimrock Investor and certain new preferred interest members (individually a "Preferred Member" and collectively the "Preferred Members") entered into that certain Second Joinder and Fourth Amendment to the Operating Agreement of LakePoint Land, LLC (the "Second Joinder to LPL Operating Agreement"), pursuant to which twenty-four (24) Preferred Members were admitted as Members in LPL with a collective Ownership Interest in LPL of 14.2795%, as a result of which LSDG's Ownership Interest in LPL was adjusted to 25.6361%, LPI's Ownership Interest in LPL was adjusted to 51.5825%, and the Rimrock Investor's Ownership Interest in LPL was adjusted to 8.5019%. The Preferred Members made "Total Capital Equity Investments" in LPL in the amount of $7,296,817.00, and existing Members made additional "Initial Capital Contributions" in the amount of $358,572.00.

As of the Petition Date, the Ownership Interests of the Members of LPL were as follows: (i) LPI held a 51.5825% Ownership Interest, (ii) LSDG held a 25.6361% Ownership Interest, (iii) the Rimrock Investor held a 8.5019% Ownership Interest, and (iv) the Preferred Members collectively held a 14.2795% Ownership Interest.

LPL was formed for the business of assembling, acquiring, and developing a project in Bartow County, Georgia (the "Project") (discussed in detail below), including, without limitation, the purchase, ownership, management, leasing, and sale of such Project.

## 2. LakePoint Land III, LLC

LPL III, a Georgia limited liability company, was formed on December 12, 2011. LPL III's original Manager was LSDG. On May 20, 2018, LSDG was replaced as LPL III's Manager by LPL. LPL is the Sole Manager of LPL III, and owns 100% of the membership interests of LPL III. LPL III was formed to hold title to approximately 62 acres of the "Project" (as described below) land that was being considered for possible conservation easement dedication and use. No conservation easement transaction for such 62 acres was ever consummated.

## 3. LakePoint Land IV, LLC

LPL IV, a Georgia limited liability company, was formed on December 17, 2012. LPL IV's original Manager was LSDG. On May 20, 2018, LSDG was replaced as LPL IV's Manager by LPL. LPL is the Sole Manager of LPL IV, and owns 100% of the membership interests of LPL IV. LPL IV was formed to acquire approximately 74 acres of Project land from Allatoona Distribution, LLC, a Georgia limited liability company, as described below. Such land was ultimately conveyed to LPL.

## 4. LakePoint Services, LLC

LP Services, a Georgia limited liability company, was formed on December 10, 2013. LP Service's original Manager was LSDG. On May 20, 2018, LSDG was replaced as LP Service's Manager by LPL. LPL is the Sole Manager of LP Services, and owns 100% of the membership interests of LP Services. LP Services was formed to function as the operating entity for the Project, including hiring Project employees.

### 5. LakePoint Sports South, LLC

LP Sports South, a Georgia limited liability company, was formed on November 23, 2015. LP Sports' original Manager was LSDG. On May 20, 2018, LSDG was replaced as LP Sports' Manager by LPL. LPL is the Sole Manager of LP Sports, and owns 100% of the membership interests of LP Sports. LP Sports was formed to hold title to the portion of the Project known as the South Campus sports complex, as discussed below. No property was ever conveyed to LP Sports.

### 6. LP Housing LLC

LP Housing LLC, a Georgia limited liability company ("LP Housing), was formed on February 27, 2013. LP Housing's original Manager was LSDG. On May 20, 2018, LSDG was replaced as LP Housing's Manager by LPL. LPL is the Sole Manager of LP Housing, and owns 100% of the membership interests of LP Housing. LP Housing was formed to function as the housing bureau for the Project and to manage all housing contracts with on-Project and off-Project hotels that house participants in tournament and competitions held at the Project.

### 7. LakePoint Hospitality, LLC

LP Hospitality, a Georgia limited liability company ("LP Hospitality"), was formed on July 30, 2013. LP Hospitality's original Manager was LSDG. On May 20, 2018, LSDG was replaced as LP Hospitality's Manager by LPL. LPL is the Sole Manager of LP Hospitality, and owns 100% of the membership interests of LP Hospitality. LP Hospitality was formed to own and develop hotels on the Project, either alone or jointly with other development and/or operating partners. LP Hospitality never owned or developed any hotels.

### 8. LakePoint Merchandise, LLC

LP Merchandise, a Georgia limited liability company ("LP Merchandise"), was formed on October 5, 2012. LP Merchandise's original Manager was LSDG. On May 20, 2018, LSDG was replaced as LP Merchandise's Manager by LPL. LPL is the Sole Manager of LP Merchandise, and owns 100% of the membership interests of LP Merchandise. LP Merchandise was formed to own, lease, manage, and/or operate merchandise kiosks at the Project, and to sell merchandise at the Project. Mr. N. Freeman made a personal loan in the amount of $458,000.00 to LPL (the "N. Freeman Loan"), to enable LPL to acquire merchandise kiosks for use at the Project by LP Merchandise and third-parties who were licensed to sell goods and merchandise at the Project. The N. Freeman Loan is evidenced by a promissory note payable to Mr. N. Freeman (the "Freeman Note"). Prior to the Petition Date, LPL was making monthly interest only payments to Mr. N. Freeman under the Freeman Note in the amount of $5,343. As of the Petition Date, the principal balance of the Freeman Note was $458,000.00.

### 9. Project

The Project,[6] sometimes referred to as "LakePoint Sporting Community & Town Center" or "LakePoint Sporting Community", initially consisted of 1,200+ acres of real property located in Bartow County, City

---

[6]    The "Project" was defined in Article I, Definitions, on page 6 of the Original LPL Operating Agreement as, "The entire LakePoint Sporting Community & Town Center project initially comprising approximately 1,200 +/- acres, . . . which Project is planned to be developed as a first-class mixed-use development with certain improvements as determined from time-to-time by the Company which may include, without limitation, sports/athletic facilities and athletic fields, office facilities, retail facilities,

of Emerson, Georgia, which LPL acquired from Blankenship & Gaskin Properties, LLC in August 2011 for a purchase price of $16,765,175.00. At such time, LPL also acquired certain other smaller in-fill properties from other parties. In December 2012, LPL acquired an additional 74+ acres adjacent parcel from Allatoona Distribution, LLC for a purchase price of $9,839,042.00, bringing the total Project acreage to 1,274+ acres (collectively, the "Property").

LPL has developed a portion of the Project known as the "South Campus" (i.e. an approximately 155 acre portion of the Project located west of Interstate 75 and south of a railroad line running just north of and parallel to Emerson-Allatoona Road), as a mixed use, amateur/youth sporting tournament vacation destination centered around approximately 58 acres of indoor and outdoor sports tournament venues, presently including baseball, softball, lacrosse, soccer, wake-boarding, indoor and outdoor volleyball, and basketball, among other current facilities and uses. In 2017, the Project attracted over 1.1 million visitors and is projected to attract over 1.2 million visitors in 2018.

The Project's centerpiece and primary economic driver is the South Campus indoor and outdoor amateur/youth sports complex. The existing approximately 58 acres of amateur/youth sporting venues serve as the Project's primary traffic driver, generating consumer traffic for the surrounding commercial components that currently include retail, entertainment, service and hotel uses, and are planned to include retail, entertainment, hotel, restaurant, office, medical, and multi-family residential facilities designed so as to create a "stay and play" environment for those teams and family members participating in the tournaments and sporting events held by tenants or owners of portions of the Project.

In mid-2012, LPL worked with Bartow County, Georgia, and the Georgia Department of Transportation ("GDOT"), and signed a comprehensive Memorandum of Understanding under which such parties agreed to jointly fund the $5.2 million infrastructure construction and rerouting of Georgia Highway 293 through the Project's South Campus, and in 2017, LPL worked with these same entities to fund up to an additional $29 million in roadway, infrastructure, and bridge improvements on the Project's "North Campus" (i.e. an approximately 562 acre portion of the Project located west of Interstate 75 and north of a railroad line running parallel to Emerson-Allatoona Road), to extend LakePoint Parkway north of Emerson-Allatoona Road through the North Campus to Red Top Mountain Road, thereby opening up the Project's North Campus for development. In August 2017, Rimrock funded $250,000 to LPL to pay consultants performing pre-construction activities for the roadway and infrastructure improvements. The Debtors have been informed that, in February 2018, the Rimrock Investor entered into an agreement with Bartow County to fund $596,422 to support these improvements, and in May 2018, under the same agreement, Rimrock agreed to fund not less than an additional $1,791,000 to support work alongside the roadway. Work on such North Campus road and infrastructure improvements commenced in early 2018. The work for the improvements is conducted through contracts among GDOT, Bartow County, the construction manager, and the Rimrock Investor. The Debtors are not a party to these contracts.

LPL also procured a package of comprehensive and economically beneficial municipal and other governmental incentives for the Project. Such economic benefits were negotiated in 2011 with the City of Emerson, the City of Cartersville, Bartow County, Georgia, the Bartow County Development Authority (the "Authority"), and the State of Georgia, and include among other things, tax abatements for completed projects. Also, in 2015 Bartow County, Georgia, and the Authority issued a $36.285 million bond for the development of an Indoor Pavilion (defined and discussed below).

---

medical facilities, hospitality facilities and entertainment facilities, all of which is generally located in proximity to Lake Allatoona along Interstate 75 in the City of Emerson, Bartow County, Georgia . . . . "

Necessary governmental approvals were procured by LPL in 2012 to allow the establishment of the Red Top Community Improvement District ("CID"), which encompasses all of the Project. The CID has served as a conduit by which the Project can receive a variety of local, state, and federal grants and funds. The CID can also levee an additional property tax on property owners in the CID to fund, among other things, roadway construction and maintenance, as well as development of public transportation systems.

Prior to the Petition Date, LPL made substantial progress in obtaining anchor tenants for the amateur/youth sports complex located on the Project's South Campus and owners of the adjoining commercial properties, including for example Perfect Game, Inc., which currently leases and operates eight state-of-the-art baseball fields that can host an aggregate total of 56 games per day (i.e., seven games per field a day), Sing-Bev. Properties, LLC, which developed, owns, and operates a cable wakeboard park at the Project, and the Indoor Pavilion as discussed further below.

LPL established the "LakePoint Housing Bureau" in 2014 (the "Housing Bureau"), through which tournament participant hotel rooms are required to be booked before any non-local team can play in a sporting tournament at the Project. As a part of the event registration process, a team must contact the Housing Bureau, which is responsible for booking all tournament hotel rooms, and secure their team room reservations. The Housing Bureau has entered into agreements with both "on campus" hotels and "off campus" hotels (located within an approximately 35+/- mile radius of the Project) to participate in the Housing Bureau. LPL retained Experient (a subsidiary of Maritz Travel) to assist it in establishing and operating the Housing Bureau, which was expected to generate significant revenues for the Project over time.

LPL commenced the Project's horizontal site development in the third quarter of 2013. This phase one construction project involved the master-grading of substantial portions of the South Campus of the Project; the installation of internal roadways and utilities on the South Campus; and the construction of the Project's South Campus baseball and soccer/lacrosse fields and related support facilities. Such horizontal site development work and construction of the South Campus sports complex was substantially completed in June 2014 allowing tournaments and competitions to begin on the baseball, soccer, and lacrosse fields at the Project. This development was a necessary precursor to the future development and construction of the Project's planned retail, office, hospitality, entertainment, multi-family residential, and medical facilities.

### 10. Governance of the Debtors

On the Petition Date, and during the pendency of the Chapter 11 Cases, Robert Zurcher has been the sole Manager of LPL. LPL is the sole manager of each of the other Debtors. Robert Zurcher is the Chief Financial Officer of each of the Debtors.

## B.     PREPETITION CAPITAL STRUCTURE

### 1. Rimrock Loans

In order to commence the horizontal site development of certain portions of the South Campus of the Property as a part of the Project, LPL tried to secure bank or other traditional development financing from the time of the initial acquisition of the Property in August 2011 until the early fall of 2013, but was unable to do so. Ultimately, LPL entered into a Loan Agreement dated October 2, 2013 (the "Original Loan Agreement"), pertaining to loans in the form of a $30 million loan A at an initial 12.0% interest rate (the "A Loan"), plus a $17 million loan B at an initial 17.0% interest rate (the "B Loan"). At the time that the B Loan was funded the A Loan interest rate was increased under the "Modified Loan Agreement" (defined below) to 14.0% and the B Loan principal amount was increased to $22 million, resulting in an

the aggregate principal Loan amount of $52 million (the A Loan and the B Loan are collectively referred to as, the "Loans"), from Rimrock.  The Loans were secured by all or substantially all of LPL's assets, including the Property comprising the Project.

LPL III, LPL IV, LSDG, and LPI (each, a "Guarantor", and collectively, the "Guarantors") each signed payment and completion guaranty agreements (each, a "Guarantee," and, collectively the "Guaranties") wherein those parties, among other things, guaranteed LPL's obligations under the Loans.  The Original Loan Agreement was amended by that certain Amended and Restated Loan Agreement dated as of June 18, 2014 (the "Amended Loan Agreement"), and was further amended by that certain First Modification to Amended and Restated Loan Agreement dated as of June 18, 2014 (the "Modified Loan Agreement"; collectively with the Original Loan Agreement and the Amended Loan Agreement, the "2014 Loan Agreement").

## 2. Bond Financing for Indoor Pavilion

As a part of the Second Modification (defined below), LPL received Rimrock's consent to the following: (a) split "Parcel J4" of the Project into five (5) lots, (b) the sale and release of "Lot 3" of Parcel J4 from Rimrock's mortgage and other security instruments in connection with the proposed sale of such Lot 3 to the Authority, and (c) the creation and granting by LPL of certain access and parking easements  pursuant to an Easement Agreement dated as of July 9, 2015 (the "Easement"), in favor of the Authority burdening portions of the remainder of Parcel J4, and the consent to and subordination to such Easement by Rimrock, all in connection with and as conditions precedent to the issuance by the Authority of $36,285,000.00 in the aggregate principal amount of Recreational Facilities Taxable Revenue Bonds (LakePoint Sports Pavilion Project) Series 2015 (the "Bonds") to construct the Indoor Pavilion.  The Authority issued and sold the Bonds on or about July 9, 2015, concurrently with the acquisition of Lot 3 of Parcel J4.  The Authority used the proceeds of the sale of such Bonds to finance: (a) the costs of acquiring, constructing, and installing an approximately 170,000 square foot indoor sports pavilion on Lot 3 of Parcel J4 of the Project (the "Indoor Pavilion"), (b) capitalized interest on the Bonds until July 1, 2016, and (c) the costs and expenses of issuing the Bonds.  The Authority acquired Lot 3 of Parcel J4 on July 9, 2015, for a purchase price of $5,035,000.00, of which $4,819,589.37 was paid to Rimrock as the "release price" for Lot 3 of Parcel J4.

LPL formed a subsidiary, LP Indoor Pavilion, LLC, a Delaware limited liability company ("LPIP"), in connection with the acquisition of Lot 3 of Parcel J4 by the Authority and the development of the Indoor Pavilion.  In connection with the Bonds and the development of the Indoor Pavilion, the Authority contracted with LPIP, as "Manager," to oversee the acquisition, construction, and equipping of the Indoor Pavilion on behalf of the Authority pursuant to the terms of a Fee Development Agreement dated as of April 16, 2015, between the Authority and LPIP, as Manager, as authorized by a resolution adopted by the Issuer on May 11, 2015, as amended and restated by an Amended and Restated Fee Development Agreement (the "Development Agreement"), dated on or about July 9, 2015, between the Authority and LPIP.

In addition, LPIP, as Manager, was engaged by the Authority to manage and operate the Indoor Pavilion for and on behalf of the Authority pursuant to the terms of a Management Service Agreement (the "Management Service Agreement"), dated as of July 1, 2015, between the Authority and LPIP, for a management fee equal to the gross revenues to be derived from the operation of the Indoor Pavilion.  Pursuant to the Management Service Agreement, LPIP, as Manager, was obligated to pay all costs of operating, maintaining, and repairing the Indoor Pavilion and to pay to the Authority amounts sufficient to enable the Authority to pay the principal of and interest on the Bonds, as and when such amounts became due.  In addition, LPIP, as Manager, contracted with Sport Parks of Georgia, LLC ("Sport Parks"), to operate the Indoor Pavilion pursuant to the terms of an Operating Agreement for such

facility (the "Facility Operating Agreement"), dated as of July 1, 2015, between Sport Parks and LPIP. To secure its obligations under the Management Service Agreement, LPIP granted to the Authority a first priority security interest in its management fees paid pursuant to the Management Agreement and in certain contracts to which LPIP was a party, pursuant to a Security Agreement (the "Security Agreement"), dated as of July 1, 2015, between the Authority and LPIP.

In addition, the Authority granted to LPIP an option to purchase the Indoor Pavilion upon the payment in full or defeasance of the Bonds and the discharge of the Bond indenture pursuant to the terms of a Purchase Option Agreement dated as of July 9, 2015 (the "Purchase Option Agreement"), between the Authority and LPIP.  In addition, pursuant to a PILOT Agreement, dated as of July 9, 2015 (the "PILOT Agreement"), between the Authority and LPIP, LPIP agreed to make certain annual payments to the tax collector of Bartow County in amounts equal to and in lieu of the ad valorem property taxes on the Indoor Pavilion that would be due if title to the Indoor Pavilion was vested in LPIP.  The issuance of the Bonds, the execution and delivery of the related agreements as described herein, and the execution and delivery of all other documents, instruments, and agreements pertaining thereto are referred to herein as the "Bond Transaction."

In connection with the Second Modification, the release of Lot 3 of Parcel J4 and the sale thereof by LPL to the Authority and Rimrock's consent to and subordination to the Easement, as additional collateral security for the Loans, Rimrock required the execution of an Assignment of Purchase Option Agreement by LPIP[7] in favor of Rimrock (the "Assignment of Purchase Option"), and the execution of an Agreement Regarding Indoor Pavilion Transaction by and among LPL, LPIP, Sport Parks, and the Authority (the "Side Agreement").  Pursuant to the Side Agreement, Rimrock was granted the right to cure any defaults or events of default by LPIP and/or Sport Parks under the Management Service Agreement, the Facility Operating Agreement and/or any other contracts and/or agreements by and between the Authority and either of LPIP and/or Sport Parks with respect to the Indoor Pavilion.  The Side Agreement also provided that in the event that Rimrock exercised its right to cure a default it would have the right to act on behalf of, or select replacements for, LPIP, any contractual operator of the Indoor Pavilion or any of their affiliates with respect to the Management Service Agreement and/or such other contracts and/or agreements.

In June 2017, Rimrock authorized LPL to fund $28,000 to LPIP in working capital.  In early 2018, Bartow County, the Authority, and LPIP entered into an agreement authorizing LPIP to continue as Manager of the Indoor Pavilion (the "Indoor Pavilion Support Agreement").  In order for the agreement to stay in place through its third year, the agreement contemplated that the Rimrock Investor would make a minimum investment of $10 million into the Project.  In addition, as part of the agreement, LPIP terminated its agreement with Sport Parks and entered into that certain Operating Agreement with the Rimrock Investor dated as of March 27, 2018.

---

[7]      LPIP executed the Assignment of Purchase Option and the Side Agreement to facilitate the execution of the Second Modification, the release of the Indoor Pavilion property by Rimrock for sale by LPL to the Authority, and the execution of a consent to and subordination to the Easement by Rimrock, all of which were conditions precedent to the entire Indoor Pavilion transaction imposed by the Authority. The Bond Transaction would not have closed and the Indoor Pavilion would not have been built if those agreements had not been executed.

## C.   EVENTS LEADING TO AND CIRCUMSTANCES SURROUNDING THE CHAPTER 11 FILING

In early 2015, certain events of default consisting of covenant defaults (the "Events of Default") occurred under the 2014 Loan Agreement.  As a result of such Events of Default, LPL, the Guarantors, and Rimrock entered into negotiations to modify the terms of the 2014 Loan Agreement and to waive the Events of Default.  The parties ultimately entered into a Second Modification to Amended and Restated Loan Agreement and Waiver dated as of July 9, 2015 (the "Second Modification", collectively with the 2014 Loan Agreement, the "2015 Loan Agreement").

Under the Second Modification, LPL was obligated to raise additional capital (the "2015 Equity Raise"). The Second Modification provided that 2015 Equity Raise needed to be at least $10 million in the form of a capital call or capital raise (the "LPL Capital Call" and the "LPL New Member Offering").  The Second Modification also required LPL to use the proceeds of the 2015 Equity Raise to fund at least $5 million of the 2015 Contribution (defined below), and utilize the remaining proceeds for specific Project development costs (not to exceed $1.6 million), to establish certain reserves (not to exceed $2,000,000), and for certain other purposes.  In addition, in consideration of such default waivers, and as condition precedent to Rimrock's entering into the Second Modification, LSDG and LPI, as "Pledgors," and Rimrock, as "Pledgee," entered into that certain Pledge Agreement dated as of July 9, 2015 (the "Pledge Agreement").  Under the Pledge Agreement, LSDG and LPI pledged to and for the benefit of Rimrock all of their respective ownership and membership interests in LPL and LPL III as additional security for the Loans.  Under Section 4.3 of the Second Modification, LPL and each Guarantor reaffirmed that the then current "Redemption Amount" of the Loans (i.e., the amount necessary to repay the Loans in full) was $64,992,658.00, plus any interest that may accrue and be due and owing after October 2, 2015, plus an "Amendment Fee" of $1 million.

The original term of the Loans expired on October 2, 2015.   Pursuant to the Second Modification, the parties agreed that the term of the Loans would be automatically extended until December 31, 2015, in the event that LPL contributed at least $15 million (the "2015 Contribution")[8] into a lock box account controlled by Rimrock (the "Lock Box Account"), provided that no event of default existed under the 2015 Loan Agreement and related documents.  The Second Modification required the 2015 Contribution to consist of the following: (i) "Gross Revenues" (as defined in the Original Loan Agreement) of no less than $5 million from the Bond Transaction, (ii) no less than $5 million from the proceeds of the 2015 Equity Raise, and (iii) proceeds of additional sales of parcels of Project land.  As discussed above, the sale of Lot 3 of Parcel J4 in connection with the Indoor Pavilion transaction resulted in a purchase price paid to LPL in the amount of $5,035,000, and the payment to Rimrock of $4,819,589.37 as a release price, in partial satisfaction of the requirements of the Second Modification.

On October 2, 2015, LPL and the Guarantors, and Rimrock entered into that certain Third Modification to Amended and Restated Loan Agreement and Waiver (the "Third Modification"), which, among other things, amended the definition of 2015 Contribution and the definition of 2015 Equity Raise.  The Third

---

[8]        In the event that the 2015 Contribution exceeded $15 million, the Second Modification provided that any excess amount thereof was required to be applied as follows: (i) first, to LPL's expenses in excess of LPL's "Monthly Budget" (as provided for in the Second Modification"), incurred prior to the date of such 2015 Contribution being paid into the Lock Box Account, and then to any projected LPL expenses in excess of LPL's Monthly Budget thereafter through December 31, 2015, (ii) second, to fund, as necessary, a $200,000 LPL operating account reserve, (iii) third, to replenish, as necessary, the $250,000 Lock Box Account reserve, and (iv) lastly, towards the Additional 2015 Contribution of $4 million.

Modification redefined 2015 Contribution as, "no less than FIFTEEN MILLION DOLLARS AND NO/100 ($15,000,000), which shall consist of (i) Gross Revenues of no less than FOUR MILLION EIGHT HUNDRED NINETEEN THOUSAND FIVE HUNDRED EIGHTY-NINE DOLLARS AND 37/100 ($4,819,589.37) from the Indoor Pavilion Bond Transaction, (ii) no less than FIVE MILLION DOLLARS AND NO/100 ($5,000,000) from the proceeds of the 2015 Equity Raise and (iii) proceeds of additional sales of parcels of the Land; . . ."  The Third Modification required LPL to use the proceeds of the 2015 Equity Raise to fund no more than $10 million of the 2015 Contribution, with the proceeds of such 2015 Equity Raise to be applied in the following order: first, no less than $5 million to be applied to the 2015 Equity Raise; second, $2,000,000 of such funds to be retained by LPL as an operating expense reserve to pay for operating expenses of the Indoor Pavilion, third, and thereafter for certain other specified purposes.  Under the Third Amendment, LPL and the Guarantors acknowledged and confirmed that the Redemption Amount under the Loan Agreement was $64,292,658 (excluding application of any proceeds received as to the "LakePoint Station" transaction (discussed below), and excluding interest, fees, expenses, and other amounts that were chargeable or otherwise reimbursable under the Loan Agreement and/or other loan documents.

On October 2, 2015, LPL sold 5.826 acres known as "Parcel I7" of the Project to LakePoint Station, LLC, a Georgia limited liability company ("LakePoint Station").  The purchase price of that sale was $3.36 million.  At such closing LPL paid $2,928,718.00 to Rimrock as the release price for such property, in partial satisfaction of the requirements of the Second Modification and the Third Modification.

On October 14, 2015, LPL, the Guarantors and Rimrock entered into that certain Fourth Modification to Amended and Restated Loan Agreement (the "Fourth Modification").  Under the Fourth Modification, Rimrock granted LPL permission to use up to $352,500 of the cash equity proceeds from the 2015 Equity Raise in excess of $7,500,000 to grade the remaining "I parcels" after the sale of 1.13 acres known as "Parcel I6-b" to LakePoint Station.   Under the Fourth Modification, LPL and the Guarantors acknowledged and confirmed that the Redemption Amount under the Loan Agreement was $55,460,801.00 (excluding application of any proceeds received as to the Parcel I-6b LakePoint Station transaction (discussed below), and excluding interest, fees, expenses, and other amounts that were chargeable or otherwise reimbursable under the Loan Agreement and/or other loan documents.

On October 14, 2015, LPL sold 1.13 acres known as "Parcel I6-b" of the Project to LakePoint Station. The purchase price of that sale was $600,000.00.  At such sale closing, LPL paid $555,412.00 to Rimrock as the release price for such property, in partial satisfaction of the requirements of the Second Modification, the Third Modification, and the Fourth Modification.

In the Fall of 2015, LPL conducted the LPL Capital Call and the LPL New Member Offering to fulfill its obligations under the Second Modification with respect to such 2015 Equity Raise, which resulted in capital contributions to LPL in the amount of $7,655,389.00, consisting of the following: $358,572.00 as a result of the LPL Capital Call and $7,296,817.00 as a result of the LPL New Member Offering (which was made by the Preferred Members described above).[9]  On or about October 2, 2015, LPL paid

---

[9]      At the time of the LPL Capital Call and the LPL New Member Offering, LPL advised existing and new investors that no assurance could be given that LPL would have sufficient funds from a combination of proceeds of sale of parcels of the Project and proceeds of the LPL New Member Offering and the LPL Capital Call to make the necessary payments to extend the term of the Loans, or that LPL would be able to renegotiate or refinance the Loans.  LPL further advised existing and new investors that unless LPL was able to renegotiate or refinance the Loans on or before their expiration, as the same was extended as contemplated in the Second Modification, LPL would be unable to repay the Loans upon maturity, and Rimrock may exercise various rights and remedies under its loan agreements, which may result in investors losing their entire investment.  LPL also advised existing and new investors that its

$7,655,389.00 of the 2015 Contribution to Rimrock, and those funds were accepted and applied by Rimrock in accordance with the Third Modification.[10]  Such funds were deposited by LPL into the Lock Box Account.[11]  LPL was required to raise at least $7.5 million in the Equity Raise for an extension of the Redemption Date from October 2, 2015 to December 31, 2015 to occur.  LPL raised a total of $7,655,389.00, in partial satisfaction of the requirements of the Third Modification.

Pursuant to the Third Modification, the Outside Redemption Date was extended from October 2, 2014 to October 9, 2015.  Under the Third Modification, LPL had the right, subject to certain conditions, to further extend Outside Redemption Date three additional times as follows: (a) until October 26, 2015, provided that on or before October 9, 2015, LPL received at least $5 million in cash proceeds from equity investors pursuant to the LPL Capital Call and LPL New Member Offering, (b) until December 31, 2015, provided that on or before October 26, 2015, LPL either (i) received at least an additional $2.5 million from equity investors pursuant to the LPL Capital Call and LPL New Member Offering and satisfied certain other conditions, or (ii) received at least $7.5 million from equity investors pursuant to the LPL Capital Call and LPL New Member Offering and satisfied certain other conditions, (c) until March 31, 2016, provided that LPL deposited an additional $4 million into the Lock Box Account on or before December 31, 2015 (the "Additional 2015 Contribution");[12] and (d) until June 30, 2016, provided that it deposited another $4 million into the Lock Box Account on or before March 31, 2016 (the "2016 Contribution").

On or about December 3, 2015, LPL sold 0.676 acres known as "Parcel J9A" of the Project to The Krystal Company for a purchase price of $615,000.00, and paid to Rimrock a release price of $528,188.00 for release of such collateral, in partial satisfaction of the requirements of the Second Modification, the Third Modification, and the Fourth Modification.

As of December 31, 2015, LPL, the Guarantors, and Rimrock entered into that certain Fifth Modification to Amended and Restated Loan Agreement (the "Fifth Modification").  Pursuant to the Fifth Modification, the time for payment of the Additional 2015 Contribution in the amount of $4 million was extended from December 31, 2015 to January 27, 2016, and provided that if such Additional 2015 Contribution was paid on or before such date, the Redemption Date was automatically extended to March

---

loan documents with Rimrock included very restrictive loan covenants, which could result in Rimrock exercising various rights or remedies that could result in investors losing their entire investment.

[10]    These funds were used to: first, to pay to any expenses then due and owing to Rimrock; second, if but only if the Redemption Date had occurred, to pay accrued, unpaid interest under the Loans; third, to pay a $1 million "Amendment Fee" owed to Rimrock in connection with the Second Modification; and lastly, to pay the "Redemption Amount" (as defined in the Second Modification to be $64,994.658, plus any interest that may accrue and be owning after the original term of the Loans of October 2, 2015.

[11]    Those funds were used to establish or restore a minimum Lock Box Account reserve of $250,000; and $1.6 million thereof was released from the Lock Box Account and used by LPL to pay for the grading of the Projects "I Parcels."  The balance of the funds were used for other purposes prescribed in the Second Modification.

[12]    In the event that the Additional 2015 Contribution exceeded $4 million, any excess amount thereof was required to be applied as follows: (i) first, to LPL's expenses in excess of LPL's "Monthly Budget" (as provided for in the Second Modification"), incurred prior to the date of such Additional 2015 Contribution being paid into the Lock Box Account, and then to any projected LPL expenses in excess of LPL's Monthly Budget thereafter through June 20, 2016, (ii) second, to fund, as necessary, a $200,000 LPL operating account reserve, (iii) third, to replenish, as necessary, the Lock Box Account reserve, and (iv) lastly, towards the 2016 Contribution of $4 million.

31, 2016. Under the Fifth Modification, LPL and the Guarantors acknowledged and confirmed that the Redemption Amount under the Loan Agreement was $54,905,389, excluding interest, fees, expenses, and other amounts that were chargeable or otherwise reimbursable under the Loan Agreement and/or other loan documents.

As of January 29, 2016, LPL, the Guarantors, and Rimrock entered into that certain Sixth Modification to Amended and Restated Loan Agreement (the "Sixth Modification"). Pursuant to the Sixth Modification the time for payment of the Additional 2015 Contribution in the amount of $4 million was extended from January 27, 2016 to March 1, 2016, and provided that if such Additional 2015 Contribution was paid on or before such date, the Redemption Date was automatically extended to March 31, 2016. Under the Sixth Modification, Rimrock acknowledged receipt of the Freeman Note and consented to the Freeman Note. Under the Sixth Modification, LPL and the Guarantors acknowledged and confirmed that the Redemption Amount under the Loan Agreement was $54,905,389, excluding interest, fees, expenses, and other amounts that were chargeable or otherwise reimbursable under the Loan Agreement and/or other loan documents.

As of March 1, 2016, the Guarantors and Rimrock entered into that certain Seventh Modification to Amended and Restated Loan Agreement (the "Seventh Modification"). Pursuant to the Seventh Modification the time for payment of the Additional 2015 Contribution in the amount of $4 million was extended from March 1, 2016 to March 11, 2016, and provided that if such Additional 2015 Contribution was paid on or before such date, the Redemption Date was automatically extended to March 31, 2016. Under the Seventh Modification, LPL and the Guarantors acknowledged and confirmed that the Redemption Amount under the Loan Agreement was $54,905,389, excluding interest, fees, expenses, and other amounts that were chargeable or otherwise reimbursable under the Loan Agreement and/or other loan documents.

On March 11, 2016, LPL sold 21.296+/- acres of the property to LakePoint Pavilion Center, LLC, a Georgia limited liability company ("LPPC"), for $9 million. The property sold consisted of "Lots 1, 2, 4 and 5" of "Parcel J4" of the Project. At such closing Rimrock was paid a release price of $8,117,183.29, in partial satisfaction of the requirements of the Second Modification, the Third Modification, the Fourth Modification, the Fifth Modification, the Sixth Modification, and the Seventh Modification.

As of June 24, 2016, the Guarantors and Rimrock entered into that certain Eighth Modification to Amended and Restated Loan Agreement (the "Eighth Modification"). Pursuant to the Eighth Modification, the Final Redemption Date was redefined to mean August 1, 2016. Under the Eighth Modification, LPL and the Guarantors acknowledged and confirmed that the Redemption Amount under the Loan Agreement was $54,905,389, excluding interest, fees, expenses, and other amounts that were chargeable or otherwise reimbursable under the Loan Agreement and/or other loan documents.

LPL was unable to pay the Redemption Amount on the Final Redemption Date. As a result of such non-payment, on August 2, 2016, counsel to Rimrock sent to LPL and Guarantors a notice of default and reservation of rights under the Loan Agreement (the "Default Notice"), pursuant to which Rimrock declared the Loans to be in default as a result of LPL's failure to pay the Redemption Amount on or before August 1, 2016.

As a result of such default, LPL, the Guarantors, Rimrock, and the Rimrock Investor entered into that certain Forbearance Agreement dated as of September 23, 2016 (the "Forbearance Agreement"), wherein Rimrock agreed to forbear from the exercise of its rights and remedies until December 23, 2016 (the "Forbearance Period"), to provide LPL with additional time to attempt to refinance the Loans and indebtedness to Rimrock. Under Section 6.2 of the Forbearance Agreement, Rimrock agreed to certain conditions and time-frames pursuant to which Rimrock agreed to accept a discounted payoff of $56

million (the "Discounted Payoff Amount"). Pursuant to Section 8.4 of the Forbearance Agreement, LPL, LPL III, and LPL IV executed and delivered in escrow to Carlton Fields, P.A., Rimrock's real estate counsel, certain deeds in lieu of foreclosure (the "Deeds in Lieu") for the Property and certain related property. Under Section 9.1 of the Forbearance Agreement, LPL and the Guarantors agreed that Rimrock would have the right to record the Deeds in Lieu in the event that Rimrock did not timely receive the Discounted Payoff Amount. LPL and Rimrock further agreed that upon recordation of the Deeds in Lieu the "Obligations" under the Loans would be reduced by an amount equal to the lesser of $45 million or the amount of such Obligations on the date the Deeds in Lieu were recorded.

Despite their continued efforts to secure alternative financing and pay the Discounted Payoff Amount to Rimrock, the Debtors were unsuccessful. As a result, as of November 4, 2016, LPL, the Guarantors, Rimrock, and the Rimrock Investor entered into a certain Agreement (the "First Amendment to Forbearance Agreement"). Under Section 2.b. of the First Amendment to Forbearance Agreement, the expiration date of the Forbearance Period was modified from December 23, 2016, to December 20, 2016, and under Section 2.c. of the First Amendment to Forbearance Agreement Section 6.2 of the Forbearance Agreement was amended and restated to provide that the "Payoff Amount" was $62,066,002, to be paid in accordance with a schedule set forth in such Section 2.c. As a result, the Discounted Payoff Amount was no longer applicable. Under Section 5 of the First Amendment to Forbearance Agreement, Rimrock and the Rimrock Investor granted to LPL a lease and license to use, occupy, and operate the Project during the Forbearance Period consistent with past practices and in the ordinary course (the "Lease/License"), to assure continuity of operations of the Project. Under Section 3 of the First Amendment to Forbearance Agreement, new Deeds in Lieu were executed and delivered by LPL to replace the original Deeds in Lieu being held in escrow, and LPL and the Guarantors agreed that such new Deeds in Lieu were immediately effective and could be recorded by Rimrock in the real estate records of Bartow County, Georgia. LPL and Guarantors further acknowledged that Rimrock intended to transfer the real property that was the subject of such Deeds in Lieu to the Rimrock Investor by deeds to the Rimrock Investor (the "Rimrock Investor Deeds"), to be recorded immediately after the recording of the Deeds in Lieu. Under Section 4 of the First Amendment to Forbearance Agreement, the Rimrock Investor entered into certain option contracts (the "Option Contracts"), pursuant to which LPL had the option to repurchase the property transferred to the Rimrock Investor through the Rimrock Investor Deeds by payment of the Payoff Amount prior to the expiration of the Forbearance Period. On December 1, 2016, LPL, the Guarantors, Rimrock, and the Rimrock Investor entered into a certain Agreement (the "Third Amendment to Forbearance Agreement"). The Forbearance Period expired on December 14, 2016, pursuant to the terms in Schedule 6.1 in the Third Amendment to Forbearance Agreement due to LPL's failure to provide Rimrock with a commitment letter from a reputable third party investment source to fund a refinancing. The Option Contracts terminated concurrently with the expiration of the Forbearance Period.

Despite their continued efforts to secure alternative financing, the Debtors were unsuccessful, and the Deeds in Lieu to Rimrock transferring all of the Property and certain related property to Rimrock were recorded, and the Rimrock Investor Deeds were recorded. LPL and Guarantors were unable to repurchase the Property pursuant to the Option Contracts. As a result, legal ownership of the Property (as well as other related assets of the Debtors that Rimrock had a lien against) were transferred to Rimrock (and then to the Rimrock Investor). As a result of the transfer, $6,394,041.00 of accrued, unpaid interest, fees and expenses under the Loans was satisfied and the aggregate principal balance of the Loans were reduced from $54,905,389.00 to $16,299,430.00.

Notwithstanding the recording of the Deeds in Lieu, during the period of from the date of grant of the Lease/License until the Petition Date, LPL has continued to manage and operate the Project under the Lease/License granted to them by Rimrock and the Rimrock Investor. During such period of time, LPL has unsuccessfully attempted to refinance the Loans. Further, during such period of time, Rimrock, LPL,

and the Guarantors entered into multiple amendments to the Forbearance Agreement. In addition, at certain times during such period of time, LPL has requested and Rimrock has agreed to fund certain protective advances evidenced by various funding letters from Rimrock (collectively, the "Funding Letters"), pursuant to which LPL has borrowed an additional $1,355,458.00 from Rimrock. As of the Petition Date, the aggregate principal balance under the 2015 Loan Agreement was an amount not less than $17,654,889 and the accrued interest was an amount not less than $4,780,607.00.

During the last few months the Debtors and Rimrock have engaged in significant negotiations to come up with a plan to enable the Debtors to adjust their respective balance sheets while at the same allowing LPL's legacy investors to retain an equity interest in LPL.

On January 16, 2018, Earl Ehrhart ("Mr. Ehrhart") resigned as chief executive officer of LPL. In connection with his resignation, the Rimrock Investor entered into a consulting agreement (the "Consulting Agreement") with Taylor English Decisions, LLC, a Georgia limited liability company (the "Consultant"),[13] whereby the Rimrock Investor engaged the Consultant, as an independent consultant, to coordinate with and support new and/or interim management at LPL in connection with efforts to foster positive public relations communications and engagement related to ongoing and future developments at the Project for a term lasting through May 31, 2018. In exchange for the services provided under the Consulting Agreement, the Rimrock Investor agreed to pay the Consultant fees totaling $250,000, payable in two installments. Both installments have been paid to Mr. Ehrhart.

Also in connection with Mr. Ehrhart's resignation, LPL and Mr. Ehrhart entered into a separation agreement and release (the "Separation Agreement"), whereby the parties agreed to the mutual termination of Mr. Ehrhart's employment agreement. LPL also agreed to pay Mr. Ehrhart's regular salary for the period covering January 15, 2018 through January 31, 2018 (the "Final Salary Payment") plus a severance payment of $50,000 (the "Severance Payment"). The Final Salary Payment was payable in the ordinary course consistent with past practices. Pursuant to the terms of the Separation Agreement, the Severance Payment shall be made to Mr. Ehrhart upon the earlier of March 13, 2019 or the day of emergence (including any "effective date" under a confirmed plan of reorganization), dismissal, or discharge from any bankruptcy case by LPL. The Separation Agreement contained mutual releases by the parties. As set forth in agreements between the parties, the Debtors will use their commercially reasonable efforts to cause the Separation Agreement to be assumed in connection with the occurrence of the Effective Date.

On February 28, 2018, LPL terminated Mr. N. Freeman's employment agreement (the "Employment Agreement"), pursuant to section 7.07 of the Employment Agreement which provided LPL and/or Rimrock the right to terminate the agreement if Rimrock exercised its rights under the Loan Documents as lender upon an Event of Default. In accordance with the Employment Agreement, Mr. N. Freeman was paid through the date of termination and no other compensation or benefits were owed to Mr. N. Freeman, except for vested benefits under LPL's benefit plans and any right to continued health coverage under COBRA or similar state law.

As noted in section II.A.1 above, pursuant to a Joint Written Consent of the Members and the Manager of LakePoint Land, LLC, on March 13, 2018, LSDG resigned as the Manager of LPL and the Members of LPL elected Robert Zurcher as the new Manager of LPL.

These actions and the discussions between the Debtors and Rimrock over the last few months ultimately lead to the preparation and presentation of the Restructuring Support Agreement and the Plan Term Sheet,

---

[13]     Mr. Ehrhart is the chief executive officer of the Consultant.

which is an exhibit to the Restructuring Support Agreement. The Restructuring Support Agreement is an Exhibit to this Disclosure Statement and was previously filed in these Chapter 11 Cases [Docket No. 5-1].

## III.
## SIGNIFICANT DEVELOPMENTS IN THE CHAPTER 11 CASES

### A. "FIRST DAY" ORDERS AND RETENTION OF PROFESSIONALS

On the Petition Date, the Debtor filed "first day" motions and applications with the Bankruptcy Court seeking certain relief to aid in the efficient administration of the Chapter 11 Cases and to facilitate the Debtors' transition to debtor-in-possession status. The relief requested in these motions and applications were granted at hearings held on June 13, 2018 and July 3, 2018. Pursuant to the Bankruptcy Court's first-day orders and professional retention orders, Arnall Golden Gregory LLP ("AGG") was retained as counsel to the Debtors; Vantage Point Advisory, Inc. ("Vantage Point") was retained as financial advisor to the Debtors; and Garden City Group, LLC ("GCG") was retained as the Claims Agent for the Chapter 11 Cases. *See* Docket Nos. 74, 75, and 76.

### B. APPOINTMENT OF COMMITTEE

On July 10, 2018, the United States Trustee issued a text entry on the Docket in the Chapter 11 Cases that no official committee of unsecured creditors has been appointed. As of the date of filing this Disclosure Statement, no official committee of unsecured creditors has been appointed.

### C. DEBTOR-IN-POSSESSION FINANCING

As part of the "first day" hearings in the Chapter 11 Cases, the Debtors sought authorization to enter into a debtor-in-possession credit facility that would provide financing of up to a maximum amount of $5 million. On June 14, 2018, the Bankruptcy Court entered an interim order authorizing the DIP Facility on an interim basis [Docket No. 36]. The Bankruptcy Court held a final hearing to consider approval of the DIP Facility on July 3, 2018, and on July 3, 2018, the Bankruptcy Court entered a final order approving the DIP Facility on a final basis [Docket No. 64].

### D. SCHEDULES AND CLAIMS BAR DATE

On June 26, 2018, the Debtors each filed with the Bankruptcy Court their schedules of assets and liabilities (as amended, the "Schedules") and statements of financial affairs in their respective bankruptcy case. On June 27, 2018, the Debtors filed their *Motion to Establish a Bar Date for Filing Proofs of Claim or Interest and for Approval of the Bar Date Notice and Procedures* [Docket No. 60], seeking a bar date of August 6, 2018 (the "Bar Date"). On June 28, 2018, the Bankruptcy Court entered an Order [Docket No. 61] establishing August 6, 2018, as the Bar Date for all creditors in the Chapter 11 Cases.

## IV.
## SUMMARY OF THE PLAN

This section of the Disclosure Statement summarizes the Plan. This summary is qualified in its entirety by reference to the Plan.

## A.    ADMINISTRATIVE EXPENSE AND PRIORITY TAX CLAIMS

### 1.    Administrative Expense Claims

Except to the extent that a holder of an Allowed Administrative Expense Claim (other than a Professional Fee Claim) agrees to less favorable treatment, each Holder of an Allowed Administrative Expense Claim (other than a Professional Fee Claim) shall receive, in full satisfaction and discharge thereof, cash equal to the unpaid amount of such Administrative Expense Claim either: (a) if such Administrative Expense Claim is Allowed on or prior to the Effective Date, on the Effective Date or as soon as reasonably practicable thereafter (or, if not then due and payable, when such Allowed Administrative Claim is due and payable or as soon as reasonably practicable thereafter); (b) if such Administrative Expense Claim is not Allowed as of the Effective Date, no later than thirty (30) days after the date on which an order Allowing such Administrative Expense Claim becomes a Final Order, or as soon as reasonably practicable thereafter; (c) if such Allowed Administrative Expense Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the filing of the Chapter 11 Cases in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Expense Claim, without any further action by the holders of such Allowed Administrative Expense Claim; (d) at such time and upon such terms as may be agreed upon by such holder and the Debtors (with the consent of the Prepetition Lender) or the Reorganized Debtors, as applicable; or (e) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

### 2.    Professional Fee Claims

All Entities seeking an award by the Bankruptcy Court of Professional Fee Claims shall file and serve on attorneys for the Reorganized Debtors, the U.S. Trustee, attorneys for the Rimrock Investor, and such other Entities who are designated by the Bankruptcy Rules, the Confirmation Order, or other order of the Bankruptcy Court, on or before the date that is forty-five (45) days after the Effective Date, their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred from the Petition Date through the Effective Date.  Objections to any Professional Fee Claims must be filed and served on attorneys for the Reorganized Debtors, attorneys for the Rimrock Investor, and the requesting party no later than twenty-one (21) calendar days after the filing of the final applications for compensation or reimbursement (unless otherwise agreed by the party requesting compensation of a Professional Fee Claim).

Allowed Professional Fee Claims shall be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court (a) upon the later of (i) the Effective Date, and (ii) the date upon which an order relating to any such Allowed Professional Fee Claim is entered, in each case, as soon as reasonably practicable, or (b) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Professional Fee Claim and the Debtors (with the consent of the Prepetition Lender) or the Reorganized Debtors, as applicable. On or about the Effective Date, holders of Professional Fee Claims shall provide a reasonable estimate of their unpaid Professional Fee Claims incurred in rendering services to the Debtors or their Estates as of the Effective Date; *provided* that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the professional's request for payment of Professional Fee Claims. The Debtors or the Reorganized Debtors, as applicable, shall either escrow or separately reserve for and segregate such estimated amounts for the benefit of the holders of the Professional Fee Claims until the final fee applications related thereto are resolved by order of the Bankruptcy Court or agreement of the parties.

The Reorganized Debtors are authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.      **Priority Tax Claims**

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive, in full satisfaction and discharge thereof, Cash equal to the unpaid amount of such Allowed Priority Tax Claim either on, or as soon as practicable after, the latest of (a) the Effective Date, (b) the date on which such Priority Tax Claim becomes Allowed, (c) the date on which such Priority Tax Claim becomes due and payable, and (d) such other date as mutually may be agreed to by and among such holder and the Debtors (with the consent of the Prepetition Lender) or the Reorganized Debtors, as applicable.

4.      **DIP Facility Claims**

All obligations, other than expenses of the DIP Lender (which shall be paid in Cash by no later than the Effective Date), owed under or in connection with the DIP Facility by the Debtors shall be satisfied in full by (a) $2,000,000 proceeds of the Exit Facility, and (b) to the extent that such obligations under the DIP Facility exceed $2,000,000, the distribution to the DIP Lender (or its designee) of Class B-1 Membership Units based on a capital contribution to New HoldCo equal to the amount of outstanding obligations under the DIP Facility in excess of $2,000,000 as of the Effective Date.  For the avoidance of doubt, the DIP Facility will be fully drawn prior to the Effective Date and, thus, under subparagraph (b) of the preceding sentence, the DIP Lender (or its designee) shall receive the distribution of Class B-1 Membership Units based on a capital contribution to New HoldCo equal to $3,000,000.

**B.      CLASSIFICATION OF CLAIMS AND INTERESTS**

1.      **Classification in General**

Notwithstanding the combination of separate plans of reorganization for the Debtors that are set forth in the Plan for purposes of economy and efficiency, the Plan constitutes a separate chapter 11 plan for each Debtor, each of which shall include the classifications set forth below.  Accordingly, if the Bankruptcy Court does not confirm the Plan with respect to one or more Debtors, it may still confirm the Plan with respect to any other Debtor that satisfies the confirmation requirements of section 1129 of the Bankruptcy Code.

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and Distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided* that a Claim or Interest is placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Allowed Claim or Allowed Interest has not been satisfied, released, or otherwise settled.

2.      **Formation of Debtor Groups for Convenience Only**

The Plan groups the Debtors together solely for the purpose of describing treatment under the Plan, confirmation of the Plan, and making Distributions in accordance with the Plan in respect of Claims against and Interests in the Debtors under the Plan.  Such groupings shall not affect any Debtor's status as a separate legal Entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal Entities, or cause the transfer of any assets; and, except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal Entities after the Effective Date.

3.      **Summary of Classification**

The following table designates the Classes of Claims against and Interests in each of the Debtors and specifies which of those Classes are (a) Impaired or Unimpaired by the Plan, (b) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (c) presumed to accept or deemed to reject the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims and Priority Tax Claims have not been classified.

| Class | Designation | Treatment | Entitled to Vote |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | No (Presumed to accept) |
| 2 | Other Priority Claims | Unimpaired | No (Presumed to accept) |
| 3 | Prepetition Lender Claims | Impaired | Yes |
| 4 | General Unsecured Claims | Unimpaired | No (Presumed to accept) |
| 5 | Affiliate Note Claims | Impaired | Yes |
| 6 | MOU Claims | Impaired | Yes |
| 7 | Executive Compensation Claims | Impaired | Yes |
| 8 | Intercompany Claims | Unimpaired | No (Presumed to accept) |
| 9 | Preferred Member Interests | Impaired | Yes |
| 10 | Common Member Interests | Impaired | Yes |
| 11 | Rimrock Investor Member Interests | Impaired | No (Presumed to reject, but has consented to treatment pursuant to Restructuring Support Agreement) |

4.      **Special Provision Governing Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan shall affect the rights of the Debtors or the Reorganized Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

5.      **Elimination of Vacant Classes**

Any Class of Claims against or Interests in a Debtor that, as of the commencement of the Confirmation Hearing, does not have at least one (1) holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan of such Debtor for purposes of voting to accept or reject such Debtor's Plan, and disregarded for purposes of determining whether such Debtor's Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

C.      **TREATMENT OF CLAIMS AND INTERESTS**

1.      **Other Secured Claims (Class 1)**

(a)      Classification:  Class 1 consists of Other Secured Claims. To the extent that Other Secured Claims are determined by the Bankruptcy Court to be Impaired under the Plan and such Claims are secured by different Collateral or different interests in the same Collateral, such Claims shall be treated as separate subclasses of Class 1 for purposes of voting to accept or reject the Plan and receiving Distributions under the Plan.

(b)      Treatment:  Each holder of an Allowed Other Secured Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Other Secured Claim, in the sole discretion of the Debtors (with the consent of the Prepetition Lender) or the Reorganized Debtors, as applicable: (i) reinstatement of its Allowed Other Secured Claim in accordance with section 1124(2) of the Bankruptcy Code (including any cash necessary to satisfy the requirements for reinstatement), such that such claim is rendered unimpaired; (ii) either (A) cash in the full amount of such Allowed Other Secured Claim, including any postpetition interest accrued pursuant to section 506(b) of the Bankruptcy Code, (B) the proceeds of the sale or disposition of the collateral securing such Allowed Other Secured Claim, to the extent of the value of such holder's secured interest in such collateral, (C) the collateral securing such Allowed Other Secured Claim and any interest on such Allowed Other Secured Claim required to be paid pursuant to section 506(b) of the Bankruptcy Code, or (D) such other distribution as necessary to satisfy the requirements of section 1129 of the Bankruptcy Code; or (iii) such other treatment as mutually may be agreed to by and among such holder and the Debtors or the Reorganized Debtors. Any cure amount that the Debtors may be required to pay pursuant to section 1124(2) of the Bankruptcy Code on account of any such reinstated Other Secured Claim shall be paid on, or as soon as practicable after, the latest of (x) the Effective Date, (y) the date on which such Other Secured Claim becomes Allowed, or (z) such other date as mutually may be agreed to by and among such holder and the Debtors or the Reorganized Debtors as applicable. Any distributions due pursuant to clause (ii) above shall be made either on, or as soon as practicable after, the latest of (I) the Effective Date, (II) the date on which such Other Secured Claim becomes Allowed, (III) the date on which such Other Secured Claim becomes due and payable, and (IV) such other date as mutually may be agreed to by such holder and the Debtors or the Reorganized Debtors as applicable.

(c)      Voting:  Class 1 is Unimpaired, and the holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Secured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited.

2.      **Other Priority Claims (Class 2)**

(a)      Classification:  Class 2 consists of Other Priority Claims.

(b)      Treatment:  Each holder of an Allowed Other Priority Claim shall receive, in full and complete settlement, release, and discharge of such Claim, (i) reinstatement of its Allowed Other Priority Claim in accordance with section 1124(2) of the Bankruptcy Code (including any cash necessary to satisfy the requirements for reinstatement), such that such Claim is rendered Unimpaired or (ii) such other treatment as mutually may be agreed to by and among such holder and the Debtors (with the consent of the Prepetition Lender) or the Reorganized Debtors as applicable.  Any cure amount that the Debtors may be required to pay pursuant to section 1124(2) of the Bankruptcy Code on account of any such reinstated Other Priority Claim shall be paid on, or as soon as practicable after, the latest of (w) the Effective Date, (x) the date on which such Other Priority Claim becomes Allowed, (y) the date on which such Other Priority Claim otherwise is due and payable, and (z) such other date as mutually may be agreed to by and among such holder and the Debtors or the Reorganized Debtors as applicable.

(c)      Voting:  Class 2 is Unimpaired, and the holders of Other Priority Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Other Priority Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited.

3.      **Prepetition Lender Claims (Class 3)**

(a)      <u>Classification</u>:  Class 3 consists of Prepetition Lender Claims.

(b)      <u>Allowance</u>:  The Prepetition Lender Claims are Allowed pursuant to section 506(a) of the Bankruptcy Code against each of the Debtors in the aggregate face amount of the then outstanding amount under the Prepetition Loan Agreement, plus any unreimbursed amounts thereunder, and any accrued and unpaid interest payable specified under the Prepetition Loan Agreement on such unreimbursed amounts through the Effective Date, plus any fees, charges, expenses, reimbursement obligations, indemnification obligations, increased costs, and other amounts due but unpaid under the Prepetition Loan Agreement.  Notwithstanding the foregoing, the Prepetition Lender shall only be entitled to one satisfaction and one Distribution under the Plan on account of the Prepetition Lender Claims.  The Prepetition Lender shall not be required to file proofs of Claim on account of any Prepetition Lender Claim.

(c)      <u>Treatment</u>:  In exchange for the complete settlement, release, and discharge of the Prepetition Lender Claims, as well as in consideration for the making of the Exit Equity Contribution by the Rimrock Investor and the waiver by the Rimrock Investor of any distributions to which it may be entitled on account of its existing Interests in LPL, on the Effective Date, the Prepetition Lender (or its designee) shall receive Class A Membership Units, Class B-1 Membership Units, and Class B-2 Membership Units.

The number of Class A Membership Units issued to the Prepetition Lender (or its designee) shall be based on a capital contribution to New HoldCo equal to $4,552,000 (based on a pre-money valuation of New HoldCo equal to $50 million).  The Class A Membership Units issued to the Prepetition Lender (or its designee) shall constitute 100% of the Class A Membership Units issued as of the Effective Date. The holders of Class A Membership Units shall be entitled to a return of capital and other distributions in accordance with the terms and priorities set forth in the Waterfall.

The number of Class B-1 Membership Units issued to the Prepetition Lender (or its designee) shall be based on a capital contribution to New HoldCo equal to $60,000,000.  Together with the Class B-1 Membership Units issued to the DIP Lender (or its designee) in satisfaction of the obligations under the DIP Facility, the Class B-1 Membership Units issued to the Prepetition Lender (or its designee) shall constitute 100% of the Class B-1 Membership Units issued as of the Effective Date.  The holders of Class B-1 Membership Units shall be entitled to a return on capital, a return of capital, and other distributions in accordance with the terms and priorities set forth in the Waterfall.

The number of Class B-2 Membership Units issued to the Prepetition Lender (or its designee) shall be based on a capital contribution to New HoldCo equal to $10,000,000, and shall represent 100% of the Class B-2 Membership Units issued as of the Effective Date.  The holders of Class B-2 Membership Units shall be entitled to a return of capital and other distributions in accordance with the terms and priorities set forth in the Waterfall.

(d)      In addition to the foregoing, all outstanding professional fees and expenses of the Prepetition Lender under the Prepetition Loan Agreement (including fees and expenses of legal advisors, financial advisors, and investment banks) shall be paid in full in Cash by the Debtors on the Effective Date.

(e)      <u>Voting</u>:  Class 3 is Impaired, and the holders of Prepetition Lender Claims in Class 3 are entitled to vote to accept or reject the Plan.

4.      **General Unsecured Claims (Class 4)**

(a)      <u>Classification</u>:  Class 4 consists of General Unsecured Claims.  For the sake of clarity, Class 4 General Unsecured Claims shall not include unsecured Claims treated under Class 5 (Affiliate Note Claims), Class 6 (MOU Claims) or Class 7 (Executive Compensation Claims) of the Plan.

(b)      <u>Treatment</u>:  Each holder of an Allowed General Unsecured Claim shall receive, at the election of the Debtors (with the consent of the Prepetition Lender) or the Reorganized Debtors, as applicable, in full and complete settlement, release, and discharge of such Claim, (i) reinstatement pursuant to section 1124(2) of the Bankruptcy Code (including any Cash necessary to satisfy the requirements for reinstatement), such that such Claim is rendered Unimpaired, (ii) payment in full in Cash on, or as soon as practicable after, the latest of (A) the Effective Date, (B) the date on which such General Unsecured Claim becomes Allowed, (C) the date on which such General Unsecured Claim otherwise is due and payable, and (D) such other date as mutually may be agreed to by and among such holder and the Debtors or the Reorganized Debtors as applicable, or (iii) such other treatment as mutually may be agreed to by and among such holder and the Debtors or the Reorganized Debtors as applicable. Any cure amount that the Debtors may be required to pay pursuant to section 1124(2) of the Bankruptcy Code on account of any such reinstated General Unsecured Claim shall be paid on, or as soon as practicable after, the latest of (w) the Effective Date, (x) the date on which such General Unsecured Claim becomes Allowed, (y) the date on which such General Unsecured Claim otherwise is due and payable, and (z) such other date as mutually may be agreed to by and among such holder and the Debtors or the Reorganized Debtors as applicable.

(c)      <u>Voting</u>:  Class 4 is Unimpaired, and the holders of General Unsecured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Allowed General Unsecured Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited.

5.      **Affiliate Note Claims (Class 5)**

(a)      <u>Classification</u>:  Class 5 consists of Affiliate Note Claims.

(b)      <u>Treatment</u>:  In exchange for the complete settlement, release, and discharge of the Affiliate Note Claims, on the Effective Date (or as soon as reasonably practicable thereafter), each holder of an Allowed Affiliate Note Claim will receive Class E Membership Units. Each holder of an Allowed Affiliate Note Claim shall receive a number of Class E Membership Units based on a capital contribution to New HoldCo equal to the Allowed outstanding principal amount of the Affiliate Notes held by such holder as of the Effective Date, adjusted to reflect the Membership Interest of LSDG as discussed in Class 10 of the Plan and as set forth in the Waterfall.  The holders of Class E Membership Units shall be entitled to a return on capital (including interest accrued on the Affiliate Notes as of the Effective Date), a return of capital, and other distributions in accordance with the terms and priorities set forth in the Waterfall.

(c)      <u>Voting</u>:  Class 5 is Impaired, and the holders of Affiliate Note Claims in Class 5 are entitled to vote to accept or reject the Plan.

6.        **MOU Claims (Class 6)**

        (a)      <u>Classification</u>:  Class 6 consists of MOU Claims.

        (b)      <u>Treatment</u>:  In exchange for the complete settlement, release, and discharge of the MOU Claims, on the Effective Date (or as soon as reasonably practicable thereafter), each holder of an Allowed MOU Claim will receive Class F Membership Units.  Each holder of an Allowed MOU Claim shall receive a number of Class F Membership Units based on a capital contribution to New HoldCo equal to the Allowed principal amount of such holder's Claim against the Debtors as of the Effective Date pursuant to the terminated MOU to which such holder is a counterparty, adjusted to reflect the Membership Interest of LSDG as discussed in Class 10 of the Plan and as set forth in the Waterfall. The holders of Class F Membership Units shall be entitled to a return on capital, a return of capital, and other distributions in accordance with the terms and priorities set forth in the Waterfall.

        (c)      <u>Voting</u>:  Class 6 is Impaired, and the holders of MOU Claims in Class 6 are entitled to vote to accept or reject the Plan.

7.        **Executive Compensation Claims (Class 7)**

        (a)      <u>Classification</u>:  Class 7 consists of Executive Compensation Claims.

        (b)      <u>Treatment</u>:  In exchange for the complete settlement, release, and discharge of all Executive Compensation Claims, on the Effective Date (or as soon as reasonably practicable thereafter), each holder of an Allowed Executive Compensation Claim will receive Class F Membership Units issued by New HoldCo.  Unless otherwise specifically assumed by the Debtors in accordance with the terms of the Plan, all executive employment agreements will be rejected by the Debtors prior to or in connection with the occurrence of the Effective Date.  Notwithstanding the rejection of any employment agreement by the Debtors, any and all provisions thereof running in favor of the Debtors (including, without limitation, any non-compete, non-solicit or confidentiality provisions) that would otherwise survive a termination of such agreement by the Debtors shall continue to be binding on the employee after the Effective Date (and shall not be released pursuant to Section 10.4(a) of the Plan).  Each holder of an Allowed Executive Compensation Claim shall receive a number of Class F Membership Units based on a capital contribution to New HoldCo equal to the Allowed amount of deferred compensation owed to such holder by the Debtors as of the Effective Date, adjusted to reflect the Membership Interest of LSDG as discussed in Class 10 of the Plan and as set forth in the Waterfall.  The holders of Class F Membership Units shall be entitled to a return on capital, a return of capital, and other distributions in accordance with the terms and priorities set forth in the Waterfall.

        (c)      <u>Voting</u>:  Class 7 is Impaired, and the holders of Executive Compensation Claims in Class 7 are entitled to vote to accept or reject the Plan.

8.        **Intercompany Claims (Class 8)**

        (a)      <u>Classification</u>:  Class 8 consists of Intercompany Claims.

        (b)      <u>Treatment</u>:  Each Intercompany Claim shall, on the Effective Date, (i) be reinstated, in full or in part, and treated in the ordinary course of business or (ii) be cancelled and discharged, as determined by the Debtors, with the consent of the Prepetition Lender.  Holders of Intercompany Claims shall not receive or retain any property on account of such Intercompany Claim to the extent that such Intercompany Claim is cancelled and discharged.

(c)    <u>Voting</u>:  Class 8 is Unimpaired, and the holders of Intercompany Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, holders of Allowed Intercompany Claims are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited.

9.    **Preferred Member Interests (Class 9)**

(a)    <u>Classification</u>:  Class 9 consists of Preferred Member Interests.

(b)    <u>Treatment</u>:  In exchange for the complete settlement, release, discharge, cancellation, and extinguishment of the Preferred Member Interests, on the Effective Date (or as soon as reasonably practicable thereafter), each holder of a Preferred Member Interest will receive Class C Membership Units.  Each holder of an Allowed Preferred Member Interest shall receive a number of Class C Membership Units based on a capital contribution to New HoldCo equal to the principal amount of the capital account held by such holder against LPL on account of its Allowed Preferred Member Interest as of the Effective Date, adjusted to reflect the Membership Interest of LSDG as discussed in Class 10 of the Plan and as set forth in the Waterfall.  The holders of Class C Membership Units shall be entitled to a return on capital (including preferred returns accrued on the Preferred Member Interests as of the Effective Date), a return of capital, and other distributions in accordance with the terms and priorities set forth in the Waterfall.

(c)    <u>Voting</u>:  Class 9 is Impaired, and the holders of Preferred Member Interests in Class 9 are entitled to vote to accept or reject the Plan.

10.    **Common Member Interests (Class 10)**

(a)    <u>Classification</u>:  Class 10 consists of Common Member Interests.

(b)    <u>Treatment</u>:  In exchange for the complete settlement, release, discharge, cancellation,  and extinguishment of the Common Member Interests, on the Effective Date (or as soon as reasonably practicable thereafter), (i) LPI, as a holder of Allowed Common Member Interests with respect to additional capital contributions made in 2015, shall receive Class D-1A Membership Units, (ii) LPI, as a holder of Allowed Common Membership Interests with respect to original capital contributions made in 2011 through 2013, shall receive Class D-1B Membership Units, and (iii) LSDG, as a holder of Allowed Common Member Interests, will receive Class D-2 Membership Units.  For the sake of clarity, LPI and LSDG are receiving different tranches of Class D units as a matter of administrative convenience due to the fact that LPI has paid in capital with respect to its Common Member Interests (which is entitled to priority as set forth in the Waterfall) and LSDG did not make any capital contributions.

LPI, as holder of an Allowed Common Member Interest, shall receive a number of Class D-1A Membership Units based on a capital contribution to New HoldCo equal to the principal amount of the capital account held by such holder against LPL on account of its Allowed Common Member Interest as of the Effective Date with respect to additional capital contributions made in 2015, adjusted to reflect the Membership Interest of LSDG as discussed below and as set forth in the Waterfall.  The holders of Class D-1A Membership Units shall be entitled to a return on capital (including preferred returns accrued on the Common Member Interests as of the Effective Date), a return of capital and other distributions in accordance with the terms and priorities set forth in the Waterfall (with it being understood that only holders of Class D-1A and D-1B Membership Units will have capital accounts on the Effective Date).

LPI, as holder of an Allowed Common Member Interest, shall receive a number of Class D-1B Membership Units based on a capital contribution to New HoldCo equal to the principal amount of the

capital account held by such holder against LPL on account of its Allowed Common Member Interest as of the Effective Date with respect to the original capital contributions made in 2011 through 2013, adjusted to reflect the Membership Interest of LSDG as discussed below and as set forth in the Waterfall. The holders of Class D-1B Membership Units shall be entitled to a return on capital (including preferred returns accrued on the Common Member Interests as of the Effective Date), a return of capital, and other distributions in accordance with the terms and priorities set forth in the Waterfall (with it being understood that only holders of Class D-1A Membership Units and Class D-1B Membership Units will have capital accounts on the Effective Date).

LSDG, as holder of an Allowed Common Member Interest, shall receive a number of Class D-2 Membership Units proportional to the number of D-1A Membership Units and D-1B Membership Units received by LPI, determined by dividing the capital account of LPI by 51.5825% (percentage of LPI's Existing Ownership of LPL) and multiplying the result by 25.6361% (percentage of LSDG's Existing Ownership of LPL)  The holders of Class D-2 Membership Units shall be entitled to distributions in accordance with the terms and priorities set forth in the Waterfall.

(c)     Voting:  Class 10 is Impaired, and the holders of Common Membership Interests in Class 10 are entitled to vote to accept or reject the Plan.

11.     **Rimrock Investor Member Interests (Class 11)**

(a)     Classification:  Class 11 consists of Rimrock Investor Member Interests.

(b)     Treatment:  On the Effective Date, the Rimrock Investor Member Interests shall be cancelled, extinguished and discharged, and the Rimrock Investor shall not receive or retain any property or interest on account of such Interest of capital and other distributions in accordance with the terms and priorities set forth in the Waterfall.

(c)     Voting:  Class 11 is not receiving or retaining any property under the Plan, and the holders of Rimrock Investor Member Interests are conclusively presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, holders of Rimrock Investor Member Interests are not entitled to vote to accept or reject the Plan, and the votes of such holders will not be solicited.  Pursuant to the Restructuring Support Agreement, the holder of the Rimrock Investor Member Interests has consented to the treatment to be provided to it as a holder of an Interest in Class 11.

**D.     MEANS FOR IMPLEMENTATION**

1.     **Restructuring Expenses**

To the extent not otherwise paid, the Debtors shall promptly pay outstanding and invoiced Restructuring Expenses as follows:  (A) on the Effective Date, Restructuring Expenses incurred during the period prior to the Effective Date to the extent invoiced to the Debtors at least two (2) Business Days in advance and (B) after the Effective Date, any unpaid Restructuring Expenses within five (5) Business Days of receiving an invoice; *provided that* such Restructuring Expenses shall be paid in accordance with the terms of any applicable engagement letters or other contractual arrangements without the requirement for the filing of retention applications, fee applications, or any other applications in the Chapter 11 Cases, and without any requirement for further notice or Bankruptcy Court review or approval; *provided further that* to the extent timely invoiced Restructuring Expenses are not paid by the Debtors within the timeframes set forth in Section 5.1 of the Plan such Restructuring Expenses shall not be waived and shall be included in a subsequent invoice.

2.      **Continued Corporate Existence and Operating Agreements**

The Debtors shall continue to exist after the Effective Date as the Reorganized Debtors in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the Amended Organizational Documents.

On or after the Effective Date, each Reorganized Debtor may take such action that may be necessary or appropriate as permitted by applicable law and such Reorganized Debtor's organizational documents, as such Reorganized Debtor may determine is reasonable and appropriate to effect any transaction described in, approved by, or necessary or appropriate to effectuate, the Plan, including, without limitation, causing: (i) a Reorganized Debtor to be dissolved; (ii) the legal name of a Reorganized Debtor to be changed; or (iii) the closure of a Reorganized Debtor's Chapter 11 Case on the Effective Date or any time thereafter.

On the Effective Date, the holders of Class A through F Membership Units of New HoldCo will enter into the HoldCo Operating Agreement reflecting the terms set forth in the Restructuring Support Agreement and the exhibits thereto.  The existing operating agreement of LPL shall be amended and restated to (a) reflect 100% ownership of Reorganized LPL by New HoldCo, and (b) provide that Reorganized LPL will be managed by its sole member, New HoldCo.  Copies of the proposed HoldCo Operating Agreement and the Amended LPL Operating Agreement shall be filed with the Bankruptcy Court in the Plan Supplement and served on all holders of Claims and Interests entitled to vote on the Plan.

3.      **Exit Facility**

On the Effective Date, in accordance with, and subject to, the terms and conditions of the Exit Facility Documents, the Reorganized Debtors will enter into the Exit Facility without the need for any further corporate action or Bankruptcy Court approval, and without further action by the holders of Claims or Interests.  The proceeds of the Exit Facility shall be used to (i) refinance up to $2,000,000 of the DIP Facility, (ii) fund other Distributions, costs, and expenses contemplated by the Plan, and (iii) fund general working capital and for general corporate purposes of the Reorganized Debtors, in each case subject to the terms of the Exit Facility Documents.

The Confirmation Order shall constitute approval of the Exit Facility (including the transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred and fees paid by the Reorganized Debtors in connection therewith), and authorization for the Reorganized Debtors to enter into and perform under the Exit Facility Documents and such other documents as may be required or appropriate.

All Liens and security interests granted pursuant to the Exit Facility Documents shall be (i) valid, binding, perfected, and enforceable Liens and security interests in the personal and real property described in and subject to such document, with the priorities established in respect thereof under applicable non-bankruptcy law, (ii) granted in good faith and deemed not to constitute a fraudulent conveyance or fraudulent transfer, and (iii) not otherwise subject to avoidance, recharacterization, or subordination under any applicable law.  Each of the Debtors, the Reorganized Debtors, and the Entities granted such Liens and security interests are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary to establish, attach, and perfect such Liens and security interests under any applicable law, and shall thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

The Reorganized Debtors shall be authorized to execute, deliver, and enter into and perform under the Exit Facility Documents without the need for any further corporate or limited liability company action and without further action by the holders of Claims or Interests.

Among other things, the Exit Facility Documents shall provide:

> (i)    The original principal amount of the Exit Facility shall be $2,000,000, which will consist of a "rollover" of an equivalent amount of the DIP Facility.

> (ii)    The Exit Facility will be secured by a first priority lien on all assets of the Reorganized Debtors.

> (iii)    The Exit Facility shall bear interest at a rate equal to 12% per annum, which amount shall be paid on the first business day of each month in Cash.

> (iv)    The Exit Facility shall have an initial revolving balance and commitment of $2,000,000, but shall include an incremental revolving facility of up to an additional $18,000,000 that may be borrowed by the Reorganized Debtors in the sole discretion of the Exit Lender upon request made by the Reorganized Debtors.

> (v)    The Exit Facility will have a maturity date of the five year anniversary of the Effective Date.

The Exit Lender will charge no commitment, arrangement or other fees in connection with the Exit Facility.

4.    **HoldCo Operating Agreement.**

The HoldCo Operating Agreement shall become effective on the Effective Date, and shall be binding on the Reorganized Debtors, New HoldCo, and all holders of New Membership Units in New HoldCo. All holders of New Membership Units in New HoldCo shall be deemed to be parties to the HoldCo Operating Agreement, without the need for execution by any such holder.

5.    **Authorization and Issuance of New Membership Units**

On the Effective Date and immediately following the funding of the Exit Facility, New HoldCo and Reorganized LPL, as applicable, are authorized to issue or cause to be issued and shall issue the New Membership Units in accordance with the terms of the Plan, and the Amended Organizational Documents, without the need for any further limited liability company action. All of the New Membership Units, when so issued, shall be duly authorized, validly issued, fully paid, and non-assessable.

Upon the Effective Date, (a) the New Membership Units shall not be registered under the Securities Act of 1933, and shall not be listed for public trading on any securities exchange, and (b) none of the Reorganized Debtors shall be a reporting company under the Exchange Act.

6.    **Section 1145 Exemption**

The offer, issuance, and distribution of the New Membership Units hereunder pursuant to the terms of the Plan shall be exempt, pursuant to section 1145 of the Bankruptcy Code, without further act or action by any Entity, from registration under (a) the Securities Act of 1933, as amended, and all rules and

regulations promulgated thereunder, and (b) any state or local law requiring registration for the offer, issuance, or distribution of Securities.

The New Membership Units shall be freely tradable by the recipients thereof, subject to: (a) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act of 1933; (b) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of such securities or instruments; (c) the restrictions, if any, on the transferability of the New Membership Units contained in the Amended Organizational Documents; and (d) applicable regulatory approval.

7.    **Cancellation of Existing Securities and Agreements**

Except for the purpose of evidencing a right to a Distribution under the Plan and except as otherwise set forth in the Plan, including with respect to executory contracts or unexpired leases that shall be assumed by the Debtors, on the Effective Date, all agreements, instruments, and other documents evidencing any Prepetition Lender Claims, Affiliate Note Claims, MOU Claims, Executive Compensation Claims, Preferred Member Interests, Common Member Interests, or any Rimrock Investor Member Interests and any rights of any holder in respect thereof shall be deemed cancelled, discharged, and of no force or effect and the obligations of the Debtors thereunder shall be deemed fully satisfied, released, and discharged.

Notwithstanding such cancellation and discharge, the Prepetition Loan Agreement, the Affiliate Notes, the employment agreements evidencing the Executive Compensation Claims, the documents evidencing the Preferred Member Interests, and the documents evidencing the Common Member Interests shall continue in effect solely to the extent necessary to (a) allow the holders of Allowed Prepetition Lender Claims, Allowed Affiliate Note Claims, Allowed MOU Claims, Allowed Executive Compensation Claims, Allowed Preferred Member Interests, and Allowed Common Member Interests to receive Distributions under the Plan, (b) allow the Debtors, the Reorganized Debtors, and New HoldCo and the Disbursing Agent to make post-Effective Date Distributions or take such other action pursuant to the Plan on account of the Allowed Prepetition Lender Claims, Allowed Affiliate Note Claims, Allowed MOU Claims, Allowed Executive Compensation Claims, Allowed Preferred Member Interests, and Allowed Common Member Interests, and to otherwise exercise their rights and discharge their obligations relating to the interests of the holders of such Claims and Interests in accordance with the Plan, (c) allow holders of Claims to retain their respective rights and obligations vis-à-vis other holders of Claims pursuant to any applicable loan documents, (d) allow the Prepetition Lender to enforce its rights, claims, and interests vis-à-vis any non-Debtor, (e) preserve any rights of the Prepetition Lender to payment of fees, expenses, and indemnification obligations as against any money or property distributable to holders under the Prepetition Loan Agreement, including any rights to priority of payment and/or to exercise charging liens, (f) allow the Prepetition Lender to enforce any obligations owed to it under the Plan, (g) permit the Prepetition Lender to perform any function necessary to effectuate the foregoing, and (h) permit the Prepetition Lender to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court relating to the Prepetition Facility, *provided* that nothing in Section 5.6 of the Plan shall affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any liability or expense to any of the Reorganized Debtors.

Notwithstanding the foregoing, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, the Debtors of their interests, as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in Section 5.6 of the Plan shall be deemed null and void and shall be of no force and effect.  Nothing contained in the Plan shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtors or any of their counterparties under any executory contract or unexpired lease to the extent such executory contract or unexpired lease has been assumed by the Debtors pursuant

to a Final Order of the Bankruptcy Court or hereunder.  Nothing contained in the Plan shall release the Debtors or the Reorganized Debtors, as applicable, from their obligations under the Plan.

### 8.    Officers and Boards of Directors

The HoldCo Operating Agreement shall provide for a Board of Directors or Board of Managers initially consisting of three (3) members, with one (1) seat for the Chief Executive Officer of New HoldCo and two (2) seats to be appointed by members holding a majority of the membership units of New HoldCo. The identities of the members of each board of directors or managers of a Reorganized Debtor, as applicable, and, to the extent applicable, the officers of each Reorganized Debtor, shall be disclosed at or prior to the Confirmation Hearing in accordance with section 1129(a)(5) of the Bankruptcy Code.

Commencing on the Effective Date, each of the directors, managers, and officers of each of the Reorganized Debtors shall be elected and serve pursuant to the terms of the applicable Amended Organizational Documents of such Reorganized Debtor and may be replaced or removed in accordance with such Amended Organizational Documents.

### 9.    Exit Equity Contribution

On the Effective Date, and in partial consideration for its receipt of certain Class A Membership Units in an amount equal to $4,552,000 and certain Class B Membership Units, the Rimrock Investor (or certain of its affiliates) shall contribute the following to the Reorganized Debtors:

ʃ    all land, property and other assets that were transferred by the Debtors to the Prepetition Lender and then by the Prepetition Lender to the Rimrock Investor on or around November 3, 2016 in connection with those certain Deeds in Lieu delivered by the Debtors to Rimrock (the "Deed in Lieu Property");

ʃ    that certain approximately 2.2 acre parcel of property at the Project commonly referred to as Parcel J17 purchased by an affiliate of the Prepetition Lender for $1,712,000 (the "J17 Parcel");

ʃ    that certain approximately 6.058 acre parcel of property at the Project commonly referred to as the North Stars Way Parcel purchased by an affiliate of the Prepetition Lender for $450,000 (the "North Stars Way Parcel"); and

ʃ    a commitment to contribute (either to Bartow County or directly to one or more approved contractors) an amount of not less than $2,390,000 under that certain Supplemental Funding Agreement, dated as of February 7, 2018, between Bartow County and the Rimrock Investor.

Complete and accurate legal descriptions for the Deed in Lieu Property, the J17 Parcel, and the North Stars Way Parcel are set forth in Exhibit C attached hereto.  With respect to subparagraph (iv) above, the Debtors acknowledge that Rimrock Investor (or certain of its affiliates) has already committed to contribute an amount of not less than $2,390,000 under that certain Supplemental Funding Agreement, dated as of February 7, 2018, between Bartow County and the Rimrock Investor in satisfaction of such section's requirements.

All property contributed to the Reorganized Debtors in connection with making the Exit Equity Contribution shall vest in the Reorganized Debtors free and clear of any Liens, Claims, and encumbrances that arise from or relate to any obligations or Claims against the Debtors.

10.    **Restructuring Transactions**

On or as soon as practicable after the Effective Date, the Reorganized Debtors shall take such actions as may be or become necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, financing, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the applicable requirements of applicable law and any other terms to which the applicable Entities may determine, (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree, (iii) the filing of appropriate certificates of formation, reincorporation, merger, consolidation, conversion, or dissolution, and the Amended Organizational Documents pursuant to applicable state law, (iv) the issuance of Securities, all of which shall be authorized and approved in all respects in each case without further action being required under applicable law, regulation, order, or rule, and (v) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law, subject, in each case, to the Amended Organizational Documents, as applicable.

Each officer, member of the Board of Managers or Board of Directors, or manager of the Debtors is (and each officer, member of the board of managers or board of directors, or manager of the Reorganized Debtors shall be) authorized and directed to issue, execute, deliver, file, or record such contracts, securities, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, all of which shall be authorized and approved in all respects, in each case, without the need for any approvals, authorization, consents, or any further action required under applicable law, regulation, order, or rule (including, without limitation, any action by the members or directors or managers of the Debtors or the Reorganized Debtors) except for those expressly required pursuant to the Plan.

The operating agreements and other organizational documents, as applicable, of the Debtors shall be amended or amended and restated consistent with section 1123(a)(6) of the Bankruptcy Code, if applicable, and otherwise in accordance with the Plan and the Restructuring Support Agreement.

All matters provided for in the Plan involving the corporate structure of the Debtors or the Reorganized Debtors, to the extent applicable, or any corporate, limited liability company, or related action required by the Debtors or the Reorganized Debtors, as applicable, in connection herewith shall be deemed to have occurred and shall be in effect, without any requirement of further action by the members, or directors or managers of the Debtors or the Reorganized Debtors, as applicable, and with like effect as though such action had been taken unanimously by the members, directors, managers, or officers, as applicable, of the Debtors or the Reorganized Debtors.

11.    **Cancellation of Liens**

Except as otherwise specifically provided in the Plan, including pursuant to Section 5.6(b) of the Plan, upon the indefeasible payment in full in Cash of any Other Secured Claim, any Lien securing an Other Secured Claim that is indefeasibly paid in full, in Cash, shall be deemed released, and the holder of such Other Secured Claim shall be authorized and directed to release any Collateral or other property of the Debtors (including any Cash collateral) held by such holder and to take such actions as may be requested by the Reorganized Debtors to evidence the release of such Lien, including the execution, delivery and filing or recording of such releases as may be requested by the Reorganized Debtors.

12. **Employee Matters**

Subject to Section 5.12(b) of the Plan and except with respect to Executive Compensation Agreements, on the Effective Date, the Reorganized Debtors shall be deemed to have assumed Employee Arrangements; *provided that* notwithstanding anything contrary in the Employee Arrangements, the consummation of the Plan shall not be treated as a change in control or other similar transaction under the Employee Arrangements.

Any Interests granted prior to the Effective Date to a current or former employee, officer, director or contractor under an Employee Arrangement or otherwise shall be deemed cancelled on the Effective Date and shall be subject to the treatment provided for in the Plan. For the avoidance of doubt, if a Benefit Plan or an Employee Arrangement is assumed and the Benefit Plan or Employment Arrangement provides in part for an award or potential award of Interests in the Debtors, such Benefit Plan or Employment Arrangement shall be assumed in all respects other than the provisions of such agreement relating to awarding an Interest in any of the Debtors.

Certain membership units in New HoldCo representing ten percent (10%) of all membership units of New HoldCo (other than Class A Membership Units) shall be reserved and may be issued post-Effective Date to the management, employees or consultants of the Reorganized Debtors in accordance with the terms and conditions of any incentive plan or employment or consulting agreement approved by the Board of Directors or Board of Managers of New HoldCo (such Membership Units, the "Class B-3 Membership Units"). To the extent that Class B-3 Membership Units are issued, the holders of such Class B-3 Membership Units shall be entitled to receive distributions in accordance with the terms and priorities set forth in the Waterfall.

13. **Nonconsensual Confirmation**

The Debtors intend to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code as to any Classes that reject or are deemed to reject the Plan.

14. **Closing of Chapter 11 Cases**

After an Estate has been fully administered, the Reorganized Debtors shall seek authority from the Bankruptcy Court to close the applicable Chapter 11 Case(s) in accordance with the Bankruptcy Code and Bankruptcy Rules.

15. **Notice of Effective Date**

On the Effective Date, the Debtors shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

E. **DISTRIBUTIONS**

1. **Distributions Generally**

One or more Disbursing Agents shall make all Distributions under the Plan to the appropriate holders of Allowed Claims in accordance with the terms of the Plan.

2.        **Distribution Record Date**

As of the close of business on the Effective Date, the various lists of holders of Claims or Interests in each Class, as maintained by the Debtors or their respective agents, shall be deemed closed, and there shall be no further changes in the record holders of any of the Claims or Interests.  The Debtors or the Reorganized Debtors shall have no obligation to recognize any transfer of the Claims or Interests occurring on or after the Effective Date.

3.        **Date of Distributions.**

Except as otherwise provided in the Plan, any Distributions and deliveries to be made under the Plan shall be made on the Effective Date or as otherwise determined in accordance with the Plan, including, without limitation, the treatment provisions of Article IV of the Plan, or as soon as practicable thereafter; *provided* that the Reorganized Debtors may implement periodic Distribution dates to the extent they determine them to be appropriate.

4.        **Disbursing Agent**

All Distributions under the Plan shall be made by the Disbursing Agent, on behalf of the applicable Debtor (unless otherwise provided in the Plan), on or after the Effective Date or as otherwise provided in the Plan.  The Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties, and all reasonable and documented fees and expenses incurred by such Disbursing Agent directly related to Distributions hereunder shall be reimbursed by the Reorganized Debtors.  The Reorganized Debtors shall use all commercially reasonable efforts to provide the Disbursing Agent (if other than the Reorganized Debtors) with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the Debtors' or the Reorganized Debtors' books and records.  The Reorganized Debtors shall cooperate in good faith with the applicable Disbursing Agent (if other than the Reorganized Debtors) to comply with the reporting and withholding requirements outlined in Section 6.19 of the Plan.

5.        **Rights and Powers of Disbursing Agent**

From and after the Effective Date, the Disbursing Agent, solely in its capacity as Disbursing Agent, shall be exculpated by all Entities, including, without limitation, holders of Claims against and Interests in the Debtors and other parties in interest, from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of the Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of such Disbursing Agent.  No holder of a Claim or Interest or other party in interest shall have or pursue any Claim or Cause of Action against the Disbursing Agent, solely in its capacity as Disbursing Agent, for making payments in accordance with the Plan or for implementing provisions of the Plan, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of such Disbursing Agent.

The Disbursing Agent shall be empowered to (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties hereunder, (b) make all Distributions contemplated hereby, and (c) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

6.       **Expenses of Disbursing Agent**

Except as otherwise ordered by the Bankruptcy Court, any reasonable and documented fees and expenses incurred by the Disbursing Agent acting in such capacity (including reasonable documented attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash by the Reorganized Debtors in the ordinary course of business.

7.       **Postpetition Interest**

Except as otherwise specifically provided for in the Plan, the Confirmation Order, or another order of the Bankruptcy Court or required by the Bankruptcy Code, interest shall not accrue or be paid on any Claims on or after the Petition Date; *provided* that, if interest is payable pursuant to Section 6.7 of the Plan, interest shall accrue at the federal judgment rate pursuant to 28 U.S.C. § 1961 on a non-compounded basis from the date the obligation underlying the Claim becomes due and is not timely paid through the date of payment.  Notwithstanding the foregoing, postpetition interest on Claims arising under the DIP Facility shall accrue and be paid in accordance with the terms set forth in the agreements governing such Claims.

8.       **Delivery of Distributions**

All Distributions to any holder of an Allowed Claim as and when required by the Plan shall be made by the Disbursing Agent.  In the event that any Distribution to any holder is returned as undeliverable, no further Distributions shall be made to such holder unless and until the Disbursing Agent is notified in writing of such holder's then-current address, at which time all currently-due, missed Distributions shall be made to such holder as soon as reasonably practicable thereafter without interest.  Nothing in the Plan shall require the Disbursing Agent to attempt to locate holders of undeliverable Distributions and, if located, assist such holders in complying with Section 6.190 of the Plan.

9.       **Distributions after Effective Date**

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

10.      **Unclaimed Property**

Undeliverable Distributions or unclaimed Distributions shall remain in the possession of the Reorganized Debtors until such time as a Distribution becomes deliverable or the holder accepts Distribution, or such Distribution reverts back to the Reorganized Debtors, and shall not be supplemented with any interest, dividends, or other accruals of any kind.  Such Distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one hundred and eighty (180) days from the date of the attempted Distribution.  After such date, all unclaimed property or interest in property shall revert to the Reorganized Debtors, and the Claim of any other holder to such property or interest in property shall be discharged and forever barred.  The Reorganized Debtors and the Disbursing Agent shall have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records and filings with the Bankruptcy Court.

11.      **Time Bar to Cash Payments**

Checks issued by the Disbursing Agent in respect of Allowed Claims shall be null and void if not negotiated within one hundred and eighty (180) days after the date of issuance thereof.  Thereafter, the amount represented by such voided check shall irrevocably revert to the Reorganized Debtors, and any

Claim in respect of such voided check shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary. Requests for re-issuance of any check shall be made to the Disbursing Agent by the holder of the Allowed Claim to whom such check was originally issued.

12. **Manner of Payment under Plan**

Except as otherwise specifically provided in the Plan, at the option of the Debtors or the Reorganized Debtors, as applicable, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

13. **Satisfaction of Claims**

Except as otherwise specifically provided in the Plan, any Distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

14. **Fractional Membership Units**

If any Distributions of New Membership Units would result in the issuance of a fractional unit of New Membership Units, then the number of New Membership Units to be issued in respect of such Distribution shall be calculated to one decimal place and rounded up or down to the closest whole unit (with a half unit or greater rounded up and less than a half unit rounded down). The total number of New Membership Units to be distributed in connection with the Plan shall be adjusted as necessary to account for the rounding provided for in Section V.E.14 of the Plan. No consideration shall be provided in lieu of fractional units that are rounded down. Neither the Reorganized Debtors nor the Disbursing Agent shall have any obligation to make a Distribution that is less than one (1) New Membership Unit.

15. **Minimum Cash Distributions**

The Disbursing Agent shall not be required to make any Distribution of Cash less than One Hundred Dollars ($100) to any holder of an Allowed Claim; *provided* that if any Distribution is not made pursuant to Section V.E.15 of the Plan, such Distribution shall be added to any subsequent Distribution to be made on behalf of the holder's Allowed Claim.

16. **Setoffs and Recoupments**

The Debtors and the Reorganized Debtors, as applicable, or such entity's designee (including, without limitation, the Disbursing Agent) may, but shall not be required to, setoff or recoup against any Claim, and any Distribution to be made on account of such Claim, any and all claims, rights, and Causes of Action of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the holder of such Claim pursuant to the Bankruptcy Code or applicable nonbankruptcy law; *provided*, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by a Debtor or a Reorganized Debtor or its successor of any claims, rights, or Causes of Action that a Debtor or a Reorganized Debtor or its successor or assign may possess against the holder of such Claim.

17. **Allocation of Distributions between Principal and Interest**

Except as otherwise required by law (as reasonably determined by the Reorganized Debtors), Distributions with respect to an Allowed Prepetition Lender Claim shall be allocated first to the principal portion of such Allowed Claim (as determined for United States federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any.

18.    **No Distribution in Excess of Amount of Allowed Claim**

No holder of an Allowed Claim shall receive, on account of such Allowed Claim, Distributions in excess of the Allowed amount of such Claim, except to the extent postpetition interest is permitted by Section 6.7 of the Plan.

19.    **Withholding and Reporting Requirements**

(a)    <u>Withholding Rights</u>.  In connection with the Plan, any party issuing any instrument or making any Distribution described in the Plan shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all Distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements.  In the case of a non-Cash Distribution that is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and either (i) sell such withheld property to generate Cash necessary to pay over the withholding tax (or reimburse the distributing party for any advanced payment of the withholding tax), or (ii) pay the withholding tax using its own funds and retain such withheld property.  Any amounts withheld pursuant to the preceding sentence shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.  Notwithstanding the foregoing, each holder of an Allowed Claim or any other Entity that receives a Distribution pursuant to the Plan shall have responsibility for any taxes imposed by any Governmental Unit, including, without limitation, income, withholding, and other taxes, on account of such Distribution.  Any party issuing any instrument or making any Distribution pursuant to the Plan has the right, but not the obligation, to not make a Distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

(b)    <u>Forms</u>.  Any party entitled to receive any property as an issuance or Distribution under the Plan shall, upon request, deliver to the Disbursing Agent or such other Person designated by the Reorganized Debtors (which Person shall subsequently deliver to the Disbursing Agent any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a foreign Person) Form W-8 and any other forms or documents reasonably requested by any Reorganized Debtor to reduce or eliminate any withholding required by any federal, state, or local taxing authority.  If such request is made by the Reorganized Debtors, the Disbursing Agent, or such other Person designated by the Reorganized Debtors or Disbursing Agent and the holder fails to comply before the date that is one hundred and eighty (180) days after the request is made, the amount of such Distribution shall irrevocably revert to the applicable Reorganized Debtor and any Claim in respect of such Distribution shall be discharged and forever barred from assertion against such Reorganized Debtor or its respective property.

20.    **Hart-Scott-Rodino Antitrust Improvements Act**

Any New Membership Units to be distributed under the Plan to an Entity required to file a premerger notification and report form under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, to the extent applicable, shall not be distributed until the notification and waiting periods applicable under such Act to such Entity have expired or been terminated

## F.    PROCEDURES FOR DISPUTED CLAIMS

1.    **Objections to Claims**

Except insofar as a Claim is Allowed under the Plan, only the Reorganized Debtors shall be entitled to object to Claims after the Effective Date.  Any objections to proofs of Claim shall be served and filed (a) on or before one-hundred and eighty (180) days following the later of (i) the Effective Date and

(ii) the date that a proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim, or (b) such later date as ordered by the Bankruptcy Court upon motion filed by the Debtors or the Reorganized Debtors as applicable. The expiration of such period shall not limit or affect the Reorganized Debtors' rights to dispute Claims asserted other than through a proof of Claim.

### 2.    Estimation of Claims

The Debtors or the Reorganized Debtors, as applicable, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors or the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claim.

### 3.    No Distributions Pending Allowance

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or Distribution provided under the Plan shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

### 4.    Distributions after Allowance

To the extent that a Disputed Claim ultimately becomes, in whole or in part, an Allowed Claim, Distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan, including the treatment provisions provided in Article IV of the Plan. Such Distributions shall be made as soon as practicable after the date that the order or judgment of the Bankruptcy Court allowing such Disputed Claim (or portion thereof) becomes a Final Order.

### 5.    Claim Resolution Procedures Cumulative

All of the objection, estimation, and resolution procedures in the Plan are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with the Plan without further notice or Bankruptcy Court approval.

## G.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES

### 1.    Rejection of Executory Contracts and Unexpired Leases

On the Effective Date, all Executory Contracts or Unexpired Leases of the Debtors will be deemed rejected in accordance with the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except those Executory Contracts or Unexpired Leases that (a) have been previously rejected or assumed by any Debtor (in consultation and with the consent of the Prepetition Lender) pursuant to an order of the Bankruptcy Court, or (b) are the subject of a motion to assume filed by any Debtor (in consultation and with the consent of the Prepetition Lender) which is pending on the Effective Date.

Upon the occurrence of the Effective Date, unless otherwise agreed to by the Debtors and approved by the Prepetition Lender, all contracts, leases, and agreements (including, without limitation, any management or similar agreements) between any of the Debtors, on the one hand, and LSDG and/or LPI, on the other hand, shall be deemed rejected and terminated as of the Effective Date; *provided* that LSDG and LPI shall receive no consideration under the Plan on account of the rejection and termination of such contracts, leases, and agreements and any rejection damage Claim in favor of LSDG or LPI, if any, shall be deemed to be a Disallowed Claim under the Plan.

2.    **Claims Based on Rejection of Executory Contracts or Unexpired Leases**

All proofs of claim with respect to Claims arising from the rejection pursuant to the Plan of any Executory Contracts or Unexpired Leases, if any, must be filed with the Claims Agent and served upon counsel for the Reorganized Debtors within thirty (30) days after the Effective Date. Any Claims arising from the rejection of Executory Contracts or Unexpired Leases that become Allowed Claims are classified and shall be treated as a Class 4 General Unsecured Claims, as applicable. Any Claims arising from the rejection of an Executory Contract or Unexpired Lease pursuant to the Plan not filed within the time required by the Plan will be forever barred from assertion against the Debtors, the Reorganized Debtors and property of the Debtors or the Reorganized Debtors, as applicable, unless otherwise ordered by the Bankruptcy Court or provided in the Plan. Notwithstanding the foregoing, a Claim for damages arising from the rejection of an Executory Contract or Unexpired Lease rejected pursuant to an order of the Bankruptcy Court must be filed prior to any bar date or deadline set forth in such order authorizing the rejection of such Executory Contract or Unexpired Lease.

**H.    CONDITIONS PRECEDENT TO CONFIRMATION OF PLAN AND EFFECTIVE DATE**

1.    **Conditions Precedent to Confirmation of Plan**

The following are conditions precedent to confirmation of the Plan:

(a)    the Bankruptcy Court shall have entered the Confirmation Order.

(b)    the Bankruptcy Court shall have entered the Disclosure Statement Order finding that the Disclosure Statement contains adequate information pursuant to section 1125 of the Bankruptcy Code;

(c)    the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall be in form and substance consistent in all material respects with the Restructuring Support Agreement and otherwise satisfactory, acceptable or reasonably acceptable to the Debtors, the Prepetition Lender, and the Rimrock Investor, to the extent set forth in the Restructuring Support Agreement or the Exit Facility Documents, as applicable; and

(d)    the Restructuring Support Agreement shall not have been terminated and no termination notice shall have been given that with the passage of time would cause or permit a termination of the Restructuring Support Agreement.

2.      **Conditions Precedent to Effective Date**

The following are conditions precedent to the Effective Date of the Plan:

(a)      the Bankruptcy Court shall have entered the Confirmation Order without any material modification that would require re-solicitation, and shall be final and non-appealable and shall not be subject to any stay;

(b)      the Restructuring Support Agreement shall not have been terminated and shall be in full force and effect and no termination notice shall have been given that with the passage of time would cause or permit a termination of the Restructuring Support Agreement;

(c)      the Debtors shall have been and continue to be in material compliance with all covenants in the Restructuring Support Agreement;

(d)      the Debtors shall have satisfied the "Milestones" set forth in the Plan Term Sheet attached to the Restructuring Support Agreement (or such Milestones shall otherwise have been waived in accordance with the terms of the Restructuring Support Agreement);

(e)      all conditions in the Restructuring Support Agreement shall have been satisfied or waived;

(f)      Rimrock Investor shall have made the Exit Equity Contribution and the Confirmation Order shall provide that the Exit Equity Contribution will vest in the Reorganized Debtors free and clear of any and all Liens and Claims arising from obligations or Claims owed by the Debtors (other than agreed upon permitted encumbrances);

(g)      the proceeds of the Exit Facility, together with cash on hand upon the consummation of the Restructuring shall be sufficient to fund the Restructuring consistent with the Restructuring Support Agreement and the Plan Term Sheet attached thereto;

(h)      the Board of the LakePoint Master Owners' Association, Inc. (the "MOA") shall be replaced with such persons designated by the Prepetition Lender (and the composition of such Board and the management composition of the MOA shall otherwise be satisfactory to the Prepetition Lender in its sole discretion);

(i)      the Design Review Committee (the "DRC") described in that certain Master Declaration of Protective Covenants, Conditions, Restrictions, Easements for LakePoint Sporting Community & Town Center dated August 16, 2011 (as amended to date) shall have been replaced with such persons designated by the Prepetition Lender (and the composition of the DRC shall otherwise be satisfactory to the Prepetition Lender in its sole discretion);

(j)      the Debtors' designees on the Board of the Red Top Community Improvement District (the "CID") shall be replaced with such persons designated by the Prepetition Lender (and the composition of such Board and the management composition of the CID shall otherwise be satisfactory to the Prepetition Lender in its sole discretion);

(k)      with respect to any other governing bodies or other entities related to the operation and governance of the LakePoint Sporting Community & Town Center (the "Project") to which the Debtors are entitled to appoint board members or other officers or responsible persons, the Debtors shall have replaced such persons with persons designated by the Prepetition Lender (and the composition

of such boards and the management  composition of such governing bodies or entities shall otherwise be satisfactory to the Prepetition Lender in its sole discretion);

(l)    the HoldCo Operating Agreement and the Amended LPL Operating Agreement shall be in form and substance acceptable to the Prepetition Lender in its sole discretion;

(m)    the absence of material litigation restraining or materially altering the Restructuring;

(n)    no Claims or Interests shall have been filed against the Debtors in an amount more than $500,000 greater (either individually or in the aggregate) than those set forth on the Schedule of Claims and Interests (a) that have been Allowed by the Bankruptcy Court, or (b) that the Prepetition Lender has determined are bona fide in nature (based on its reasonable judgment and determination);

(o)    that certain Indoor Support Agreement dated as of February 7, 2018, by and among LP Indoor Pavilion, LLC, the Development Authority of Bartow County, and Bartow County Georgia shall not have been terminated and shall be continuing and binding upon the parties thereto as of the Effective Date;

(p)    the absence of an event or occurrence that has caused (or is reasonably likely to cause) a material adverse effect with respect to the Debtors, their operations, their assets or the Project;

(q)    the Definitive Documents shall (i) have been executed and delivered, and any conditions precedent contained to effectiveness therein have been satisfied or waived in accordance therewith, and (ii) be in full force and effect and binding upon the relevant parties;

(r)    the Amended Organizational Documents shall have been filed with the appropriate governmental authorities, as applicable;

(s)    all actions, documents (including the Definitive Documents), and agreements necessary to implement and consummate the Plan shall have been effected or executed and binding on all parties thereto:

(t)    all governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions contemplated by the Plan shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without any action being taken or threatened by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions; and

(u)    all unpaid Restructuring Expenses shall have been paid in Cash, to the extent invoiced, at least two (2) business days prior to the Effective Date.

3.    **Waiver of Conditions Precedent**

(a)    Except as otherwise provided herein, all actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously and no such action shall be deemed to have occurred prior to the taking of any other such action. Each of the conditions precedent in Section 9.1 and Section 9.2 of the Plan may be waived in writing by the Debtors with the prior written consent of the Prepetition Lender and the Rimrock Investor without leave of or order of the Bankruptcy Court.

(b)    The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

4.    **Effect of Failure of a Condition**

If the conditions listed in Section 9.2 of the Plan are not satisfied or waived in accordance with Section 9.3 of the Plan on or before the first Business Day that is more than sixty (60) days after the date on which the Confirmation Order is entered or by such later date as set forth by the Debtors (with the consent of the Prepetition Lender) in a notice filed with the Bankruptcy Court prior to the expiration of such period, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall (a) constitute a waiver or release of any Claims against or any Interests in the Debtors or claims by the Debtors, (b) prejudice in any manner the rights of any Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtors, the Rimrock Investor, the Prepetition Lender, or any other Entity.

I.    **EFFECT OF CONFIRMATION**

1.    **Vesting of Assets**

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all assets and property of the Debtors' Estates and the assets included in the Exit Equity Contribution shall vest in the Reorganized Debtors, free and clear of all Claims, Liens, encumbrances, charges, and other interests, except as provided pursuant to the Plan, the Confirmation Order, or the Exit Facility Documents.  On and after the Effective Date, the Reorganized Debtors may take any action, including, without limitation, the operation of their businesses; the use, acquisition, sale, lease and disposition of property; and the entry into transactions, agreements, understandings, or arrangements, whether in or other than in the ordinary course of business, and execute, deliver, implement, and fully perform any and all obligations, instruments, documents, and papers or otherwise in connection with any of the foregoing, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code, except as expressly provided in the Plan. Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for professional fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

2.    **Binding Effect**

As of the Effective Date, the Plan shall bind all holders of Claims against and Interests in the Debtors and their respective successors and assigns, notwithstanding whether any such holders were (a) Impaired or Unimpaired under the Plan, (b) deemed to accept or reject the Plan, (c) failed to vote to accept or reject the Plan, or (d) voted to reject the Plan.

3.    **Discharge of Claims and Termination of Interests**

Upon the Effective Date and in consideration of the Distributions to be made hereunder, except as otherwise expressly provided in the Plan, each holder (as well as any representatives, trustees, or agents on behalf of each holder) of a Claim or Interest and any affiliate of such holder shall be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities that arose prior to the Effective Date.  Upon the Effective Date, all such Entities shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim

against or terminated Interest in the Debtors against the Debtors, the Reorganized Debtors, or any of their assets or property, whether or not such holder has filed a proof of Claim and whether or not the facts or legal bases therefor were known or existed prior to the Effective Date.

4.        **Term of Injunctions or Stays**

Unless otherwise provided in the Plan, the Confirmation Order, or in a Final Order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

5.        **Injunction**

**Upon entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates, shall be enjoined from taking any actions to interfere with the implementation or consummation of the Plan in relation to any Claim or Interest extinguished, discharged or released pursuant to the Plan.**

**Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court or as agreed to by the Debtors (with the consent of the Prepetition Lender) and a holder of a Claim against or Interest in the Debtors, all Entities who have held, hold, or may hold Claims against or Interests in any or all of the Debtors (whether proof of such Claims or Interests has been filed or not and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their respective present or former employees, agents, officers, directors, principals, and affiliates are permanently enjoined, on and after the Effective Date, solely with respect to any Claims, Interests, and Causes of Action that will be or are extinguished, discharged, or released pursuant to the Plan from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Released Parties or the property of any of the Released Parties, (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Released Parties or the property of any of the Released Parties, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Released Parties or the property of any of the Released Parties, (iv) asserting any right of setoff, directly or indirectly, against any obligation due the Released Parties or the property of any of the Released Parties, except as contemplated or allowed by the Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.**

**By accepting Distributions pursuant to the Plan, each holder of an Allowed Claim or Interest extinguished, discharged, or released pursuant to the Plan shall be deemed to have affirmatively and specifically consented to be bound by the Plan, including, without limitation, the injunctions set forth in Section 10.5 of the Plan.**

**The injunctions in Section 10.5 of the Plan shall extend to any successors of the Debtors and the Reorganized Debtors and their respective property and interests in property.**

6.  **Releases**

    (a)  **Releases by Debtors**

**As of the Effective Date, except for the right to enforce the Plan or any right or obligation arising under the Definitive Documents that remains in effect after the Effective Date, for good and valuable consideration, on and after the Effective Date, the Released Parties[14] shall be deemed released and discharged by the Debtors, the Reorganized Debtors, and the Estates, and any person seeking to exercise the rights of the Estates, including any successors to the Debtors or any Estates representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, from any and all Claims, obligations, rights, suits, judgments, damages, demands, debts, rights, Causes of Action, remedies, losses, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or the Estates, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, contingent or fixed, existing or hereinafter arising, in law, equity or otherwise, that the Debtors, the Reorganized Debtors, the Estates, or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Estates, the conduct of the Debtors' businesses, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtors and any Released Party, the Debtors' restructuring, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Prepetition Facility Documents, the DIP Orders, the Disclosure Statement, the Restructuring Support Agreement, and the Plan and related agreements, instruments, and other documents (including the Definitive Documents), and the negotiation, formulation, or preparation thereof, the solicitation of votes with respect to the Plan, or any other act or omission, in all cases based upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, including, without limitation, all Avoidance Actions.**

    (b)  **Releases by Holders of Claims or Interests**

**As of the Effective Date, except for the right to enforce the Plan or any right or obligation arising under the Definitive Documents that remains in effect after the Effective Date, for good and valuable consideration, on and after the Effective Date, each of the Released Parties shall be deemed released and discharged by the Releasing Parties[15] and all Persons entitled to assert Claims**

---

[14]    As defined in the Plan, "Released Parties" means each of the following: (a) each Debtor and Reorganized Debtor; (b) the Debtors' current and former officers and directors; (c) the Prepetition Lender; (d) the DIP Lender; (e) Rimrock Investor; (f) the parties to the Restructuring Support Agreement; and (g) with respect to each of the foregoing entities in clauses (a) through (f), such entities' predecessors, successors and assigns, subsidiaries, affiliates, managed accounts or funds, current or former officers, directors, principals, shareholders, members, partners, employees, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and such entities' respective heirs, executors, estates, servants and nominees, in each case, solely in their capacity as such.

[15]    As defined in the Plan, "Releasing Parties" means (a) the holders of Impaired Claims or Interests who abstain from voting on the Plan or vote to reject the Plan but do not opt-out of these releases on the Ballots; (b) the holders of Unimpaired Claims or Interests who do not object to the releases by filing an objection to the Plan; and (c) the holders of Impaired Claims or Interests who vote to accept the Plan..

through or on behalf of the Releasing Parties with respect to the matters for which the Releasing Parties are providing releases, in each case, from any and all Claims, obligations, rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever (including any derivative claims asserted or assertable on behalf of a Debtor), whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, matured or unmatured, contingent or fixed, existing or hereinafter arising, in law, equity or otherwise, that such Entity would have been legally entitled to assert in their own right (whether individually or collectively) based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Estates, the Debtors' restructuring, the Chapter 11 Cases, the purchase, sale or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party (other than assumed contracts or leases), the restructuring of Claims and Interests before or during the Chapter 11 Cases, the Prepetition Facility Documents, the DIP Orders, the negotiation, formulation, preparation or consummation of the Plan (including the Plan Supplement), the Restructuring Support Agreement, the Definitive Documents, or any related agreements, instruments or other documents, or the solicitation of votes with respect to the Plan, in all cases based upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date.

Notwithstanding anything to the contrary in the Plan, (i) any Person or Entity (A) releasing claims hereunder who does not provide (or is not deemed to provide) a valid and binding release of the Released Parties, or (B) who has asserted or later asserts a claim against a Released Party, in each case, shall not be (or be deemed to be) a Released Party, and (ii) any Claim of the Debtors, their Estates or any of the Debtors' direct or indirect subsidiaries, on the one hand, against the Debtors, their Estates or any of the Debtors' direct or indirect subsidiaries, on the other hand, shall not be (or be deemed to be) released pursuant to the Plan.

7.    **Exculpation**

Notwithstanding anything in the Plan to the contrary, and to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby released and exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, cause of action, remedy, loss, and liability for any claim in connection with or arising out of the administration of the Chapter 11 Cases, the negotiation, formulation, preparation, and pursuit of the Disclosure Statement, the Restructuring Support Agreement, the transactions relating to the Debtors' restructuring, the Plan, or the solicitation of votes for, or confirmation of, the Plan, the funding or consummation of the Plan (including the Plan Supplement), the Definitive Documents, or any related agreements, instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Distribution of any Securities issued or to be issued pursuant to the Plan, whether or not such Distribution occurs following the Effective Date, the occurrence of the Effective Date, negotiations regarding or concerning any of the foregoing, or the administration of the Plan or property to be distributed under the Plan.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Exculpated Parties from liability.  Nothing in the Plan shall be deemed to be a release or waiver of the Reorganized Debtors' obligations under the Exit Facility Documents.

8.    **Retention of Causes of Action/Reservation of Rights**

Except as otherwise provided in Section 10.6(a) of the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, Claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had

immediately prior to the Effective Date on behalf of the Estates or themselves in accordance with any provision of the Bankruptcy Code or any applicable nonbankruptcy law, including, without limitation, any affirmative Causes of Action against parties with a relationship with the Debtors, other than the Released Parties. The Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such Claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced. Notwithstanding the foregoing, the Debtors and the Reorganized Debtors shall not retain any Claims or Causes of Action released pursuant to the Plan against the Released Parties or arising under chapter 5 of the Bankruptcy Code (except that such Claims or Causes of Action, including chapter 5 claims, may be asserted as a defense to any Claim in connection with the claims reconciliation and objection procedures pursuant to section 502(d) of the Bankruptcy Code or otherwise).

9.    **Solicitation of Plan**

As of and subject to the occurrence of the Confirmation Date: (a) the Debtors shall be deemed to have solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including, without limitation, sections 1125(a) and (e) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation, and (b) the Debtors and their respective directors, officers, employees, affiliates, agents, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any Securities under the Plan, and therefore are not, and on account of such offer, issuance, and solicitation will not be, liable at any time for any violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or the offer and issuance of any Securities under the Plan.

Notwithstanding anything in the Plan to the contrary, as of the Effective Date, pursuant to section 1125(e) of the Bankruptcy Code, the Debtors upon appropriate findings of the Bankruptcy Court shall be deemed to have solicited acceptance of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code, and to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code, in the offer, issuance, sale, or purchase of a Security offered or sold under the Plan of a Reorganized Debtor, and shall not be liable to any Person on account of such solicitation or participation.

## J.    RETENTION OF JURISDICTION

1.    **Retention of Jurisdiction**

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain non-exclusive jurisdiction over all matters arising under, or arising in, or relating to these Chapter 11 Cases, the Plan or interpreting the Confirmation Order to the fullest extent legally permissible by 28 U.S.C. § 1334 to hear, and by 28 U.S.C. § 157 to determine, all proceedings in respect thereof, including, without limitation, for the following purposes:

(a)    to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases, and the allowance, classification, priority, compromise, estimation, or payment of Claims resulting therefrom;

(b)      to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date, including, any proceeding with respect to a Cause of Action;

(c)      to ensure that Distributions to holders of Allowed Claims and Allowed Interests are accomplished as provided for in the Plan and the Confirmation Order and to adjudicate any and all disputes arising from or relating to Distributions under the Plan;

(d)      to consider the allowance, classification, priority, compromise, estimation, or payment of any Claim or Interest, including any Administrative Expense Claims;

(e)      to enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(f)      to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(g)      to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(h)      to hear and determine all Professional Fee Claims and any disputes with respect to the Restructuring Expenses;

(i)      to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Plan Supplement, the Confirmation Order, any transactions or payments contemplated in the Plan, or any agreement, instrument, or other document governing or relating to any of the foregoing;

(j)      to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute, and consummate the Plan;

(k)      to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(l)      to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(m)      to hear, adjudicate, decide, or resolve any and all matters related to Article X of the Plan, including, without limitation, the releases, discharge, exculpations, and injunctions issued thereunder;

(n)      to enforce all orders previously entered by the Bankruptcy Court;

(o)      to resolve disputes concerning Disputed Claims or the administration thereof;

(p)     to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code, including in connection with or related to the Plan, the Disclosure Statement, the Confirmation Order, the Plan Supplement, or any document related to the foregoing;

(q)     to enter a final decree closing the Chapter 11 Cases;

(r)     to recover all assets of the Debtors and property of the Debtors' Estates, wherever located;

(s)     to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory; and

(t)     to hear and resolve any dispute over the application to any Claim of any limit on the allowance of such Claim set forth in sections 502 or 503 of the Bankruptcy Code, other than defenses or limits that are asserted under non-bankruptcy law pursuant to section 502(b)(1) of the Bankruptcy Code.

2.      **Courts of Competent Jurisdiction**

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## K.      MISCELLANEOUS PROVISIONS

1.      **Payment of Statutory Fees**

On the Effective Date and thereafter as may be required, the Reorganized Debtors shall pay all fees incurred pursuant to section 1930 of chapter 123 of title 28 of the United States Code, together with interest, if any, pursuant to § 3717 of title 31 of the United States Code for each Debtor's case, or until such time as a final decree is entered closing a particular Debtor's case, a Final Order converting such Debtor's case to a case under chapter 7 of the Bankruptcy Code is entered, or a Final Order dismissing such Debtor's case is entered.

2.      **Substantial Consummation of the Plan**

On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

3.      **Expedited Determination of Taxes**

The Reorganized Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods of the Debtors through the Effective Date.

4.      **Exemption from Certain Transfer Taxes**

Pursuant to section 1146 of the Bankruptcy Code, (a) the issuance, transfer or exchange of any Securities or instruments, (b) the creation, filing or recording of any Lien, mortgage, deed of trust, or other security

interest, (c) the making, assignment, filing or recording of any lease or sublease or the making or delivery of any deed, bill of sale, or other instrument of transfer under, pursuant to, in furtherance of, or in connection with the Plan, including, without limitation, any deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated under the Plan or the reinvesting, transfer, or sale of any real or personal property of the Debtors pursuant to, in implementation of or as contemplated in the Plan (whether to one or more of the Reorganized Debtors or otherwise), (d) the grant of Collateral under the Exit Facility Documents**,** and (e) the issuance, renewal, modification, or securing of indebtedness in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, shall not constitute a "transfer under a plan" within the purview of section 1146 of the Bankruptcy Code and shall not be subject to or taxed under any law imposing any document recording tax, stamp tax, conveyance fee, or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax, or other similar tax or governmental assessment.  Consistent with the foregoing, each recorder of deeds or similar official for any county, city, or Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax, or similar tax.

5.      **Amendments**

(a)      <u>Plan Modifications</u>.    Subject to the terms of the Restructuring Support Agreement, (i) the Debtors reserve the right (with the consent of the Prepetition Lender), in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend, modify or supplement the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code and (ii) after entry of the Confirmation Order, the Debtors may (with the consent of the Prepetition Lender), upon order of the Bankruptcy Court, amend, modify, or supplement the Plan in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, in each case without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as the Bankruptcy Code may otherwise direct.

(b)      <u>Other Amendments</u>.    Subject to the Restructuring Support Agreement, after the Confirmation Date, so long as such action does not materially adversely affect the treatment of holders of Claims or Interests hereunder, the Debtors (with the consent of the Prepetition Lender) may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes and effects of the Plan, and any holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented.  Before the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court; *provided*, that such technical adjustments and modifications do not adversely affect in a material way the treatment of holders of Claims or Interests and that any such technical adjustment or modification is consistent with the Restructuring Support Agreement.

6.      **Effectuating Documents and Further Transactions**

Each of the officers of the Reorganized Debtors is authorized, in accordance with his or her authority under the resolutions of the applicable board of directors or managers, to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

7.      **Revocation or Withdrawal of Plan**

Subject to the terms of the Restructuring Support Agreement, the Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date as to any or all of the Debtors.  If, with respect to a Debtor, the Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date as to such Debtor does not occur, then, with respect to such Debtor: (a) the Plan shall be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing of or limiting an amount of any Claim or Interest or Class of Claims or Interests), rejection of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (c) nothing contained in the Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, such Debtor or any other Entity, (ii) prejudice in any manner the rights of such Debtor or any other Entity, or (iii) constitute an admission of any sort by any Debtor, the Prepetition Lender, or any other Entity.  This provision shall have no impact on the rights of the Rimrock Investor, the Prepetition Lender, the DIP Lender or the Debtors, as set forth in the Restructuring Support Agreement, in respect of any such revocation or withdrawal.

8.      **Severability of Plan Provisions**

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, in each case at the election and the request of the Debtors (with the consent of the Prepetition Lender), shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Reorganized Debtors (as the case may be), and (c) nonseverable and mutually dependent.

9.      **Governing Law**

Except to the extent that the Bankruptcy Code or other U.S. federal law is applicable, or to the extent an exhibit or schedule hereto, or a schedule in the Plan Supplement or a Definitive Document provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Georgia**,** without giving effect to the principles of conflict of laws thereof; *provided* that entity governance matters relating to a Debtor or a Reorganized Debtor shall be governed by the laws of the state of organization of the Debtors or the Reorganized Debtors.

10.     **Time**

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth in the Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

11.     **Dates of Actions to Implement the Plan**

In the event that any payment or act under the Plan is required to be made or performed on a date that is not on a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

12.     **Immediate Binding Effect**

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the holders of Claims and Interests, the Released Parties, and each of their respective successors and assigns, including, without limitation, the Reorganized Debtors.

13.     **Deemed Acts**

Subject to and conditioned on the occurrence of the Effective Date, whenever an act or event is expressed under the Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of the Plan and the Confirmation Order.

14.     **Successors and Assigns**

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or permitted assign, if any, of each Entity.

15.     **Entire Agreement**

On the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

16.     **Exhibits to Plan**

All exhibits, schedules, supplements, and appendices to the Plan (including the Plan Supplement) are incorporated into and are a part of the Plan as if set forth in full therein.

17.     **Notices**

To be effective, all notices, requests, and demands to or upon the Debtors, the Rimrock Investor, the Prepetition Lender, or the Exit Lender shall be in writing (including by electronic or facsimile transmission) and, unless otherwise expressly provided in the Plan, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

(a)    if to the Debtors or the Reorganized Debtors:

LakePoint Land, LLC
755 Hwy 293
Emerson, Georgia 30137
Attention: Robert Zurcher
Email: bobzurcher@lakepointsports.com

With a copy (which shall not constitute notice) to:

Arnall Golden Gregory
171 17th Street NW, Suite 2100
Atlanta, Georgia 30363
Attention: Philip G. Skinner, Esq. and Sean Kulka, Esq.
Email: philip.skinner@agg.com; sean.kulka@agg.com

(b)    If to the Prepetition Lender, the Exit lender or Rimrock Investor, to:

Rimrock High Income Plus (Master) Fund, Ltd.
100 Innovation Drive, Suite 200
Irvine, California 92617
Attention: Jeff Bemis
Email: jbemis@rimrockcapital.com

With a copy (which shall not constitute notice) to:

King & Spalding LLP
1180 Peachtree Street
Atlanta, Georgia 30309
Attention:  W. Austin Jowers, Esq.
Email:  ajowers@kslaw.com

And

King & Spalding LLP
444 W. Lake Street, Suite 1650
Chicago, Illinois 60606
Attention:  Elizabeth Dechant, Esq.
Email:  edechant@kslaw.com

After the occurrence of the Effective Date, the Reorganized Debtors have authority to send a notice to Entities that in order to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entities must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the occurrence of the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities that have filed such renewed requests.

## V.
## FINANCIAL INFORMATION AND PROJECTIONS

Section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization. Furthermore, a debtor must demonstrate that all fees payable under section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, have either been paid in full or have been provided for under the Plan. As set forth in the Financial Projections (defined below), the Debtors believe they will have sufficient resources to make all payments required pursuant to the Plan, including all fees payable under section 1930 of title 28 of the United States Code, and that confirmation of the Plan is unlikely to be followed by liquidation or the need for further reorganization, of the Debtors or any successor to the Debtors under the Plan.

The Debtors prepared the financial projections attached hereto as <u>Exhibit D</u> (the "<u>Financial Projections</u>") based on, among other things, the anticipated future financial condition and results of operations of the Debtors. In conjunction with Vantage Point, the Debtors' management team developed and refined the business plan and prepared consolidated financial projections of the Debtors for the post-emergence period from October 1, 2018 and continuing through the end of the 2020 calendar year (the "<u>Projection Period</u>").[16]

The Financial Projections assume an Effective Date (when the Plan will be consummated in accordance with its terms and all transactions contemplated by the Plan will be consummated) of October 3, 2018. Any significant delay in the Effective Date may have a significant negative impact on the operations and financial performance of the Debtors including, but not limited to, an increased risk or inability to meet forecasts and the incurrence of higher Chapter 11 administrative expenses.

Although the Financial Projections represent the Debtors' best estimates and good faith judgment (for which the Debtors' management team believes it has a reasonable basis) of the results of future operations, financial position, and cash flows of the Debtors, they are only estimates and actual results may vary considerably from the Financial Projections. Consequently, the inclusion of the Financial Projections should not be regarded as a representation by the Debtors, the Debtors' advisors or any other person that the projected results of operations, financial position, and cash flows of the Debtors will be achieved.

The Debtors do not intend to further update or otherwise revise the Financial Projections to reflect circumstances that may occur after their preparation, or to reflect the occurrence of unanticipated events, even in the event that any or all of the underlying assumptions are shown to be in error. Additional information relating to the principal assumptions used in preparing the Financial Projections is set forth below.

THE FINANCIAL PROJECTIONS HAVE BEEN PREPARED BY THE MANAGEMENT OF THE DEBTORS, IN CONJUNCTION WITH VANTAGE POINT. THE FINANCIAL PROJECTIONS WERE NOT PREPARED TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS OR THE RULES AND REGULATIONS OF THE SEC, AND BY THEIR NATURE ARE NOT FINANCIAL STATEMENTS PREPARED IN ACCORDANCE WITH ACCOUNTING PRINCIPLES GENERALLY ACCEPTED IN THE UNITED STATES OF AMERICA.

---

[16]    The Debtors operate on a three hundred sixty five (365) day calendar year, with the fiscal year ending on December 31.

THE DEBTORS' INDEPENDENT ACCOUNTANTS HAVE NEITHER EXAMINED NOR COMPILED THE ACCOMPANYING FINANCIAL PROJECTIONS AND ACCORDINGLY DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE FINANCIAL PROJECTIONS, ASSUME NO RESPONSIBILITY FOR THE FINANCIAL PROJECTIONS, AND DISCLAIM ANY ASSOCIATION WITH THE FINANCIAL PROJECTIONS.

THE FINANCIAL PROJECTIONS DO NOT REFLECT THE IMPACT OF FRESH START REPORTING IN ACCORDANCE WITH AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS STATEMENT OF POSITION 90-7 "FINANCIAL REPORTING BY ENTITIES IN REORGANIZATION UNDER THE BANKRUPTCY CODE." THE IMPACT OF FRESH START REPORTING AT THE EFFECTIVE DATE MAY HAVE AN IMPACT ON ASSETS, LIABILITIES, AND INTEREST HOLDERS' EQUITY AS REFLECTED ON THE REORGANIZED DEBTORS' CONSOLIDATED BALANCE SHEETS AND PROSPECTIVE RESULTS OF OPERATIONS.

**General Assumptions and Methodology**

The Financial Projections incorporate the time period beginning on October 1, 2018 and continuing through the end of the 2020 calendar year. The entire projection period is shown on a monthly basis and includes summary Income Statement and Balance Sheet detail. The income statement was derived from a detailed assessment of all potential sources of revenue relative to both the historical and projected expenses required to support the Debtors' ongoing operations. The balance sheet was compiled based on the structure outlined in the Plan Term Sheet including a $2 million "roll-over" of the DIP Facility into the Exit Facility of up to $20 million. The Exit Facility is assumed to bear interest at a rate equal to 12% per annum on a cash basis with a maturity date of the five-year anniversary of the Effective Date.

**Consolidated Statements of Operations Assumptions**

The Financial Projections estimate that the Debtors will generate gross revenue of approximately $2.8 million, $4.1 million, and $4.4 million for the full calendar year 2018, 2019, and 2020, respectively. Specifically, the 2018 projection represents a year-over-year decline of approximately 22% relative to FY2017. FY2019 represents an increase over FY2018 of approximately 45.7%, but only a 13.7% increase over the FY2017 base year. The Debtors believe growth through the projection period will be primarily supported by an end to the restructuring process and a return of several key sponsors that elected not to renew their existing agreements for the 2018 season, as well as the addition of other new sponsors.

In support of the projected growth rates, the Debtors have assumed that existing management and certain key operating personnel will remain in place throughout the projection period. The Debtors have also assumed that they will continue to be successful in their efforts to recruit and retain seasonal labor in support of the summer baseball season. Moreover, the Debtors have projected that recurring operating expenses will increase at an average annual rate of 3%. Debtors' management team believes that this expense projection is reasonable given the current level of development at the South Campus.

Specifically, the Debtors project Earnings before Interest, Taxes, Depreciation, and Amortization ("EBITDA") of ($389,796), $199,015, and $360,901 for the full calendar year 2018, 2019 and 2020, respectively. This results in a total interest coverage ratio of 0.77x and 1.06x for 2019 and 2020, respectively, and supports the Debtors' belief that they will have sufficient liquidity to pay debt service under the proposed Exit Facility.

The Debtors expect that starting in 2020 or soon thereafter, additional earnings and cash flow will be generated from new vertical developments by the Debtors.  To be conservative, the Debtors have not included these sources of revenue in their projections.

**Consolidated Balance Sheet and Statement of Cash Flows Assumptions**

The Financial Projections estimate that the Debtors will have sufficient liquidity to meet all of their obligations under the Plan, as well as to support operations throughout at least the end of the calendar year 2020.  Specifically, the Debtors project that they will emerge from Chapter 11 under the Plan with $2 million of cash on hand and that the outstanding amount under the proposed $20 million Exit Facility will not exceed $3.1 million dollars during the projection period.  This projection supports the Debtors' belief that they will have ample liquidity to fund operations, as well as future growth and development.

The balance sheet also assumes that, pursuant to the Plan, Rimrock will contribute 100% of the real property that it had previously obtained through deeds-in-lieu on or around November 2016, as well as certain other contiguous parcels of land that Rimrock has acquired over the past year.  The result of this transaction along with the conversion of approximately $7.4 million of debt related to other claimants in the Chapter 11 Cases to a various number of membership units will result in an "opening" balance sheet as of the Effective Date with total assets and equity of approximately $57.6 million and $54.6 million, respectfully.  This compares favorably to the pre-petition balance sheet, which had total assets and equity of approximately $2.8 million and negative $28.4 million, respectively.

# VI.
## VALUATION ANALYSIS

One of the requirements of section 1129(a) of the Bankruptcy Code is the "best interests test" (discussed in Section XI(C)(1)(b) infra).  This test requires a bankruptcy court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under Chapter 7 of the Bankruptcy Code.  To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the property that such classes of claims and equity interests will receive and retain under the proposed plan.

The Debtors believe that the Liquidation Analysis attached hereto as Exhibit E demonstrates that this requirement has been met and is supported by the following methodology and assumptions.

Specifically, the Liquidation Analysis assumes that the Chapter 11 Cases are converted to Chapter 7 and all of the Debtors' remaining assets are liquidated as quickly and efficiently as possible.  Reasonable efforts would be made to collect existing accounts receivable and liquidate any remaining fixed assets.  All existing agreements and contracts would be rejected and all non-essential employees would be relieved of their duties at the earliest possible date.

As of May 31, 2018, on a consolidated basis the Debtors had total assets valued at approximately $2.8 million, including cash and accounts receivable totaling approximately $1.5 million representing approximately 52.4% of the Debtors' total asset value.  The Liquidation Analysis attached hereto as Exhibit E assumes the Debtors would be able to collect approximately 65% of the existing account receivables, as well as various other miscellaneous assets resulting in a total liquidation recovery of

approximately $710,000.     This projected value is net of $50,000 in projected Chapter 7 administrative expenses.

In order to satisfy the "best interests test" these projected recoveries must be compared to any existing liabilities so that each impaired class may evaluate what, if anything, they are likely to receive from a liquidation of the Debtors' assets. As of May 31, 2018, the Debtors had total liabilities of approximately $31.1 million. Of that amount the Debtors owe approximately $22.4 million to Rimrock on a senior secured basis, and approximately an additional $7.6 million to other claimants in the Chapter 11 Cases. In addition, the Debtors have borrowed additional funds on a secured basis pursuant to the DIP Facility, which primed Rimrock's prepetition secured claim.

Specific values to the Debtors' assets are set forth in Exhibit E, but in summary, in the event that the Debtors liquidate their remaining assets, the Liquidation Analysis indicates that 100% of the cash proceeds would be distributed to the DIP Lender. Specifically, the analysis concludes that any accrued interest under the DIP Facility would likely be paid in full and a portion of the outstanding principal balance of the DIP Facility would also be paid. The projected recovery for all other claimants, including Rimrock, is zero.

In addition to the aforementioned, the "best interests test" also requires that under the Plan all holders of impaired Claims and Interests will receive or retain property with a value not less than the value such holders would receive in a liquidation under Chapter 7 of the Bankruptcy Code. Specifically, the Plan proposes to pay all non-disputed current liabilities (except creditors that have agreed to a different treatment under the Plan) in full, and grant a various number of membership units in the Reorganized LPL to certain holders of Claims and Interests. To support the Reorganized LPL post confirmation, Rimrock is also contributing 100% of the real property that it had previously obtained through deeds-in-lieu on or around November 2016 as well as certain other assts. In summary, the Reorganized LPL is projected to have total assets of approximately $57.6 million and access to a $20 million exit facility to support additional growth within the Project. In the event that the Plan is not approved and the Chapter 11 Cases are converted to Chapter 7 cases, holders of impaired Claims and Interests should not expect any recovery on account of their respective Claims and Interests.

## VII.
## TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL SECURITIES LAW

The issuance and the distribution under the Plan of the New Membership Units shall be exempt from registration under the Securities Act and any other applicable securities laws pursuant to section 1145 of the Bankruptcy Code.

Section 1145 of the Bankruptcy Code generally exempts from registration under the Securities Act the offer or sale under a chapter 11 plan of a security of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under a plan, if such securities are offered or sold in exchange for a claim against, or an interest in, the debtor or such affiliate, or principally in such exchange and partly for cash. Section 1145 of the Bankruptcy Code also exempts from registration the offer of a security through any right to subscribe sold in the manner provided in the prior sentence, and the sale of a security upon the exercise of such right. In reliance upon this exemption, the New Membership Units issued will be exempt from the registration requirements of the Securities Act, and state and local securities laws. These securities may be resold without registration under the Securities Act or other federal or state securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code. In addition, such section 1145 exempt securities generally may be

resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

Section 1145(b) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who, except with respect to ordinary trading transactions, (i) purchases a claim with a view to distribution of any security to be received in exchange for the claim, (ii) offers to sell securities issued under a plan for the holders of such securities, (iii) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution, or (iv) is an issuer, as used in Section 2(a)(11) of the Securities Act, with respect to such securities, which includes control persons of the issuer.

Notwithstanding the foregoing, control person underwriters may be able to sell securities without registration pursuant to the resale limitations of Rule 144 of the Securities Act which, in effect, permit the resale of securities received by such underwriters pursuant to a chapter 11 plan, subject to applicable volume limitations, notice and manner of sale requirements, and certain other conditions.  Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisers as to the availability of the exemption provided by Rule 144.

In any case, recipients of new securities issued under the Plan are advised to consult with their own legal advisers as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

## VIII.
## UNITED STATES FEDERAL INCOME TAX CONSEQUENCES

**THE DEBTORS HAVE NOT SOUGHT OR OBTAINED ANY RULING FROM THE INTERNAL REVENUE SERVICE OR FROM ANY OTHER TAXING AUTHORITY WITH RESPECT TO ANY OF THE TAX CONSEQUENCES OF THE PLAN, NOR HAVE THE DEBTORS SOUGHT OR OBTAINED AN OPINION OF COUNSEL WITH RESPECT TO ANY SUCH TAX CONSEQUENCES.  NO REPRESENTATIONS OR ASSURANCES ARE MADE WITH RESPECT TO THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN.  BECAUSE THE TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND MAY VARY BASED ON INDIVIDUAL CIRCUMSTANCES, EACH CREDITOR SHOULD CONSULT WITH ITS OWN TAX ADVISOR REGARDING THE SPECIFIC TAX CONSEQUENCES OF ANY ASPECT OF THE PLAN WITH RESPECT TO SUCH CREDITOR.**

## IX. CERTAIN RISK FACTORS TO BE CONSIDERED

Prior to voting to accept or reject the Plan, holders of Claims and Interests should read and carefully consider the risk factors set forth below, in addition to the information set forth in this Disclosure Statement together with any attachments, exhibits, or documents incorporated by reference hereto.  The factors below constitute a non-exhaustive list of risks and should not be regarded as the only risks associated with the Plan or its implementation.

## A.    CERTAIN BANKRUPTCY LAW CONSIDERATIONS

### 1.    General

Although the Debtors believe that the Chapter 11 Cases will be of short duration and will not be materially disruptive to their businesses, the Debtors cannot be certain that this will be the case.  Although the Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with

certainty the amount of time that one or more of the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed. Even if confirmed on a timely basis, bankruptcy proceedings to confirm the Plan could have an adverse effect on the Debtors' business. Among other things, it is possible that bankruptcy proceedings could adversely affect the Debtors' relationships with their key vendors, customers, and employees. The proceedings will also involve additional expense and may divert some of the attention of the Debtors' management away from business operations.

### 2.    Risk of Non-Confirmation of Plan

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate re-solicitation of votes. Moreover, while the Debtors received the requisite support from impaired classes pursuant to the Restructuring Support Agreement, the Debtors can make no assurances that they will receive the requisite acceptances to confirm the Plan, and even if all Classes entitled to vote on the Plan (the "Voting Classes") vote in favor of the Plan or the requirements for "cramdown" are met with respect to any Class that rejects the Plan, the Bankruptcy Court, which may exercise substantial discretion as a court of equity, may choose not to confirm the Plan. If the Plan is not confirmed, it is unclear what distributions (if any) holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent or alternative plan of reorganization.

### 3.    Risk of Failing to Satisfy the Vote Requirement

In the event that the Debtors are unable to get sufficient votes from the Voting Classes, the Debtors may seek to accomplish an alternative chapter 11 plan or seek to cram down the Plan on non-accepting classes. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to holders of Allowed Claims and Interests as those proposed in the Plan.

### 4.    Risk of Non-Consensual Confirmation

In the event that any impaired class of Claims or Interests does not accept or is deemed not to accept the Plan, the Bankruptcy Court may nevertheless confirm such Plan if at least one impaired class has accepted the Plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the Plan, the Bankruptcy Court determines that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. Should any Class vote to reject the Plan, then these requirements must be satisfied with respect to such rejecting Classes. The Debtors believe that the Plan satisfies these requirements.

### 5.    Risk of Non-Occurrence of Effective Date

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to the timing of the Effective Date. If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Article IX of the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtors and all holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

6.    **Risk of Termination of Restructuring Support Agreement**

The Restructuring Support Agreement contains certain provisions that give certain parties thereto the ability to terminate the Restructuring Support Agreement if various events occur.  As noted above, termination of the Restructuring Support Agreement could result in protracted Chapter 11 Cases, which could significantly and detrimentally impact the Debtors' relationships with vendors, suppliers, employees, and customers.

7.    **Risk Related to Parties in Interest Objecting to the Debtors' Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code.  However, there can be no assurance that a party in interest will not object or that the Bankruptcy Court will approve the classifications set forth in the Plan.

8.    **Risk Related to Possible Objections to the Plan**

There is a risk that certain parties could oppose and object to either the entirety of the Plan or specific provisions of the Plan.  Although the Debtors believe that the Plan complies with all relevant Bankruptcy Code provisions, there can be no guarantee that a party in interest will not file an objection to the Plan or that the Bankruptcy Court will not sustain such an objection.

9.    **Conversion to Chapter 7 Cases**

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.  See Section VI hereof, as well as the Liquidation Analysis attached hereto as <u>Exhibit E</u>, for a discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Interests.

**B.    FACTORS RELATING TO SECURITIES TO BE ISSUED UNDER PLAN GENERALLY**

1.    **No Current Public Market for Securities**

There is currently no market for the New Membership Units, and there can be no assurance as to the development or liquidity of any market for any such securities.  The Reorganized Debtors are under no obligation to list any securities on any national securities exchange.  Therefore, there can be no assurance that any of the foregoing securities will be tradable or liquid at any time after the Effective Date.  If a trading market does not develop or is not maintained, holders of the foregoing securities may experience difficulty in reselling such securities or may be unable to sell them at all.  Even if such a market were to exist, such securities could trade at prices higher or lower than the estimated value set forth in this Disclosure Statement depending upon many factors including, without limitation, prevailing interest rates, markets for similar securities, industry conditions, and the performance of, and investor expectations for, the Reorganized Debtors.  Accordingly, holders of these securities may bear certain risks associated with holding securities for an indefinite period of time.

2.      **Potential Dilution**

The ownership percentage represented by the New Membership Units distributed on the Effective Date under the Plan will be subject to dilution from the conversion of any options, warrants, convertible securities, and exercisable securities.

In the future, similar to all companies, additional equity financings or other share issuances by any of the Reorganized Debtors could adversely affect the value of the New Membership Units issuable upon such conversion. The amount and dilutive effect of the foregoing could be material.

C.      **ADDITIONAL FACTORS**

1.      **Debtors Could Withdraw Plan**

Subject to the terms of, and without prejudice to, the rights of any party to the Restructuring Support Agreement, the Plan may be revoked or withdrawn prior to the Effective Date by the Debtors.

2.      **Debtors Have No Duty to Update**

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

3.      **No Representations Outside Disclosure Statement Are Authorized**

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

4.      **No Legal or Tax Advice Is Provided by Disclosure Statement**

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each holder of a Claim or Interest should consult their own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest.

This Disclosure Statement is not legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

5.      **No Admission Made**

Nothing contained herein or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or holders of Claims or Interests.

## X. <u>VOTING PROCEDURES AND REQUIREMENTS</u>

A.      **VOTING INSTRUCTIONS AND VOTING DEADLINE**

Only holders of Claims and Interests in Class 3, 5, 6, 7, 9, and 10 (collectively, the "<u>Eligible Holders</u>") are entitled to vote to accept or reject the Plan. The Debtors are providing copies of this Disclosure

Statement (including all exhibits and appendices) and related materials and a ballot (collectively, a "Solicitation Package") to the Eligible Holders.

Each ballot contains detailed voting instructions. Each ballot also sets forth in detail, among other things, the deadlines, procedures, and instructions for voting to accept or reject the Plan, the Voting Record Date for voting purposes, and the applicable standards for tabulating ballots. The Voting Record Date for determining which holders are entitled to vote on the Plan is August 31, 2018.

Please complete the information requested on the ballot, sign, date, and indicate your vote on the ballot, and return the completed ballot by:

If sent via first class mail:
LakePoint Land, LLC et al.
c/o GCG
P.O. Box 10593
Dublin, Ohio 43017-7293


If sent via hand delivery or overnight mail:
LakePoint Land, LLC et al.
c/o GCG
5151 Blazer Parkway, Suite A
Dublin, OH 43017-4048

FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE ACTUALLY RECEIVED BY THE VOTING AGENT NO LATER THAN OCTOBER 5, 2018 5:00 P.M. EASTERN TIME (THE "**VOTING DEADLINE**").

ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN OR INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL BE COUNTED AS AN ACCEPTANCE.

If you are an Eligible Holder and you did not receive a ballot, received a damaged ballot, or lost your ballot, or if you have any questions concerning the procedures for voting on the Plan, please contact Garden City Group, LLC  at (i) 1-888-298-6319 or (ii) by emailing LPLinfo@choosegcg.com.

**THE PLAN PROVIDES THAT THE FOLLOWING HOLDERS ARE DEEMED TO HAVE GRANTED THE RELEASES SET FORTH IN SECTION 10.6(b) OF THE PLAN:   ALL ENTITIES WHO HAVE HELD, HOLD, OR MAY HOLD CLAIMS AGAINST OR INTERESTS IN ANY OR ALL OF THE DEBTORS (WHETHER PROOF OF SUCH CLAIMS OR INTERESTS HAS BEEN FILED OR NOT AND WHETHER OR NOT SUCH ENTITIES VOTE IN FAVOR OF, AGAINST OR ABSTAIN FROM VOTING ON THE PLAN OR ARE PRESUMED TO HAVE ACCEPTED OR DEEMED TO HAVE REJECTED THE PLAN) AND ALL OTHER PARTIES IN INTEREST, ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, AND PRINCIPALS, TOGETHER WITH ALL SUCH PERSON'S SUCCESSORS AND ASSIGNS.**

## B.      PARTIES ENTITLED TO VOTE

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are impaired and that are not deemed to have rejected a chapter 11 plan are entitled to vote to accept or reject such plan. Classes of claims or equity interests in which the holders of claims or equity interests are unimpaired under a chapter 11 plan are deemed to have accepted such plan and are not entitled to vote to accept or reject such plan. For a detailed description of the treatment of Claims and Interests under the Plan and whether they are entitled to vote to accept or reject the Plan, *see* Article IV of the Plan.

Claims and Interests in Classes 3, 5, 6, 7, 9, and 10 of the Plan are impaired and Eligible Holders in such Classes will receive distributions under the Plan. As a result, Eligible Holders are entitled to vote to accept or reject the Plan. Claims in all other Classes are either unimpaired and presumed to accept or impaired and deemed to reject the Plan and are not entitled to vote.

## C.      AGREEMENTS UPON FURNISHING BALLOTS

The delivery of an accepting ballot pursuant to one of the procedures set forth above will constitute the agreement of the creditor or interest holder with respect to such ballot to accept (i) all of the terms of, and conditions to, the Solicitation; and (ii) the terms of the Plan including the injunction, releases, and exculpations set forth in Sections 10.5, 10.6, and 10.7 therein. All parties in interest retain their right to object to confirmation of the Plan, subject to any applicable terms of the Restructuring Support Agreement.

## D.      CHANGE OF VOTE

Except as provided in the Restructuring Support Agreement, any party that has previously submitted to the Voting Agent prior to the Voting Deadline a properly completed ballot may revoke such ballot and change its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent, properly completed ballot for acceptance or rejection of the Plan.

## E.      WAIVERS OF DEFECTS, IRREGULARITIES, ETC.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of ballots will be determined by the Voting Agent and/or the Debtors, as applicable, in their sole discretion, which determination will be final and binding. The Debtors reserve the right to reject any and all ballots submitted by any of their respective creditors not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, be unlawful. The Debtors further reserve their respective rights to waive any defects or irregularities or conditions of delivery as to any particular ballot by any of their creditors or interest holders. The interpretation (including the ballot and the respective instructions thereto) by the Debtors, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determines. Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

## F.      MISCELLANEOUS

Unless otherwise ordered by the Bankruptcy Court, ballots that are signed, dated, and timely received, but on which a vote to accept or reject the Plan has not been indicated, will not be counted.  The Debtors, in their sole discretion, may request that the Voting Agent attempt to contact such voters to cure any such defects in the ballots.    An otherwise properly executed ballot that attempts to partially accept and partially reject the Plan will likewise not be counted.

The ballots provided to Eligible Holders will reflect the principal amount of such Eligible Holder's Claim or Interest; however, when tabulating votes, the Voting Agent may adjust the amount of such Eligible Holder's Claim or Interest by multiplying the principal amount by a factor that reflects all amounts accrued between the Voting Record Date and the Petition Date including, without limitation, interest.

Under the Bankruptcy Code, for purposes of determining whether the requisite acceptances have been received, only holders of the Claims or Interests in Classes 3, 5, 6, 7, 9, and 10, as applicable, that actually vote will be counted.  The failure of a holder to deliver a duly executed ballot to the Voting Agent will be deemed to constitute an abstention by such holder with respect to voting on the Plan and such abstention will not be counted as a vote for or against the Plan.

Except as provided below, unless the ballot is timely submitted to the Voting Agent before the Voting Deadline together with any other documents required by such ballot, the Debtors may, in their sole discretion, reject such ballot as invalid, and therefore decline to utilize it in connection with seeking confirmation of the Plan.

## XI. <u>CONFIRMATION OF PLAN</u>

## A.      CONFIRMATION HEARING

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing upon appropriate notice to all required parties.  As promptly as practicable, the Debtors will request that the Bankruptcy Court schedule the Confirmation Hearing.  Notice of the Confirmation Hearing will be provided to all known creditors and equity holders or their representatives.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the adjourned date made at the Confirmation Hearing, at any subsequent adjourned Confirmation Hearing, or pursuant to a notice filed on the docket of the Chapter 11 Cases.

## B.      OBJECTIONS TO CONFIRMATION

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and applicable local rules, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the Debtors' estates or properties, the basis for the objection and the specific grounds thereof, and must be filed with the Bankruptcy Court, with a copy to the chambers of the United States Bankruptcy Judge appointed in the Chapter 11 Cases, together with proof of service thereof, and served upon the following parties, including such other parties as the Bankruptcy Court may order:

1.      **The Debtors at:**

       LakePoint Land, LLC
       755 Hwy 293
       Emerson, Georgia 30137
       Attention: Robert Zurcher
       Email: bobzurcher@lakepointsports.com

2.      **Office of the U.S. Trustee at:**

       Office of the U.S. Trustee for the Northern District of Georgia
       362 Richard B. Russell Building
       75 Ted Turner Drive, SW
       Atlanta, Georgia 30303
       Attention: Martin P. Ochs, Esq.
       Email: martin.p.ochs@usdoj.gov

3.      **Counsel to the Debtors at:**

       Arnall Golden Gregory
       171 17th Street NW, Suite 2100
       Atlanta, Georgia 30363
       Attention: Philip G. Skinner, Esq. and Sean Kulka, Esq.
       Email: philip.skinner@agg.com; sean.kulka@agg.com

4.      **Counsel to Rimrock and the Rimrock Investor at:**

       King & Spalding LLP
       1180 Peachtree Street
       Atlanta, Georgia 30309
       Attention:  W. Austin Jowers, Esq.
       Email:  ajowers@kslaw.com

       And

       King & Spalding LLP
       444 W. Lake Street, Suite 1650
       Chicago, Illinois 60606
       Attention:  Elizabeth Dechant, Esq.
       Email:  edechant@kslaw.com

---

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

---

C.      REQUIREMENTS FOR CONFIRMATION OF PLAN

    1.      **Requirements of Section 1129(a) of the Bankruptcy Code**

        (a)      **General Requirements**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the confirmation requirements specified in section 1129(a) of the Bankruptcy Code have been satisfied including, without limitation, whether:

        1.      the Plan complies with the applicable provisions of the Bankruptcy Code;

        2.      the Debtors have complied with the applicable provisions of the Bankruptcy Code;

        3.      the Plan has been proposed in good faith and not by any means forbidden by law;

        4.      any payment made or promised by the Debtors or by a person issuing securities or  acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

        5.      the Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Reorganized Debtors, an affiliate of the Debtors participating in a Plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of the holders of Claims and Interests and with public policy, and the Debtors have disclosed the identity of any insider who will be employed or retained by the Reorganized Debtors, and the nature of any compensation for such insider;

        6.      with respect to each Class of Claims or Interests, each holder of an impaired Claim or impaired Interest has either accepted the Plan or will receive or retain under the Plan, on account of such holder's Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code;

        7.      except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (as discussed further below), each Class of Claims either accepted the Plan or is not impaired under the Plan;

        8.      except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that administrative expenses and priority Claims, other than Priority Tax Claims, will be paid in full on

the Effective Date, and that Priority Tax Claims will receive either payment in full on the Effective Date or deferred cash payments over a period not exceeding five years after the Petition Date, of a value, as of the Effective Date of the Plan, equal to the Allowed amount of such Claims;

9.    at least one Class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class;

10.    confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan; and

11.    all fees payable under section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date.

(b)    **Best Interests Test**

As noted above, with respect to each impaired class of claims and equity interests, confirmation of a plan requires that each such holder either (i) accept the plan, or (ii) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the value such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code. This requirement is referred to as the "best interests test."

This test requires a Bankruptcy Court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

The Debtors believe that under the Plan all holders of impaired Claims and Interests will receive property with a value not less than the value such holders would receive in a liquidation under chapter 7 of the Bankruptcy Code. The Debtors' belief is based primarily on (i) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of impaired Claims and Interests, and (ii) the Liquidation Analysis attached hereto as <u>Exhibit E</u>.

The Debtors believe that any liquidation analysis is speculative, as it is necessarily premised on assumptions and estimates which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors. The Liquidation Analysis provided in <u>Exhibit E</u> is solely for the purpose of disclosing to holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein. There can be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that a bankruptcy court will accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

(c)    **Feasibility**

Also as noted above, section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization.  For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan.  As part of this analysis, the Debtors have prepared the Financial Projections provided in Section V hereof.  Based upon such Financial Projections, the Debtors believe they will have sufficient resources to make all payments required pursuant to the Plan and that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.  Moreover, Section IX hereof sets forth certain risk factors that could impact the feasibility of the Plan.

(d)    **Equitable Distribution of Voting Power**

On or before the Effective Date, pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, the organizational documents for the Debtors will be amended as necessary to satisfy the provisions of the Bankruptcy Code and will include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, (i) a provision prohibiting the issuance of non-voting equity securities, and (ii) a provision setting forth an appropriate distribution of voting power among classes of equity securities possessing voting power.

2.    **Additional Requirements for Non-Consensual Confirmation**

In the event that any impaired Class of Claims or Interests does not accept or is deemed to reject the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each impaired Class of Claims or Interests that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Classes of Claims or Interests, pursuant to section 1129(b) of the Bankruptcy Code.  Both of these requirements are in addition to other requirements established by case law interpreting the statutory requirements.

Pursuant to the Plan, holders of Interests in Class 11 (Rimrock Investor Member Interests) will not receive a distribution and are thereby deemed to reject the Plan.  However, the Debtors submit that they satisfy the "unfair discrimination" and "fair and equitable" tests, as discussed in further detail below.

(a)    **Unfair Discrimination Test**

The "unfair discrimination" test applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan.  A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting Class are treated in a manner consistent with the treatment of other Classes whose legal rights are substantially similar to those of the dissenting Class and if no Class of Claims or Interests receives more than it legally is entitled to receive for its Claims or Interests.  This test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

The Debtors believe the Plan satisfies the "unfair discrimination" test.  Claims of equal priority are receiving comparable treatment and such treatment is fair under the circumstances.

(b)    **Fair and Equitable Test**

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the

allowed amount of the claims in such class.  As to dissenting classes, the test sets different standards depending on the type of claims in such class.  The Debtors believe that the Plan satisfies the "fair and equitable" test with respect to any dissenting Classes, as further explained below.

### 1.    <u>Secured Creditors</u>

The Bankruptcy Code requires that each holder of an impaired secured claim either (i) retain its liens on the property to the extent of the allowed amount of its secured claim and receive deferred cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such claim, or (ii) have the right to credit bid the amount of its claim if its property is sold and retain its liens on the proceeds of the sale (or if sold, on the proceeds thereof), or (iii) receive the "indubitable equivalent" of its allowed secured claim.

### 2.    <u>Unsecured Creditors</u>

The Bankruptcy Code requires that either (i) each holder of an impaired unsecured claim receive or retain under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and equity interests that are junior to the claims of the dissenting class not receive any property under the plan.

### 3.    <u>Equity Interests</u>

The Bankruptcy Code requires that either (a) each holder of an equity interest receive or retain under the plan property of a value equal to the greater of (i) the fixed liquidation preference or redemption price, if any, of such stock and (ii) the value of the stock, or (b) the holders of equity interests that are junior to any dissenting class of equity interests not receive any property under the plan.  Pursuant to the Plan, all Interests will be cancelled and certain holders of Interests will receive New Membership Units.

### XII.
### <u>ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN</u>

The Debtors have evaluated several alternatives to the Plan.  After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries to parties in interest, assuming confirmation and consummation of the Plan.  If the Plan is not confirmed and consummated, the alternatives to the Plan are (i) the preparation and presentation of an alternative plan of reorganization, (ii) a sale of some or all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, or (iii) a liquidation under chapter 7 of the Bankruptcy Code.

### A.    ALTERNATIVE PLAN OF REORGANIZATION

If the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period during which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different plan.  Such a plan might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of the Debtors' assets.  The Debtors, however, submit that the Plan, as described herein, enables holders of Claims and Interests to realize the most value under the circumstances.

### B.    SALE UNDER SECTION 363 OF BANKRUPTCY CODE

If the Plan is not confirmed, the Debtors could seek from the Bankruptcy Court, after notice and a hearing, authorization to sell their assets under section 363 of the Bankruptcy Code.  Upon analysis and

consideration of this alternative, the Debtors do not believe a sale of their assets under section 363 of the Bankruptcy Code would yield a higher recovery for holders of Claims and Interests than the Plan.

## C.    LIQUIDATION UNDER CHAPTER 7 OR APPLICABLE NON-BANKRUPTCY LAW

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be appointed to liquidate the assets of the Debtors for distribution to the Debtors' creditors in accordance with the priorities established by the Bankruptcy Code. The effect a chapter 7 liquidation would have on the recovery of holders of Allowed Claims and Interests is set forth in the Liquidation Analysis attached hereto as Exhibit E.

As noted in Article VI of this Disclosure Statement, the Debtors believe that liquidation under chapter 7 would result in smaller distributions to creditors and interest holders than those provided for in the Plan because of the delay resulting from the conversion of the cases and the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals that would be required to become familiar with the many legal and factual issues in the Chapter 11 Cases.

Further, LPL owns 100% of the equity interests in all of the other Debtors. As of the Petition Date, as set forth in the Schedules, the book value of the Debtors' assets were worth approximately $2.8 million on a consolidated basis. As of the Petition Date, LPL, LPL III, and LPL IV, jointly and severally owed Rimrock at least $22.4 million. This obligation is secured by all or substantially all of those Debtors' assets, which in the case of LPL includes its' equity interests in LP Services, LP Sports, LP Housing, and LP Hospitality. Rimrock's liens are senior to any and all other liens except the DIP Lender's liens. In the event that the Debtors were forced to liquidate their assets, the Bankruptcy Code and applicable nonbankruptcy law would require the Debtors or a representative of the Estates to distribute all of the net proceeds of those assets to the DIP Lender and/or Rimrock. Accordingly, holders of Claims against and Interests in the Debtors would not receive or retain any property in a hypothetical Chapter 7 liquidation of the Debtors. Accordingly, the Plan provides holders of Claims against and Interests in the Debtors with a better result than they could hope to obtain in a hypothetical liquidation.

## XIII.
## CONCLUSION AND RECOMMENDATION

The Debtors believe the Plan is in the best interests of all stakeholders and urge the holders of Claims and Interests in Classes 3, 5, 6, 7, 9, and 10 to vote in favor thereof.

Dated this 31st day of July 2018.

Respectfully submitted,

LAKEPOINT LAND, LLC
LAKEPOINT LAND III, LLC
LAKEPOINT LAND IV, LLC
LAKEPOINT SERVICES, LLC
LAKEPOINT SPORTS SOUTH, LLC
LP HOUSING LLC
LAKEPOINT HOSPITALITY, LLC
LAKEPOINT MERCHANDISE, LLC

By: _____

Robert Zurcher
Chief Financial Officer of the Debtors

**<u>EXHIBIT A</u>**

**PLAN**

**EXHIBIT B**

**RESTRUCTURING SUPPORT AGREEMENT**

## EXHIBIT C

**LEGAL DESCRIPTIONS**

**<u>EXHIBIT D</u>**

**FINANCIAL PROJECTIONS**

**<u>EXHIBIT E</u>**

**LIQUIDATION ANALYSIS**