## SENIOR SECURED CREDIT AGREEMENT

This SENIOR SECURED CREDIT AGREEMENT (this "Agreement") is dated as of [ ], 2018 and is by and among LakePoint Land, LLC, LakePoint Land III, LLC, LakePoint Land IV, LLC, LakePoint Services, LLC, LakePoint Sports South, LLC, LP Housing LLC, LakePoint Hospitality, LLC, and LakePoint Merchandise, LLC, each as borrowers (collectively, the "Borrowers", individually, a "Borrower"), and LP Investments I, LLC, as lender (the "Lender").

### W I T N E S S E T H:

WHEREAS, each of the Borrowers filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code ("Bankruptcy Protection") in the United States Bankruptcy Court for the Northern District of Georgia, Rome Division (the "Bankruptcy Court") on June 11, 2018;

WHEREAS, pursuant to that certain confirmation order, entered on [ ], 2018, the Bankruptcy Court confirmed the Borrowers' Plan of Reorganization, and the Borrowers will emerge from Bankruptcy Protection pursuant thereto on the Closing Date;

WHEREAS, the Borrowers have requested that on the Closing Date, the Lender make a revolving loan credit facility (the "Initial Revolving Facility") to the Borrowers in an aggregate principal amount of $2,000,000 for the purposes described herein;

WHEREAS, to provide security for the repayment of the loans made available pursuant hereto and payment of the other obligations of the Borrowers hereunder, the Borrowers have agreed to provide the Lender, in each case, with Liens on the Collateral (as defined below); and

WHEREAS, the Lender is willing to make the requested Initial Revolving Facility available on the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the premises and the mutual covenants herein contained, the Borrowers and the Lender agree as follows:

1.      Loans.

(a)      Initial Revolving Loans. The Borrowers hereby jointly and severally covenant and promise to pay to the Lender the aggregate unpaid principal amount of all loan advances made to the Borrowers from time to time under this Agreement, together with interest thereon calculated in accordance with the provisions of this Agreement.  Subject to the terms and conditions of this Agreement and upon satisfaction of the conditions set forth herein, the Lender agrees to make Loans (the "Initial Revolving Loans") to the Borrowers from time to time until the Commitment Termination Date in an aggregate principal amount at any one time not exceeding the amount set forth in Schedule I (the "Initial Revolving Commitment"), plus the amount of any Incremental Revolving Commitment. Until the Commitment Termination Date, the Borrower may use the Revolving Commitments by borrowing, prepaying the Loans in whole or in part, and reborrowing (subject to Section 2(d)), all in accordance with the terms and conditions thereof.

The loan advances made by the Lender pursuant to this <u>Section 1(a)</u> shall be sent by wire transfer of immediately available funds to an account designated by the Borrowers.

(b)    <u>Incremental Revolving Loans</u>. The Borrower may, by notice to the Lenders, from time to time make one or more requests to increase the Revolving Commitments (each such increase, an "<u>Incremental Revolving Commitment</u>") by an aggregate amount (for all such requests) not exceeding $18,000,000; <u>provided</u>, <u>however</u>, that the Lender shall have no obligation to agree to increase its Revolving Commitment, or to provide an Incremental Revolving Commitment, pursuant to this Section, and any election to do so shall be in the sole discretion of the Lender. Unless otherwise set forth in an amendment to this Agreement, all Loans made by the Lender on account of the Incremental Revolving Commitment (any such Loans, the "<u>Incremental Revolving Loans</u>") shall have the same terms applicable to the Initial Revolving Loans set forth in this Agreement.

(c)    <u>Interest Accrual</u>.  Interest shall accrue on a daily basis at a rate of 12% per annum (calculated on the basis of a 360 day year and compounded quarterly) on the unpaid principal balance of the Loans then outstanding; <u>provided</u>, <u>however</u>, that, upon the occurrence and during the continuance of an Event of Default, interest shall accrue on the unpaid principal balance of the Loans, together with all other outstanding Obligations, at a rate of 14% per annum (calculated on the basis of a 360 day year and compounded quarterly) (the "<u>Default Rate</u>").

(d)    <u>Borrowing Procedures</u>.  The Chief Financial Officer, on behalf of the Borrowers, shall give the Lender irrevocable notice of each borrowing by delivering a Borrowing Request by 12:00 noon New York City time not less than two (2) Business Days prior to the date of each requested borrowing of a Loan; <u>provided</u>, <u>however</u>, that (i) no Loan shall be in an amount less than $25,000 and (ii) the Borrowers shall not be permitted to deliver a Borrowing Request more frequently than once per every two calendar weeks.

2.    <u>Payments, etc.</u>

(a)    <u>Payment of Interest</u>.  All accrued and unpaid interest on the Loans shall be payable in U.S. dollars in arrears on the last Business Day of each calendar month, commencing with the calendar month ending [_____], 2018 (the "<u>Payment Date</u>").  Any interest accruing at the Default Rate shall be payable on demand by the Lender.  Any payments in excess of the accrued and unpaid interest due on any Payment Date shall be applied to the outstanding principal of the Loans as set forth in <u>Section 2(e)</u>.

(b)    <u>Maturity Date</u>.  On [   ][1], 2023, the Borrowers shall pay in cash the entire unpaid principal amount of the Loans then outstanding to the Lender, together with all accrued and unpaid interest thereon and any other expenses and obligations hereunder.

(c)    <u>Prepayment at Borrowers' Election</u>.  At any time, after two (2) Business Days' advance written notice, the Borrowers may, without premium or penalty, prepay in cash all or any portion of the unpaid principal amount of the Loans.

---

[1] NTD: To be the fifth anniversary after the Closing Date.

(d)     <u>Mandatory Prepayment</u>.

(i)     <u>Asset Dispositions</u>.  Within two (2) Business Days after the receipt by a Borrower or any of its Subsidiaries of any Net Cash Proceeds from any Asset Disposition, unless otherwise consented to in writing by the Lender, such Borrower shall prepay the outstanding Obligations in an amount equal to 100% of such Net Cash Proceeds.

(ii)     <u>Equity Interests</u>.  If any Equity Interests shall be issued by any Obligor (other than (i) proceeds of the issuance of Equity Interests to be used substantially concurrently with the receipt thereof to finance the consummation of an Investment permitted pursuant to <u>Section 8(d)</u> or any Capital Expenditure permitted hereunder and (ii) proceeds of the issuance of Equity Interests by any Obligor to any other Obligor), unless otherwise consented to in writing by the Lender, an amount equal to 100% of the Net Cash Proceeds thereof shall be applied on the date of such issuance toward the prepayment of the Obligations.

Notwithstanding anything to the contrary herein, unless otherwise consented to in writing by the Lender, any prepayments under this <u>Section 2(d)</u> shall permanently reduce the Revolving Commitments by an amount equal to such prepayment amount, and such amounts may not reborrowed.

(e)     <u>Application of Principal Payments and Reductions</u>.  All payments and prepayments of principal on the Loans and all principal reductions effected in accordance with the terms of this Agreement shall be accompanied by the payment of all accrued and unpaid interest thereon and shall be applied <u>first</u>, to accrued but unpaid interest under the Loans and <u>second</u>, to the unpaid principal balance of the Loans then outstanding.  If any Incremental Loans are made, any payments or prepayments shall be applied *pro rata* between the Initial Revolving Loans and the Incremental Revolving Loans.

(f)     <u>Payments Generally</u>.  All payments (including prepayments) to be made by any Borrower hereunder shall be made in immediately available funds in U.S. dollars, without setoff or counterclaim, before 2:00 p.m., New York City time, on the date when due.  Payments of principal or interest received after 2:00 p.m., New York City time, will be considered received at the opening of business on the next Business Day.  When a payment is due on a day that is not a Business Day, the payment shall be due the next Business Day, and additional fees or interest, as applicable, shall continue to accrue until paid.  Each such payment shall be made by wire transfer to the Lender.

(g)     <u>Payments Free of Taxes</u>.  All payments by any Borrower hereunder or any other Loan Document shall be made to each Recipient free and clear of any Taxes, except as required by applicable law.  If any applicable law requires deduction or withholding of any Tax from any such payment by any Borrower, then such Borrower shall be entitled to make a deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law.  If so requested by any Recipient, the applicable Borrower shall deliver to the Lender the original or a certified copy of each receipt evidencing payment of any Taxes made pursuant to this <u>Section 2(g)</u>.  If any Taxes are required to be withheld or deducted from any amount payable by any Borrower under this Agreement or any other Loan Document, then the amount payable by such Borrower shall be increased so that after all such required deductions or withholdings are made (including deductions or withholdings applicable to additional

amounts payable under this <u>Section 2(g)</u>), each Recipient receives an amount equal to the amount it would have received had no such deduction or withholding been made.

3.    <u>Guarantees; Security</u>.

(a)    All Obligations of the Borrowers shall be jointly and severally guaranteed by Holdings and each current and future Subsidiary of any Borrower (each such Subsidiary together with Holdings, a "<u>Guarantor</u>") pursuant to one or more guarantees (each, a "<u>Guaranty</u>") in form and substance reasonably satisfactory to the Lender.

(b)    All Obligations or Guaranteed Obligations (as defined in the Guaranties), as applicable, shall be secured by a first priority Lien by each Obligor's right, title and interest in all Property of such Obligor (other than Excluded Collateral (as defined in the Security Agreement)), as more fully described in the Security Agreement or in any other Security Documents (excluding any such Excluded Collateral, the "<u>Collateral</u>").

4.    <u>Conditions To Effectiveness</u>.    The obligation of the Lender to make Loans shall not become effective until the date on which each of the following conditions is satisfied (or waived in the sole and absolute discretion of the Lender).

(a)    The Lender (or its counsel) shall have received the following:

(i)    a counterpart of this Agreement signed by each Borrower;

(ii)    a Guaranty and Pledge Agreement executed by Holdings in favor of the Lender, in form and substance satisfactory to the Lender, guarantying the Obligations and pledging all of its equity interest in LakePoint Land, LLC as security for such guaranty; and

(iii)    a duly executed Borrowing Request with respect to any Loan made on the Closing Date.

(b)    The Borrowers shall have provided to the Lender evidence that the DIP Facility has been or concurrently with the Closing Date is being terminated, all amounts due and payable thereunder have been or concurrently with the Closing Date will be paid in full and (if applicable) all guarantees and Liens thereunder have been or concurrently with the Closing Date are being released; <u>provided</u>, <u>however</u>, that to the extent the amounts advanced hereunder are insufficient to pay in full the outstanding amount of the DIP Facility, the Borrowers shall distribute to the DIP Lender (or its designee) Class B-1 Membership Units based on a capital contribution to Holdings equal to the amount of outstanding obligations under the DIP Facility in excess of the amounts advanced hereunder on the Closing Date.

(c)    All legal matters incident to this Agreement and the borrowings hereunder shall be satisfactory to the Lender.

(d)    The Lender shall have a valid and perfected Lien on and security interest in the Collateral, and such Lien of the Lender shall be senior to all other Liens.

(e)    All reasonable and documented (in summary form) out-of-pocket fees, costs, disbursements and expenses of the Lender incurred in connection with negotiating, documenting, seeking approval of and closing the Initial Revolving Facility, including all reasonable fees,

costs, disbursements and expenses of the Lender's outside counsel, King & Spalding LLP, and other advisors shall have been paid in full in cash (or Lender is otherwise satisfied that such amounts will be paid from the proceeds of the Loans on the Closing Date).

(f)    There shall not exist any law, regulation, ruling, judgment, order, injunction or other restraint that prohibits, restricts or imposes a materially adverse condition on the Initial Revolving Facility or the exercise by the Lender of its rights as a secured party with respect to the Collateral.

(g)    All governmental and third party consents and approvals necessary in connection with the Initial Revolving Facility shall have been obtained (without the imposition of any conditions that are not acceptable to the Lender in its reasonable discretion) and shall remain in effect.

(h)    The Effective Date (as defined in the Plan of Reorganization) shall have occurred.

5.    <u>Conditions to All Credit Extensions</u>.  The obligation of the Lender to make a Loan on the occasion of any borrowing is subject to the satisfaction of each of the conditions set forth in <u>Section 4</u> on the date of such Loan (other than those conditions expressly required to be satisfied on the Closing Date) and the following additional conditions:

(a)    The Borrowers shall have delivered to the Lender an appropriate Borrowing Request, duly executed and completed, by the time specified in, and otherwise as permitted by, this Agreement.

(b)    The representations and warranties made by the Borrowers herein shall be true and correct in all respects at and as if made as of such date (in each case immediately prior to, and after giving effect to, the funding of any Loans) except to the extent they expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all respects on and as of such earlier date.

(c)    No Default or Event of Default shall exist or be continuing either prior to or after giving effect to the making of such Loan.

(d)    The making of such Loan (and the use of the proceeds therefrom) shall not violate any Law and shall not be enjoined, temporarily, preliminarily or permanently.

(e)    No Material Adverse Change shall have occurred.

(f)    There shall not exist any Law, ruling, judgment, order, injunction or other restraint that, in the judgment of the Lender, prohibits, restricts or imposes a materially adverse condition on the Borrowers, the Initial Revolving Facility or the exercise by the Lender of its rights as a secured party with respect to the Collateral.

The delivery of each Borrowing Request shall constitute a representation and warranty by the Borrowers of the correctness of the matters specified in subsections (b) through (f) above.

6.    <u>Representations and Warranties</u>.  In order to induce the Lender to enter into this Agreement and to make the Initial Revolving Commitments hereunder, each Borrower makes the

5

following representations and warranties to the Lender and such representations and warranties shall survive the execution and delivery of this Agreement:

(a)    <u>Due Organization and Qualification</u>.  Each Obligor (i) is duly organized and existing and in good standing under the laws of the jurisdiction of its organization, (ii) is qualified to do business in any state where the failure to be so qualified could reasonably be expected to result in a Material Adverse Change, and (iii) has all requisite organizational power and authority to own and operate its properties, to carry on its business as now conducted, to enter into the Loan Documents to which it is a party and to carry out the transactions contemplated thereby.

(b)    <u>Due Authorization; No Conflicts</u>.  The execution, delivery and performance by such Obligor of the Loan Documents and all other documents contemplated hereby or thereby, and the borrowing of amounts advanced thereunder and use of the proceeds of any of the Loans, (i) have been duly authorized by all necessary action on the part of such Obligor and (ii) do not and will not: (A) conflict with or constitute a breach of, or default under, or require any consent under, or result in the creation of any Lien, charge or encumbrance upon the property or assets of such Obligor pursuant to any other agreement or instrument (other than any pledge of or security interest granted in any Collateral pursuant to any Loan Document (including, but not limited to, the Liens permitted by <u>Section 8(b)</u>)) to which such Obligor is a party or is bound or by which its properties may be bound or affected; or (B) violate any provision of any Law (including, without limitation, Regulation U of the Federal Reserve Board), order, writ, judgment, injunction, decree, determination or award presently in effect having applicability to such Obligor.

(c)    <u>Government Consents</u>.  No consent, approval or authorization of, or registration, declaration or filing with, any Governmental Authority or other person or entity is required as a condition to or in connection with the due and valid execution, delivery and performance by such Obligor of any Loan Document, other than registrations, consents, approvals, notices, or other actions that have been obtained and that are still in force and effect and except for filings and recordings with respect to the Collateral to be made, or otherwise delivered in accordance with the Loan Documents for filing or recordation, as of the Closing Date or as of such later date as is permitted or contemplated pursuant to the Loan Documents.

(d)    <u>Binding Obligations</u>.  Each Loan Document has been duly executed and delivered by each Obligor that is a party thereto and constitute the legally valid and binding obligation of such Obligor, enforceable against such Obligor in accordance with its respective terms.

(e)    <u>Compliance with Laws</u>. Each Obligor is in compliance with all Requirements of Law, except to the extent that the failure to comply therewith would not, in the aggregate, be reasonably expected to have a Material Adverse Change.

(f)    <u>PATRIOT Act</u>. To the extent applicable, each Obligor is in compliance, in all material respects, with the (a) Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, and (b) Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA Patriot Act of 2001) (the "<u>PATRIOT Act</u>").  No part of the proceeds of the loans made hereunder will be used by any Obligor or any of their Affiliates, directly or indirectly, for any payments to any governmental official or employee, political party, official of

6

a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

(g)    <u>Complete Disclosure</u>. All factual information, taken as a whole, furnished by or on behalf of an Obligor in writing to the Lender (including all information contained in the other Loan Documents) for purposes of or in connection with this Agreement or the other Loan Documents, was, true and accurate, in all material respects, on the date as of which such information is dated or certified and not incomplete by omitting to state any fact necessary to make such information (taken as a whole) not misleading in any material respect at such time in light of the circumstances under which such information was provided.

7.    <u>Affirmative Covenants</u>.  Until the Full Payment of all Obligations, the Borrowers covenant and agree that the Borrowers shall and shall cause each of its Subsidiaries to comply with each of the following, as applicable:

(a)    <u>Use of Proceeds</u>.  Use the proceeds of the Loans to (i) refinance an equivalent outstanding amount of the DIP Facility, (ii) fund other Distributions (as defined in the Plan of Reorganization) and pay related fees and expenses, and (iii) fund general working capital and for general corporate purposes (including capital expenditures and capital investment) of the Borrowers.

(b)    <u>Guaranties and Collateral</u>.  Deliver, or cause to delivered, such guaranties, security agreements, mortgages and other Security Documents as are necessary to provide the Lender with a first priority Lien on all of the Property of the Obligors (other than Excluded Collateral (as defined in the Security Agreement)), in each case, together with such opinions, title insurance policies, endorsements, financing statements, control agreements and other agreements, documents and instruments in furtherance of such guaranties and collateral arrangements, in each case, as the Lender may from time to time reasonably request.

(c)    <u>Annual Financial Statements</u>.  Deliver as soon as available, but in any event within 60 days after the end of each fiscal year of the Borrowers, an unaudited consolidated balance sheet of the Borrowers and its Subsidiaries as at the end of such fiscal year, and the related consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail and prepared in accordance with GAAP, such consolidated statements to be certified by a Senior Officer of the Borrowers as fairly presenting the financial condition, results of operations, shareholders' equity and cash flows of the Borrowers and its Subsidiaries in accordance with GAAP.

(d)    <u>Quarterly Financial Statements</u>.  Deliver as soon as available, but in any event within 45 days after the end of each fiscal quarter, an unaudited consolidated balance sheet of the Borrowers and their Subsidiaries as at the end of such fiscal quarter, and the related consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal quarter and for the portion of the Borrowers' fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding fiscal quarter of the previous fiscal year and corresponding portion of the previous fiscal year, all in reasonable detail and prepared in accordance with GAAP, such consolidated statements to be certified by the Chief Financial Officer as fairly presenting the financial condition, results of operations, shareholders' equity and

cash flows of the Borrowers and their Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes.

(e)    <u>Monthly Financial Statements</u>.  Deliver as soon as available, but in any event within 30 days after the end of each fiscal month, an unaudited consolidated balance sheet of the Borrowers and its Subsidiaries as at the end of such fiscal month, and the related consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal month and for the portion of the Borrowers' fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding fiscal month of the previous fiscal year and corresponding portion of the previous fiscal year, all in reasonable detail and prepared in accordance with GAAP, such consolidated statements to be certified by the Chief Financial Officer as fairly presenting the financial condition, results of operations, shareholders' equity and cash flows of the Borrowers and its Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes.

(f)    <u>ERISA Notices</u>.  Deliver as soon as possible, but in any event within five (5) days, any notices or other communications given or received by an Obligor or any ERISA Affiliate related to the occurrence or expected occurrence of an ERISA Event.

(g)    <u>Additional Collateral; Further Assurances</u>.

(i)    With respect to any Property (to the extent included in the definition of Collateral) acquired after the Closing Date by any Obligor (other than any property described in paragraph (ii) or (iii) below) as to which the Lender does not have a perfected Lien, promptly (and in any event within five (5) Business Days, or such longer period as the Lender may agree) (i) execute and deliver to the Lender such amendments or supplements to the Security Agreement or such other Security Documents as the Lender reasonably deems necessary or advisable to grant to the Lender a security interest in such property and (ii) take all actions necessary or advisable to grant to the Lender a perfected first priority Lien in such property, including the filing of Uniform Commercial Code financing statements in such jurisdictions as may be required by the Security Agreement or by law or as may be requested by the Lender.

(ii)    With respect to any fee interest in any Real Estate acquired after the Closing Date by any Obligor, within 30 days of such acquisition (i) execute and deliver a first priority Mortgage in favor of the Lender, covering such Real Estate, (ii) if reasonably requested by the Lender, provide the Lender with the Related Real Estate Documents and (iii) if reasonably requested by the Lender, deliver to the Lender legal opinions relating to the matters described above, which opinions shall be in form and substance, and from counsel, reasonably satisfactory to the Lender.

(iii)    With respect to any new Subsidiary created or acquired after the Closing Date by any Obligor, within 10 days of such creation or acquisition (i) execute and deliver to the Lender such amendments to the Security Agreement and Guaranty Agreement as the Lender reasonably deems necessary or advisable to grant to the Lender a perfected first priority Lien in Equity Interests of such new Subsidiary that is owned by any Obligors, (ii) deliver to the Lender such documents and instruments as may be required to grant, perfect, protect and ensure the priority of such security interest, including but not limited to, the certificates representing such Equity Interest, together with undated stock powers, in blank, executed and delivered by a duly authorized officer of the relevant Obligor and (iii) cause such new Subsidiary (a) to become a

8

party to the Security Agreement and a Guaranty Agreement, (b) to take such actions necessary or advisable to grant to the Lender a perfected first priority Lien in the Collateral described in the Security Agreement, with respect to such new Subsidiary, including the filing of Uniform Commercial Code financing statements in such jurisdictions as may be required by the Security Agreement or by law or as may be requested by the Lender and (c) to deliver to the Lender a certificate of such Subsidiary, in a form reasonably satisfactory to the Lender, with appropriate resolutions, incumbency and such Subsidiary's Governing Documents.

(iv)     If reasonably requested by the Lender, each Obligor shall use commercially reasonable efforts (which shall not require any Obligor to agree to any modification to any lease or to payment of any fees other than the landlord's legal or out-of-pocket costs in connection with negotiating the landlord's agreement or bailee letter) to obtain a landlord's agreement or bailee letter, as applicable, from the lessor of each leased property or bailee with respect to any warehouse, processor or converter facility or other location where Collateral with a book value in excess of $50,000 is stored or located in the United States, which agreement or letter shall contain a waiver or subordination of all Liens or claims that the landlord or bailee may assert against the Collateral at that location, and shall otherwise be reasonably satisfactory in form and substance to the Lender.

(v)     Subject to the limitations on perfection set forth herein and in the other Loan Documents, execute any further instruments and take such further action as the Lender reasonably deems necessary to perfect, protect, ensure the priority of or continue the Lender's first priority Lien on the Collateral or to effect the purposes of this Agreement.

(h)     <u>Compliance with Laws</u>.  Comply in all material respects with laws (including without limitation, the Bankruptcy Code, ERISA, and environmental laws), pay taxes, maintain all necessary licenses and permits and trade names, trademarks, patents, preserve corporate existence, maintain appropriate and adequate insurance coverage and permit inspection of properties, books and records.

(i)     <u>Sanctions; Anti-Corruption</u>.  Comply in all material respects with (i) anti-corruption laws, (ii) anti-terrorism laws, including the PATRIOT Act and (iii) OFAC and any similar laws or regulations enacted by the European Union or the United Kingdom.

(j)     <u>Affiliate Transactions</u>.  Conduct all transactions with affiliates on terms no less favorable to the Borrowers than those obtainable in arm's length transactions, including, without limitation, restrictions on management fees to affiliates.

(k)     <u>Access</u>.  Provide to the Lender and its advisors prompt and unfettered access during normal business hours to: (i) all books and records and other information regarding the Obligors' businesses, properties or financial condition (provided, however, that the Obligors shall not be required to provide any information (y) that is subject to the attorney client privilege, or (z) that would result in a violation of law by the Lender or the Obligors), (ii) all owned, leased or managed properties at which the Obligors conduct their businesses, and (iii) the Obligors' management team and employees.

(l)     <u>Compliance Certificate</u>.  Concurrently with the delivery of the financial statements referred to in <u>Section 7(d)</u>, a duly completed certificate signed by the Chief Financial

Officer setting forth reasonably detailed calculations demonstrating compliance with <u>Section 8(k)</u>.

8.      <u>Negative Covenants</u>.  Until the Full Payment of all Obligations, the Borrowers shall not, nor shall they permit any Subsidiary to, directly or indirectly:

(a)      <u>Indebtedness</u>.      Create, suffer to exist or become obligated to pay any Indebtedness, other than:

(i)      the Obligations; and

(ii)      other Indebtedness in the aggregate amount not to exceed $50,000 outstanding at any time.

(b)      <u>Liens</u>.  Create, incur, assume or suffer to exist any Lien, upon any of its property, assets or revenues, whether now owned or hereafter acquire, other than:

(i)      Liens granted to the Lender to secure the Obligations;

(ii)      Liens for Taxes either (a) not due and payable or (b) being contested in good faith and for which the Obligors maintain adequate reserves on its books, provided that no notice of any such Lien has been filed or recorded under the IRC;

(iii)      Liens to secure payment of workers' compensation, employment insurance, social security and other like obligations incurred in the ordinary course of business;

(iv)      Liens of carriers, warehousemen, suppliers, or other Persons that are possessory in nature arising in the ordinary course of business so long as such Liens attach only to inventory and which are not delinquent or remain payable without penalty or which are being contested in good faith and by appropriate proceedings which proceedings have the effect of preventing the forfeiture or sale of the property subject thereto;

(v)      leases or subleases of Real Estate granted in the ordinary course of the Obligors' businesses (or, if referring to another Person, in the ordinary course of such Person's business), and leases, subleases, non-exclusive licenses or sublicenses of personal property (other than intellectual property) granted in the ordinary course of the Obligors' businesses (or, if referring to another Person, in the ordinary course of such Person's business), if the leases, subleases, licenses and sublicenses do not prohibit granting the Lender a security interest therein;

(vi)      Liens in favor of other financial institutions arising in connection with deposit and/or securities accounts held at such institutions, provided that the Lender has a perfected security interest in the amounts held in such deposit and/or securities accounts;

(vii)      non-exclusive licenses of intellectual property implied from a Borrower's or any Subsidiary's sales, leases, or other provisions of a product or service, in each case, granted in the ordinary course of business;

(viii)      Liens in favor of customs and revenue authorities arising as a matter of law to secure payments of customs duties in connection with the importation of goods;

(ix)     Liens on insurance proceeds in favor of insurance companies granted solely as security for financed premiums; and

(x)     other Liens securing claims in an aggregate amount not to exceed $50,000.

(c)     <u>Restricted Payments</u>.  Except as otherwise consented to in writing by the Lender, pay any dividends or make any distribution or payment on account of or redeem, retire or purchase any of its Equity Interest, other than in connection with the issuance to the Lender of Class B-1 Membership Units in Holdings.

(d)     <u>Investments</u>.  Except as otherwise consented to in writing by the Lender, directly or indirectly make any Investment, or permit any of its Subsidiaries to do so, other than:

(i)     Investments consisting of cash and Cash Equivalents;

(ii)     Investments consisting of deposit accounts and securities accounts, provided that the Lender has a perfected security interest for the benefit of the Lenders therein to the extent required under the Security Agreement;

(iii)     Investments (including debt obligations) received in connection with the bankruptcy or reorganization of customers or suppliers or in settlement of delinquent obligations of, and other disputes with, customers or suppliers arising in the ordinary course of business;

(iv)     Investments consisting of travel advances, employee relocation loans and other employee loans and advances in the ordinary course of business; and

(v)     other Investments in an aggregate amount not to exceed $25,000.

(e)     <u>Dispositions</u>.  Except as otherwise consented to in writing by the Lender, transfer, or permit any of its Subsidiaries to Transfer, in one transaction or a series of transactions, all or any part of their or their Subsidiary's business, or Property except for Transfers:

(i)     of worn-out, obsolete or no longer useful equipment in the ordinary course of business;

(ii)     of nonexclusive licenses for the use of the property of the Obligors or their respective Subsidiaries in the ordinary course of business;

(iii)     inventory in the ordinary course of business; and

(iv)     other Transfers in an amount not to exceed $25,000.

(f)     <u>Mergers or Acquisitions</u>.  Consummate any merger, combination or consolidation of the Borrowers or any of their respective Subsidiaries with or into any Person or the sale of all or substantially all of the assets, stock or other evidence of beneficial ownership of the Borrowers or any of their respective Subsidiaries (except for a Investments permitted by <u>Section 8(d)</u>) without obtaining the prior written consent of the Lender (which consent shall not be unreasonably withheld, conditioned or delayed); <u>provided</u>, <u>however</u>, that neither the terms and conditions of this <u>Section 8(f)</u> nor any other term or provision of this Agreement or any other Loan Document shall prohibit any merger, combination or consolidation, the terms of which

provide for the contemporaneous or prior Full Payment of all Obligations or any merger, combination or consolidation of the Borrowers or any of their respective Subsidiaries with each other.

(g)    <u>Sale-Leaseback Transactions</u>.  Become or remain liable as lessee or as guarantor or other surety with respect to any lease, whether an operating lease or a Capital Lease, of any property (whether real, personal or mixed, and whether now owned or hereafter acquired) (i) that any Obligor or Subsidiary has sold or transferred (or is to sell or transfer) to a Person that is not a Subsidiary, or (ii) that any Obligor or Subsidiary intends to use for substantially the same purpose as any other Property that, in connection with such lease, has been sold or transferred by any Obligor or Subsidiary to another Person.

(h)    <u>Capital Expenditures</u>.  Except as otherwise consented to in writing by the Lender, directly or indirectly make Capital Expenditures, or permit any of its Subsidiaries to make Capital Expenditures, in an amount in excess of $100,000 in any fiscal quarter.

(i)    <u>Transactions with Affiliates</u>.  Enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property or the rendering of any service) with any Affiliate of an Obligor on terms that are less favorable to an Obligor or a Subsidiary, as the case may be, than those that might be obtained at the time from Persons who are not such an Affiliate in the ordinary course of business other than (i) any transactions between the Obligors expressly permitted under the Loan Documents; (ii) reasonable and customary fees paid to members of the board of directors of the Borrowers and their respective Subsidiaries; (iii) compensation arrangements and benefit plans for officers and other employees of the Borrowers and their respective Subsidiaries entered into and maintained in the ordinary course of business and (iv) transactions permitted under <u>Section 8(c)</u>.  Notwithstanding the foregoing, to the extent any transaction described in clauses (i) through (iv) of this <u>Section 8(i)</u> is in an amount greater than or equal to $100,000, the Borrowers must provide notice to the Lender of such transaction, setting forth in reasonable detail a description of the transaction, including the parties thereto and the amount thereof.

(j)    <u>ERISA Events</u>.  Establish, contribute to, or commence any obligation to contribute to any Pension Plan or Multiemployer Plan, or terminate any Pension Plan or withdraw from any Multiemployer Plan, or otherwise cause or permit any ERISA Event to occur.

(k)    <u>Financial Covenants</u>.

(i)    Permit the Consolidated Leverage Ratio at the end of any fiscal quarter of the Borrowers to be greater than 30%; or

(ii)    Beginning with the fiscal year ending December 31, 2020, permit the Consolidated Total Revenue for any fiscal year of the Borrowers to be less than $3,080,000.

9.    <u>Events of Default; Remedies</u>.

(a)    <u>Events of Default</u>.  The term "<u>Event of Default</u>" as used herein means the occurrence or happening, at any time and from time to time, any of the following:

(i)        the Borrowers shall fail to pay (i) the principal of this Agreement as and when due and payable, or (ii) interest on this Agreement, or any other amount payable under this Agreement, as and when due and payable, in either case, whether at maturity or otherwise;

(ii)       the Borrowers or any Obligor shall fail to perform or observe any term, covenant or agreement contained in any Loan Document on its part to be performed or observed;

(iii)      any representation or warranty made or deemed made by any Borrower in this Agreement or by any Borrower in any Loan Document to which it is a party, or in any certificate, document, opinion or financial or other statement furnished under or in connection with a Loan Document, shall prove to have been incorrect in any material respect on or after the date hereof;

(iv)      any Obligor repudiates, revokes or attempts to revoke its Guaranty; any Obligor denies or contests the validity or enforceability of any Loan Documents or Obligations, or the perfection or priority of any Lien granted to the Lender; or any Loan Document ceases to be in full force or effect for any reason (other than a waiver or release by the Lender);

(v)       any breach or default of any Obligor occurs under any document, instrument or agreement (which is not cured before the expiration of any applicable grace period) to which it is a party or by which it or any of its Properties is bound, relating to any Indebtedness (other than the Obligations) in excess of $100,000, if the maturity of or any payment with respect to such Indebtedness may be accelerated or demanded, or required to be repurchased or redeemed, due to such breach;

(vi)      Any judgment, order or award for the payment of money is entered against any Obligor or its assets in an amount that exceeds, individually or cumulatively with all unsatisfied judgments or orders against all Obligors, $100,000 in the aggregate (except to the extent covered (other than to the extent of customary deductibles) by insurance pursuant to which the insurer has not denied coverage), and either (A) there is a period of 60 consecutive days at any time after the entry of any such judgment, order, or award during which (1) the same is not discharged, satisfied, vacated, or bonded pending appeal, or (2) a stay of enforcement thereof is not in effect, or (B) enforcement proceedings are commenced upon such judgment, order, or award;

(vii)     A loss, theft, damage or destruction occurs with respect to any Collateral if the amount not covered by insurance exceeds $100,000 in the aggregate;

(viii)    Any Obligor is enjoined, restrained or in any way prevented by any Governmental Authority from conducting a part of its business, which action could reasonably be expected to have a Material Adverse Change; any Obligor suffers the loss, revocation or termination of any license, permit, lease or agreement, which loss, revocation or termination could reasonably be expected to have a Material Adverse Change; except in connection with a Transfer permitted by Section 8(c), there is a cessation of any part of any Obligor's business for any period, which cessation could reasonably be expected to have a Material Adverse Change; any Collateral of any Obligor is taken or impaired through condemnation, which taking or impairment could reasonably be expected to have a Material Adverse Change; any Obligor agrees to or commences any liquidation, dissolution or winding up of its affairs; or any Obligor is not Solvent;

13

(ix)    Any Obligor generally fails to pay, or admits in writing its inability or refusal to pay, its debts as they become due; or an Insolvency Proceeding is commenced by any Obligor; any Obligor agrees to, commences or is subject to a liquidation, dissolution or winding up of its affairs; any Obligor makes an offer of settlement, extension, proposal (or files a notice of intention to make a proposal), plan of arrangement or composition to its unsecured creditors generally; a Creditor Representative is appointed to take possession of any substantial Property of or to operate or sell any of the business of any Obligor; or an Insolvency Proceeding is commenced against any Obligor and such Obligor consents to the institution of the proceeding against it, such petition commencing the proceeding is not timely contested by such Obligor, such petition is not dismissed within 30 days after its filing, or an order for relief is entered in the proceeding;

(x)    (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan that has resulted or could reasonably be expected to result in liability of any Obligor (including on account of an ERISA Affiliate) to a Pension Plan, Multiemployer Plan or PBGC, or that constitutes grounds for appointment of a trustee for or termination of any Pension Plan or Multiemployer Plan; (ii) any Obligor or ERISA Affiliate fails to pay when due any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan; (iii) any event similar to the foregoing occurs or exists with respect to a Foreign Plan and, with respect to each of clauses (i) through (iii) above, any such event could reasonably be expected to result in liability to any Obligor or ERISA Affiliate in an amount that exceeds $100,000 individually or in the aggregate; or

(xi)    A Material Adverse Change occurs.

(b)    Remedies.  Upon the occurrence of an Event of Default, the Lender may declare all or any portion of the unpaid Obligations to be immediately due and payable and exercise any other rights or remedies afforded under any agreement, by law, at equity or otherwise (provided, however, that if an Event of Default specified in Section 9(a)(ix) occurs, the entire unpaid Obligations shall forthwith become and be immediately due and payable without any declaration or other act on the part of the Lender).

10.    Amendment or Waiver.  Except as otherwise expressly provided herein, the provisions of this Agreement may be amended or waived and the Borrowers may take any action herein prohibited, or omit to perform any act herein required to be performed by it, only if the Borrowers have obtained the written consent of the Lender.

11.    Definitions.  For purposes of this Agreement, the following capitalized terms have the following meaning:

"Affiliate" with respect to any Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.  "Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.  "Controlling" and "Controlled" have correlative meanings.

"Applicable Law" means all laws, rules, regulations and governmental guidelines applicable to the Person, conduct, transaction, agreement or matter in question, including all

14

applicable statutory law, common law and equitable principles, and all provisions of constitutions, treaties, statutes, rules, regulations, orders and decrees of Governmental Authorities.

"Asset Disposition" means any Transfer (other than those set forth Sections 8(e)(i), (ii), (iii) or (iv)).

"Bankruptcy Court" has the meaning given to such term in the recitals.

"Bankruptcy Protection" has the meaning given to such term in the recitals.

"Borrowers" has the meaning given to such term in the introductory paragraph of this Agreement.

"Borrowing Request" shall mean a borrowing request in the form attached hereto as Exhibit A, or such other form acceptable to the Lender.

"Business Day" means each day other than a Saturday, Sunday or legal holiday in the State of New York.

"Capital Expenditures" means all expenditures for any asset that, in accordance with GAAP, would be required to be classified as a fixed or capital asset on the consolidated balance sheet of Obligors and their Subsidiaries including Capital Leases, but excluding, without duplication, any such expenditures made in connection with the replacement, substitution or restoration of assets to the extent financed with (a) insurance proceeds (or other similar recoveries) paid on account of the loss of or damage to the assets being replaced or restored, (b) proceeds of a trade-in of the assets being replaced or restored, to the extent of the trade-in value of the assets being replaced or restored, (c) by a Person other than any Obligor or Subsidiary, such as a landlord.

"Capital Lease" means any lease that is required to be capitalized for financial reporting purposes in accordance with GAAP.

"Cash Equivalents" means (a) marketable direct obligations issued or unconditionally guaranteed by the United States or any agency or any State thereof having maturities of not more than one (1) year from the date of acquisition; (b) commercial paper maturing no more than one (1) year after its creation and having the highest rating from either Standard & Poor's Ratings Group or Moody's Investors Service, Inc.; (c) certificates of deposit maturing no more than one (1) year after issue; (d) money market funds at least ninety-five percent (95.0%) of the assets of which constitute Cash Equivalents of the kinds described in clauses (a) through (c) of this definition, and (e) any other investment approved by the Lender in its reasonable discretion.

"CERCLA" means the Comprehensive Environmental Response Compensation and Liability Act (42 U.S.C. § 9601 et seq.).

"Chief Financial Officer" shall mean Bob Zurcher, the Borrowers' Chief Financial Officer, or any successor thereto.

"Claims" means all liabilities, obligations, losses, damages, penalties, judgments, proceedings, interest, costs and expenses of any kind (including remedial response costs,

reasonable and documented reasonable attorneys' fees of outside counsel and Extraordinary Expenses) at any time incurred by or asserted against any Indemnitee in any way relating to (a) the Loan Documents, or the use thereof or transactions relating thereto, (b) any action taken or omitted to be taken by any Indemnitee in connection with any Loan Documents, (c) the existence or perfection of any Liens, or realization upon any Collateral, (d) exercise of any rights or remedies under any Loan Documents or Applicable Law, or (e) failure by any Obligor to perform or observe any terms of any Loan Document, in each case including all reasonable costs and expenses relating to any investigation, litigation, arbitration or other proceeding (including an Insolvency Proceeding or appellate proceedings), whether or not the applicable Indemnitee is a party thereto.

"Closing Date" means the first date all the conditions precedent in Section 4 are satisfied or waived in accordance with Section 10.

"Collateral" has the meaning given to such term in Section 3(b).

"Commitment Termination Date" means [INSERT DATE THAT IS FIVE YEARS AFTER CLOSING] (except that, if such date is not a Business Day, the Commitment Termination Date shall be the next preceding Business Day).

"Consolidated Leverage Ratio" means, as of any date of determination, the ratio (expressed as a percentage) of (a) Consolidated Total Debt as of such date to (b) Consolidated Total Capital for the period of the four fiscal quarters most recently ended.

"Consolidated Total Capital" mean means Consolidated Total Debt plus the aggregate stated balance sheet amount of all equity on a consolidated basis on such date.

"Consolidated Total Debt" means, as of any date of determination, the aggregate stated balance sheet amount of all Indebtedness of the Borrowers and their Subsidiaries (or, if higher, the par value or stated face amount of all such Indebtedness (other than zero coupon Indebtedness)) on a consolidated basis on such date.

"Consolidated Total Revenue" means, for any period, the consolidated total revenue of the Borrowers and their Subsidiaries on a consolidated basis; provided that there shall be excluded (a) the revenue of any Person accrued prior to the date it becomes a Subsidiary of any Borrower or is merged into or consolidated with any Borrower or any of its respective Subsidiaries and (b) the revenue of any Person (other than a Subsidiary of any Borrower) in which a Borrower or any of its Subsidiaries has an ownership interest, except to the extent that any such revenue is actually received by such Borrower or such Subsidiary in the form of dividends or similar distributions.

"Copyright Security Agreement" each copyright security agreement, in form and substance satisfactory to the Lender, pursuant to which an Obligor grants to the Lender, a first priority Lien on its registered copyrights, as security for the Obligations or any portion thereof.

"Creditor Representative" means under any Applicable Law, a receiver, interim receiver, national receiver, receiver and manager, trustee (including any trustee in bankruptcy), custodian, conservator, administrator, examiner, sheriff, monitor, assignee, liquidator, provisional liquidator, sequestrator or similar officer or fiduciary.

16

"<u>Default</u>" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"<u>Default Rate</u>" has the meaning given to such term in <u>Section 1(c)</u>.

"<u>Deposit Account</u>" as defined in the Uniform Commercial Code as in effect in State of New York.

"<u>Deposit Account Control Agreement</u>" means the deposit account control agreements to be executed by each institution maintaining a Deposit Account for an Obligor, in favor of the Lender, as security for the Obligations, which agreements shall, unless otherwise agreed by the Lender (a) establish the Lender's control (for perfection purposes) over the subject lockbox(es), if any, and/or Deposit Account(s) and the proceeds thereof and (b) waive offset rights of such institution, except for customary administrative charges. Notwithstanding the foregoing, Deposit Account Control Agreements shall be required only to the extent requested by the Lender and only to the extent the Obligations remain outstanding for at least six (6) months following the date hereof.

"<u>DIP Facility</u>" means that certain Senior Secured Debtor-in-Possession Loan Agreement, dated as of June 14, 2018, by and among the Borrowers and the Lender.

"<u>DIP Lender</u>" means LP Investments I, LLC in its capacity as DIP Lender under the DIP Facility.

"<u>Enforcement Action</u>" means any action to enforce any Obligations or Loan Documents or to realize upon any Collateral (whether by judicial action, self-help, notification of account debtors, exercise of set-off or recoupment, or otherwise).

"<u>Environmental Laws</u>" means all Applicable Laws (including all permits and mandatory programs or guidance promulgated by regulatory agencies), relating to public health (but excluding occupational safety and health, to the extent regulated by OSHA or similar foreign Governmental Authority) or the protection or pollution of the environment, including CERCLA, Resource Conservation and Recovery Act (42 U.S.C. §§ 6901 et seq.) and the Clean Water Act (33 U.S.C. §§ 1251 <u>et seq</u>.).

"<u>Environmental Release</u>" means a release as defined in CERCLA or under any other Environmental Law, including, without limitation, a release, spill, leak, emission, deposit, pumping, pouring, emptying, discharging, injecting, escaping, leaching, disposing, dumping, dispersion or migration of Hazardous Substances into, under, above, onto or from any indoor or outdoor environmental media, including, without limitation: (a) the movement of Hazardous Substances through, in, under, above or from any environmental media located within any building, structure, asset, real Property or facility; (b) the movement of Hazardous Substances off-site from any real Property; and (c) the abandonment of barrels, tanks, containers or other closed receptacles containing Hazardous Substances.

"<u>Equity Interest</u>" means the interest of any (a) shareholder in a corporation; (b) partner in a partnership (whether general, limited, limited liability or joint venture); (c) member in a limited or unlimited liability company or corporation; or (d) other Person having any other form of equity security or ownership interest.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and any successor statute thereto.

"ERISA Affiliate" means (a) any Person subject to ERISA whose employees are treated as employed by the same employer as the employees of any Borrower or any of its Subsidiaries under IRC Section 414(b), (b) any trade or business subject to ERISA whose employees are treated as employed by the same employer as the employees of any Borrower or any of its Subsidiaries under IRC Section 414(c), (c) solely for purposes of Section 302 of ERISA and Section 412 of the IRC, any organization subject to ERISA that is a member of an affiliated service group of which any Borrower or any of its Subsidiaries is a member under IRC Section 414(m), or (d) solely for purposes of Section 302 of ERISA and Section 412 of the IRC, any Person subject to ERISA that is a party to an arrangement with any Borrower or any of its Subsidiaries and whose employees are aggregated with the employees of any Borrower or any of its Subsidiaries under IRC Section 414(o).

"ERISA Event" means (a) the occurrence of a Reportable Event with respect to a Pension Plan; (b) a withdrawal by any Obligor or ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) the occurrence or expected occurrence of a complete or partial withdrawal by any Obligor or ERISA Affiliate from a Multiemployer Plan; (d)  notification that a Multiemployer Plan is or is expected to become insolvent within the meaning of Section 4245 of ERISA or has experienced or expects to experience to  a "mass withdrawal" (within the meaning of Section 4219 of ERISA); (e) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Section 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC or trustees to terminate a Pension Plan or Multiemployer Plan; (f) any Obligor or ERISA Affiliate fails to meet any funding obligations with respect to any Pension Plan or Multiemployer Plan, or requests a minimum funding waiver; (g) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or constitutes grounds for the termination of a Multiemployer Plan; or (h) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Obligor or ERISA Affiliate.

"Event of Default" has the meaning given to such term in Section 9(a).

"Extraordinary Expenses" means all documented reasonable costs, expenses or advances that the Lender may incur during an Event of Default, or during the pendency of an Insolvency Proceeding of an Obligor, including those relating to (a) any audit, inspection, repossession, storage, repair, appraisal, insurance, manufacture, preparation or advertising for sale, sale, collection, or other preservation of or realization upon any Collateral; (b) any action, arbitration or other proceeding (whether instituted by or against the Lender, any Obligor, any representative of creditors of an Obligor or any other Person) in any way relating to any Collateral (including the validity, perfection, priority or avoidability of the Lender's first priority Lien with respect to any Collateral) or the Loan Documents, including any lender liability or other Claims; (c) the exercise, protection or enforcement of any rights or remedies of the Lender in, or the monitoring of, any Insolvency Proceeding; (d) settlement or satisfaction of any taxes, charges or Liens with respect to any Collateral; (e) any Enforcement Action; and (f) negotiation and documentation of any modification, waiver, workout, restructuring or forbearance with respect to any Loan

Documents or Obligations.  Such costs, expenses and advances include transfer fees, Other Taxes, storage fees, insurance costs, permit fees, utility reservation and standby fees, actual documented legal fees of outside counsel, fees and expenses of other advisors, appraisal fees, brokers' fees and commissions, auctioneers' fees and commissions, accountants' fees, environmental study fees, wages and salaries paid to employees of any Obligor or independent contractors in liquidating any Collateral, and travel expenses.

"Foreign Plan" means any employee benefit plan or arrangement (a) maintained or contributed to by any Obligor or Subsidiary that is not subject to the laws of the U.S.; or (b) mandated by a government other than the U.S. for employees of any Obligor or Subsidiary.

"Full Payment" means with respect to any Obligations, the full and indefeasible cash payment thereof in lawful money of the United States of America in immediately available funds, including any interest, fees and other charges accruing during an Insolvency Proceeding (whether or not allowed or allowable in the proceeding).

"GAAP" means generally accepted accounting principles in effect in the U.S. from time to time, applied consistently.

"Governing Documents" means, with respect to any Person, the certificate or articles of incorporation, by-laws, or other organizational documents of such Person.

"Governmental Authority" means any U.S. federal, state, provincial, territorial, municipal, foreign or other governmental department, agency, commission, board, bureau, court, tribunal, instrumentality, political subdivision, or other entity or officer exercising executive, legislative, judicial, regulatory or administrative functions for or pertaining to any government or court, in each case whether associated with the U.S., a state, district or territory thereof, or any other foreign entity or government.

"Guarantor" has the meaning given to such term in Section 3(a).

"Guaranty" has the meaning given to such term in Section 3(a).

"Hazardous Substances or Hazardous Substance" means (a) any substance, material or waste that is or becomes designated or regulated as "toxic," "hazardous," "pollutant," "contaminant" "solid waste," "extremely hazardous," "restricted hazardous," "hazardous constituent," "special waste," or a similar designation or regulation under any Environmental Law; (b) petroleum or petroleum product (including, without limitation, waste or used oil, gasoline, heating oil, kerosene and any other petroleum products or substances or materials derived from or commingled with any petroleum products), off-specification commercial chemical product, solid waste, radioactive materials, infectious medical waste, lead based paint, mold, mycotoxins, microbial matter and airborne pathogens (naturally occurring or otherwise), asbestos in any form that is or could become friable, urea formaldehyde foam insulation, polychlorinated biphenyls (PCBs), and radon gas; and (c) any waste or substance that is listed, defined, designated or classified as, or otherwise determined by any Environmental Laws to be, hazardous, ignitable, corrosive, radioactive, dangerous or toxic.

"Holdings" means LakePoint Land Holdings, LLC.

"<u>Incremental Revolving Commitment</u>" has the meaning given to such term in <u>Section 1(b)</u>.

"<u>Incremental Revolving Loans</u>" has the meaning given to such term in <u>Section 1(b)</u>.

"<u>Indebtedness</u>" means, as applied to any Person, (a) all indebtedness for borrowed money, (b) that portion of any obligations with respect Capital Leases which is properly classified as a liability on a balance sheet in conformity with GAAP, (c) notes payable and drafts accepted representing extensions of credit whether or not representing obligations for borrowed money, (d) any obligation owed for all or any part of the deferred purchase price of property or services (other than trade accounts payable arising in the ordinary course of business (x) that are being contested in good faith or (y) as to which payment is not overdue by more than 90 days), (e) all indebtedness secured by any Lien on any property or asset owned or held by that Person regardless of whether the indebtedness secured has been assumed by that Person or is nonrecourse to the credit of that Person, (f) all reimbursement and other payment obligations, contingent or otherwise, in respect of letters of credit or banker's acceptances, (g) obligations under any rate or currency swap, cap or collar agreement or any other agreement designed to hedge risk with respect to interest rate or currency fluctuations (the amount of which shall be determined by reference to the termination cost on the date of determination) and (h) all guarantees of such Person in respect of Indebtedness of others of the kinds referred to in clauses (a) through (g) above.

"<u>Indemnitees</u>" means the Lender and its officers, directors, employees, Affiliates, agents, consultants, advisors, and attorneys.

"<u>Initial Revolving Commitment</u>" has the meaning given to such term in <u>Section 1(a)</u>.

"<u>Initial Revolving Facility</u>" has the meaning given to such term in the recitals.

"<u>Initial Revolving Loans</u>" has the meaning given to such term in <u>Section 1(a)</u>.

"<u>Insolvency Proceeding</u>" means any case or proceeding or proposal commenced by or against a Person under any state, provincial, U.S. federal or foreign law for, or any agreement of such Person to, (a) the entry of an order for relief under the U.S. Bankruptcy Code, or any other insolvency, debtor relief, bankruptcy, receivership, debt adjustment law or similar law (whether state, provincial, federal or foreign); (b) the appointment of a Creditor Representative or other custodian for such Person or any part of its Property; or (c) an assignment or trust mortgage for the benefit of creditors.

"<u>Investment</u>" means any beneficial ownership interest in any Person (including Equity Interests and other securities), and any loan, advance or capital contribution to any Person.

"<u>IRC</u>" means the Internal Revenue Code of 1986, as in effect from time to time.

"<u>Lender</u>" means LP Investments I, LLC.

"<u>Lien</u>" means any Person's interest in Property securing an obligation owed to, or a claim by, such Person, whether such interest is based on common law, statute or contract, including liens, security interests, pledges, security transfers, security assignments, hypothecations, secured claims, statutory trusts, deemed trusts, reservations of title, exceptions, encroachments,

easements, servitudes, rights-of-way, leases, and other title exceptions and encumbrances affecting Property.

"Loans" means (a) the Initial Revolving Loans, and (b) any Incremental Revolving Loans.

"Loan Documents" means this Agreement, the Security Agreement, the Guaranties, the other Security Documents and any other agreement, document or instrument delivered to or in favor of the Lender.

"Material Adverse Change" means with respect to any event, act, condition or occurrence of whatever nature (including any adverse determination in any litigation, arbitration, or governmental investigation or proceeding), whether singularly or in conjunction with any other event or events, act or acts, condition or conditions, occurrence or occurrences, whether or not related, resulting in a material adverse change in (i) the business, operations, properties or condition (financial or otherwise) of the Borrowers, individually, and the Borrowers since Closing Date, (ii) the legality, validity or enforceability of any Loan Document, (iii) the ability of the Borrowers to perform their material obligations under the Loan Documents, (iv) the perfection or priority of the Liens granted pursuant to the Loan Documents, or (v) the rights and remedies of the Lender under the Loan Documents taken as a whole.

"Mortgage" means each mortgage, deed of trust, deed to secure debt, collateral charge mortgage, deed of hypothec or other agreement satisfactory to Lender pursuant to which an Obligor grants to the Lender Liens upon the Real Estate owned by such Obligor as security for the Obligations, it being understood and agreed that any Real Estate leased by any Obligor as a lessee shall not be subject to a Mortgage unless requested by the Lender.

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which any Obligor or ERISA Affiliate makes or is obligated to make contributions, during the preceding six (6) plan years, has made or been obligated to make contributions, or otherwise has or could expect to have any liability or obligation.

"Net Cash Proceeds" means (a) in connection with an Asset Disposition, the aggregate cash proceeds received by an Obligor or any Subsidiary of an Obligor pursuant to any such Asset Disposition net of (i) the direct costs relating to such Asset Disposition (including sales commissions and legal, accounting and investment banking fees), (ii) Taxes paid (or reasonably estimated to be payable) by such Obligor or Subsidiary as a result thereof (it being understood for the avoidance of doubt that such Taxes shall include only those payable by the seller or its Affiliates in such Asset Disposition), and (iii) amounts required to be applied to the repayment of any Indebtedness secured by a Lien on the asset subject to any such Asset Disposition or required to be paid to parties having superior rights to the proceeds of any such Asset Disposition to the extent such superior rights are permitted hereunder and (b) in connection with in connection with any issuance or sale of Equity Interests, the cash proceeds received from such issuance or incurrence, net of attorneys' fees, investment banking fees, accountants' fees, underwriting discounts and commissions and other customary costs, fees and expenses actually incurred in connection therewith.

"Obligations" means all (a) principal of and premium, if any, on this Agreement, (b) interest, expenses, fees and other sums payable by the Obligors (or any one or more of them)

under this Agreement and the other Loan Documents, (c) obligations of the Obligors under any indemnity for Claims, (d) Extraordinary Expenses, and (e) other Indebtedness, obligations and liabilities of any kind owing by the Obligors (or any one or more of them) pursuant to the Loan Documents (including pursuant to <u>Section 18</u> or <u>19</u> of this Agreement), whether now existing or hereafter arising, whether evidenced by a Guaranty or promissory note or writing, whether allowed in any Insolvency Proceeding, whether arising from an extension of credit, issuance of a letter of credit, acceptance, loan, guaranty, indemnification or otherwise, and whether direct or indirect, absolute or contingent, due or to become due, primary or secondary, or joint or several.

"<u>Obligor</u>" means the Borrowers or a Guarantor.

"<u>OFAC</u>" means The Office of Foreign Assets Control of the U.S. Department of the Treasury.

"<u>OSHA</u>" means the Occupational Safety and Hazard Act of 1970.

"<u>Other Taxes</u>" means all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made under any Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, any Loan Document.

"<u>Patent Security Agreement</u>" means each patent security agreement, in form and substance satisfactory to the Lender, pursuant to which an Obligor grants to the Lender a first priority Lien on its registered patents for the Obligations or any portion thereof.

"<u>PATRIOT Act</u>" has the meaning given to such term in <u>Section 6(f)</u>.

"<u>Payment Date</u>" has the meaning given to such term in <u>Section 2(a)</u>.

"<u>PBGC</u>" means the Pension Benefit Guaranty Corporation.

"<u>Pension Plan</u>" means any employee pension benefit plan (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV or Section 302 of ERISA or Section 412 of the Code and is sponsored or maintained by any Obligor or ERISA Affiliate or to which the Obligor or ERISA Affiliate contributes or has an obligation to contribute,, has made contributions at any time during the preceding six plan years, or otherwise has or could expect to have any liability or obligation.

"<u>Person</u>" means any individual, corporation, limited liability company, unlimited liability company, partnership, joint venture, joint stock company, land trust, business trust, unincorporated organization, Governmental Authority or other entity.

"<u>Plan of Reorganization</u>" means [   ].

"<u>Pledge Agreement</u>" means a pledge agreement in the form and substance reasonably satisfactory to the Lender, from the Obligors to the Lender and each other pledge agreement from any Obligor to the Lender, in each case pursuant to which an Obligor grants a first priority Lien on such Obligor's Equity Interests in any of its Subsidiaries.

"Property" means any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible.

"Real Estate" means all right, title and interest (whether as owner, lessor or lessee) in any real Property or any buildings, structures, parking areas or other improvements thereon.

"Recipient" means (a) the Lender or (b) any other recipient of any payment to be made by or on account of any obligation of any Borrower under any Loan Document.

"Related Real Estate Documents" means with respect to any Real Estate, the following, in form and substance reasonably satisfactory to Lender and received by Lender for review prior to the effective date of the Mortgage: (a) such assignments of leases, estoppel letters, attornment agreements, consents, waivers and releases as Lender may reasonably require with respect to other Persons having an interest in the Real Estate; (b) a current, perimeter, boundary survey of the Real Estate, containing a metes-and-bounds property description and flood plain certification; and (c) such other documents, instruments or agreements (if any) as Lender may reasonably require with respect to any Real Estate that are customary for a transaction of the nature set forth in this Agreement.

"Reportable Event" has the meaning given to such term in Section 4043 of ERISA or the regulations thereunder.

"Requirements of Law" shall mean, as to any Borrower, the articles or certificate of incorporation and by-laws or other organizational or governing documents of such Borrower, and each federal, state, local and foreign law, treaty, rule or regulation or determination of an arbitrator or a court or other governmental authority, in each case applicable to or binding upon such Borrower or any of its property or to which such Borrower or any of its property is subject.

"Revolving Commitment" means the Initial Revolving Commitment, together with any Incremental Revolving Commitment.

"Security Agreement" means the Security Agreement in the form and substance reasonably satisfactory to the Lender, from the Obligors to the Lender and each other security agreement from any Obligor to the Lender, in each case pursuant to which such Obligor grants to the Lender, a first priority Lien on such Obligor's then-owned and thereafter acquired assets (other than Excluded Collateral (as defined therein)), as security for the Obligations.

"Security Documents" means the Security Agreement, the Guaranties, the Mortgages, the Patent Security Agreements, the Copyright Security Agreements, the Pledge Agreements, the Trademark Security Agreements, the Deposit Account Control Agreements, the Related Real Estate Documents and all other documents, instruments and agreements now or hereafter securing (or given with the intent to secure) any Obligations.

"Senior Officer" means the president, chief executive officer or chief financial officer of a Borrower or, if the context requires, an Obligor.

"Solvent" means as to any Person, such Person (a) owns Property whose fair salable value is (when taken on a going concern basis unless, at the time of the applicable determination, such Person is not a going concern) greater than the amount required to pay all of its debts

(including contingent, subordinated, unmatured and unliquidated liabilities); (b) owns Property whose present fair salable value (as defined below) is greater than the probable total liabilities (including contingent, subordinated, unmatured and unliquidated liabilities) of such Person as they become absolute and matured; (c) is able to pay all of its debts as they mature; (d) has capital that is not unreasonably small for its business and is sufficient to carry on its business and transactions and all business and transactions in which it is about to engage; (e) is not "insolvent" within the meaning of Section 101(32) of the U.S. Bankruptcy Code; and (f) has not incurred (by way of assumption or otherwise) any obligations or liabilities (contingent or otherwise) under any Loan Documents, or made any conveyance in connection therewith, with actual intent to hinder, delay or defraud either present or future creditors of such Person or any of its Affiliates. As used herein, "fair salable value" means the amount that could be obtained for assets within a reasonable time, either through collection or through sale under ordinary selling conditions by a capable and diligent seller to an interested buyer who is willing (but under no compulsion) to purchase. For the avoidance of doubt, and for purposes of determining whether any Obligor is "Solvent", contribution rights of such Obligor against the other Obligors shall be considered if and to the extent permitted or provided under Applicable Law relating to such determination.

"Subsidiary" means any entity at least 50% of whose Voting Equity Interests or Equity Interests are owned by a Person (including indirect ownership by a Person through other entities in which such Person directly or indirectly owns 50% of the Voting Equity Interests or Equity Interests).

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Trademark Security Agreement" each trademark security agreement, in form and substance satisfactory to the Lender, pursuant to which an Obligor grants to the Lender a first priority Lien on its registered trademarks, as security for the Obligations or any portion thereof.

"Transfer" means, with respect to any Property, to sell, exchange, transfer, assign, license, hypothecate, pledge or make a gift, and shall include without limitation the termination or assignment of any lease or license.

"Voting Equity Interests" means with respect to any Person, the Equity Interests of such Person ordinarily having the power to vote for the election of the directors (or, in the case of Persons which are not corporations or do not have directors, individuals performing similar functions to those of a director of a corporation) of such Person.

12.    Assignment.  The Lender may assign at any time this Agreement to any of its affiliates, any financial institutions or any other Person, in which event, the assignee shall have, to the extent of such assignment, the same rights and benefits as it would have if it were the Lender, except as otherwise provided by the terms of such assignment or participation.  The rights and obligations of the Borrowers, the Lender shall be binding upon and benefit the successors and permitted assigns and transferees of the Borrowers and the Lender.  In the event of any permitted assignment hereunder, (i) the Lender agrees to pay for all costs associated with documenting, implementing or otherwise accommodating such transfer, (ii) the prospective Lender shall be, and shall provide a representation that it is, entering into such transfer for its own account and not with a view to, or for sale in connection with, any subsequent distribution

and (iii) the prospective Lender shall become a party to this Agreement (or any replacement hereof).

13.    <u>Payments</u>.  All payments to be made to the Lender shall be made in the lawful money of the United States of America in immediately available funds.

14.    <u>Nature and Extent of Each Borrower's Liability</u>.

(a)    <u>Joint and Several Liability</u>.  Each Borrower agrees that it is jointly and severally liable for, and absolutely and unconditionally guarantees to the Lender the prompt payment and performance of, all Obligations and all agreements of each other Obligor under the Loan Documents, and that it is a Guarantor.  Each Obligor agrees that its guaranty or guarantee of obligations as a Guarantor constitute a continuing guaranty or guarantee of payment and not of collection, that such obligations shall not be discharged until Full Payment of all Obligations, and that such obligations are absolute and unconditional, irrespective of (a) the genuineness, validity, regularity, enforceability, subordination or any future modification of, or change in, any Obligations or Loan Document, or any other document, instrument or agreement to which any Obligor is or may become a party or be bound; (b) the absence of any action to enforce this Agreement (including this Section) or any other Loan Document, or any waiver, consent or indulgence of any kind by the Lender with respect thereto; (c) the existence, value or condition of, or failure to perfect a Lien or to preserve rights against, any security or guaranty or guarantee for the Obligations or any action, or the absence of any action, by the Lender in respect thereof (including the release of any security or guaranty or guarantee); (d) the insolvency of any Obligor; (e) any election by the Lender in an Insolvency Proceeding for the application of Section 1111(b)(2) of the U.S. Bankruptcy Code; (f) any borrowing or grant of a Lien by any other Obligor, as debtor-in-possession under Section 364 of the U.S. Bankruptcy Code, under Applicable Law or otherwise; (g) the disallowance of any claims of the Lender against any Obligor for the repayment of any Obligations under Section 502 of the U.S. Bankruptcy Code or otherwise; or (h) any other action or circumstances that might otherwise constitute a legal or equitable discharge or defense of a surety or guarantor, except Full Payment of all Obligations.

(b)    <u>Waivers</u>.

(i)    Each Borrower expressly waives all rights that it may have now or in the future under any statute, at common law, in equity or otherwise, to compel the Lender to marshal assets or to proceed against any other Obligor, other Person or security for the payment or performance of any Obligations before, or as a condition to, proceeding against such Obligor. Each Borrower waives all defenses (other than the defense of prior payment) available to a surety, guarantor or accommodation co-obligor other than Full Payment of all Obligations.  It is agreed among each Obligor and the Lender that the provisions of this Section are of the essence of the transaction contemplated by the Loan Documents and that, but for such provisions, the Lender would decline to make the Loans.  Each Obligor acknowledges that its guaranty pursuant to this Section is necessary to the conduct and promotion of its business, and can be expected to benefit such business.

(ii)    The Lender may, in its discretion, pursue such rights and remedies as they deem appropriate, including realization upon Collateral or any Real Estate by judicial foreclosure or non-judicial sale or enforcement, without affecting any rights and remedies under this Section. If, in taking any action in connection with the exercise of any rights or remedies, the Lender shall

forfeit any other rights or remedies, including the right to enter a deficiency judgment against any Obligor or other Person, whether because of any Applicable Laws pertaining to "election of remedies" or otherwise, each Obligor consents to such action and waives any claim based upon it, even if the action may result in loss of any rights of subrogation that any Obligor might otherwise have had.  Any election of remedies that results in denial or impairment of the right of the Lender to seek a deficiency judgment against any Obligor shall not impair any other Obligor's obligation to pay the full amount of the Obligations.  Each Obligor waives all rights and defenses arising out of an election of remedies, such as non-judicial foreclosure with respect to any security for the Obligations, even though that election of remedies destroys such Obligor's rights of subrogation against any other Person.  The Lender may bid all or a portion of the Obligations at any foreclosure or trustee's sale or at any private sale, and the amount of such bid need not be paid by the Lender but shall be credited against the Obligations.  The amount of the successful bid at any such sale, whether the Lender or any other Person is the successful bidder, shall be conclusively deemed to be the fair market value of the Collateral, and the difference between such bid amount and the remaining balance of the Obligations shall be conclusively deemed to be the amount of the Obligations guaranteed under this Section, notwithstanding that any present or future law or court decision may have the effect of reducing the amount of any deficiency claim to which the Lender might otherwise be entitled but for such bidding at any such sale.

(c)     <u>Joint Enterprise</u>.  Each Borrower has requested that the Lender make the credit facilities available to the Borrowers under this Agreement on a combined basis, in order to finance the Obligors' businesses most efficiently and economically.  The Obligors' business is a mutual and collective enterprise, and the successful operation of each Obligor is or may be dependent upon the successful performance of the integrated group.  The Obligors believe that the credit facilities provided to the Borrowers under this Agreement will enhance the borrowing power of each Obligor and ease administration of such credit facilities, all to their mutual advantage.  The Obligors acknowledge that the Lender's willingness to extend credit to the Borrowers and to administer the Collateral as provided under the Loan Documents is done solely as an accommodation to the Obligors and at the Obligors' request.

(d)     <u>Subordination</u>.  Each Obligor hereby subordinates any claims, including any rights at law or in equity to payment, subrogation, reimbursement, exoneration, contribution, indemnification or set off, that it may have at any time against any other Obligor, howsoever arising, to the Full Payment of all Obligations.

15.     <u>Place of Payments</u>.  Payments of principal and interest shall be delivered as directed by prior written notice by the Lender to the Borrowers or, if not specified by the Lender, then to such holder, at the address of such holder set forth on the Borrowers' records or at such other address as is specified by prior written notice by such holder to the Borrowers.

16.     <u>Governing Law</u>.  **THE VALIDITY OF THIS AGREEMENT, THE CONSTRUCTION, INTERPRETATION, AND ENFORCEMENT HEREOF, AND THE RIGHTS OF THE PARTIES HERETO WITH RESPECT TO ALL MATTERS ARISING HEREUNDER OR RELATED HERETO SHALL BE DETERMINED UNDER, GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.**

**THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT SHALL BE TRIED AND LITIGATED ONLY IN THE STATE AND, TO THE EXTENT PERMITTED BY APPLICABLE LAW, FEDERAL COURTS LOCATED IN THE COUNTY OF FULTON, STATE OF GEORGIA, PROVIDED, HOWEVER, THAT ANY SUIT SEEKING ENFORCEMENT AGAINST ANY COLLATERAL OR OTHER PROPERTY MAY BE BROUGHT, AT THE LENDER'S OPTION, IN THE COURTS OF ANY JURISDICTION WHERE THE LENDER ELECTS TO BRING SUCH ACTION OR WHERE SUCH COLLATERAL OR OTHER PROPERTY MAY BE FOUND. THE BORROWERS AND THE LENDER WAIVE, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT IN ACCORDANCE WITH THIS SECTION 16.**

**THE BORROWERS AND THE LENDER HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREIN, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW OR STATUTORY CLAIMS.  EACH BORROWER AND THE LENDER REPRESENT THAT EACH HAS REVIEWED THIS WAIVER AND EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL.  IN THE EVENT OF LITIGATION, A COPY OF THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.**

17.     Waiver of Presentment, Demand and Dishonor.  Each Borrower hereby waives presentment for payment, protest, demand, notice of protest, notice of nonpayment and diligence with respect to this Agreement, and waives and renounces all rights to the benefits of any statute of limitations or any moratorium, appraisement, exemption, or homestead now provided or that hereafter may be provided by any federal or applicable state statute, including but not limited to exemptions provided by or allowed under the Federal Bankruptcy Code, both as to itself and as to all of its property, whether real or personal, against the enforcement and collection of the Obligations and any and all extensions, renewals, and modifications hereof.

18.     Expenses; Attorneys' Fees.  The Borrowers shall reimburse the Lender for all Extraordinary Expenses incurred by the Lender or its related Obligations or Collateral of its related Guarantors and their Collateral.  The Borrowers shall also reimburse the Lender for all reasonable and documented legal, accounting, appraisal, consulting, advisory and other fees, costs and expenses incurred by it in connection with (a) negotiation and preparation of any Loan Documents, including any amendment or other modification thereof and (b) administration of and actions relating to any Collateral, Loan Documents and transactions contemplated thereby, including any actions taken to perfect or maintain priority of the Lender's first priority Lien on any Collateral, to maintain any insurance required hereunder or to verify Collateral.    All amounts payable by the Borrowers under this Section shall be due on demand.

19.     Indemnification.

(a)    General Indemnity.    EACH OBLIGOR SHALL INDEMNIFY AND HOLD HARMLESS THE INDEMNITEES AGAINST ANY AND ALL CLAIMS THAT MAY BE INCURRED BY OR ASSERTED AGAINST ANY INDEMNITEE, INCLUDING CLAIMS ARISING FROM THE NEGLIGENCE OF AN INDEMNITEE, IN CONNECTION WITH THE NEGOTIATION, EXECUTION, DELIVERY OR PERFORMANCE OF THIS AGREEMENT, THE OTHER LOAN DOCUMENTS, THE ACQUISITION DOCUMENTS OR THE CONSUMMATION OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY OR IN CONNECTION WITH THE LENDER'S OR THE LENDER'S EXERCISE, OR FAILURE TO EXERCISE, ANY RIGHT OR REMEDY THEREUNDER OR WHICH MAY OTHERWISE BE RELATED TO ANY OF THE FOREGOING.

(b)    Survival of Indemnification.    Without limiting the foregoing, the indemnification obligations of the Obligors hereunder shall survive the following events, to the maximum extent permitted by law: (a) repayment of the Obligations, (b) any judicial or nonjudicial foreclosure of the security for the Obligations or conveyance in lieu of such foreclosure, notwithstanding that all or any portion of any Obligations shall have been discharged thereby, (c) any election by any Indemnitee to purchase all or any portion of the ownership interests at a foreclosure sale by crediting all or any portion of the Obligations against the purchase price therefor (except to the extent and only to the extent that such Indemnitee has specifically elected in writing in its sole discretion to credit against the purchase price any claims hereunder which were liquidated in amount at the time of such foreclosure sale), (d) any release or reconveyance of the Mortgage, any waiver of the lien of the Mortgage or any release or waiver of any other security for the Obligations, and (e) any termination, cancellation or modification of any of the Loan Documents (unless such termination, cancellation or modification is agreed to by the Lender and expressly provides otherwise).

(c)    Certain Limitations.    In no event shall any party to a Loan Document have any obligation thereunder to indemnify or hold harmless an Indemnitee with respect to a Claim that is determined in a final, non-appealable judgment by a court of competent jurisdiction to result from the gross negligence or willful misconduct of such Indemnitee or its Affiliates.    No Indemnitee shall have any liability for any special, indirect or punitive damages, and any obligations of the Indemnitees under this Agreement or any other Loan Document shall be several, and not joint.

20.    Business Days.    If any payment is due, or any time period for giving notice or taking action expires, on a day which is not a Business Day, the payment shall be due and payable on, and the time period shall automatically be extended to, the immediately following Business Day, and interest shall continue to accrue at the required rate hereunder until any such payment is made.

21.    No Waiver.    The rights and remedies of the Lender expressly set forth in this Agreement are cumulative and in addition to, and not exclusive of, all other rights and remedies available at law, in equity or otherwise.    No failure or delay on the part of the Lender in exercising any right, power or privilege shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or privilege preclude any other or further exercise thereof or the exercise of any other right, power or privilege or be construed to be a waiver of any Event of Default.    No course of dealing between the Borrowers and the Lender or its agents or employees shall be effective to amend, modify or discharge any provision of this Agreement or to constitute a waiver of any Event of Default.    No notice to or demand upon Borrowers in any

case shall entitle Borrowers to any other or further notice or demand in similar or other circumstances or constitute a waiver of the right of the Lender to exercise any right or remedy or take any other or further action in any circumstances without notice or demand.

22.  <u>Construction</u>.  The terms "herein," "hereof," "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular section, paragraph or subdivision.  Any pronoun used shall be deemed to cover all genders.  In the computation of periods of time from a specified date to a later specified date, "from" means "from and including," and "to" and "until" each mean "to but excluding."  The terms "including" and "include" shall mean "including, without limitation".  Section titles appear as a matter of convenience only and shall not affect the interpretation of any Loan Document.  All references to (a) laws or statutes include all related rules, regulations, interpretations, amendments and successor provisions; (b) any document, instrument or agreement include any amendments, waivers and other modifications, extensions or renewals (to the extent permitted by the Loan Documents); (c) any section, paragraph or clause means, unless the context otherwise requires, a section, paragraph or clause, respectively, of this Agreement; (d) any exhibits or schedules mean, unless the context otherwise requires, exhibits and schedules attached hereto, which are hereby incorporated by reference; (e) any Person include successors and permitted assigns; or (f) discretion of any Person means, unless otherwise stated herein, the sole and absolute discretion of such Person.  The Obligors shall have the burden of establishing any alleged negligence, misconduct or lack of good faith by the Lender under any Loan Documents.  No provision of any Loan Documents shall be construed against any party by reason of such party having, or being deemed to have, drafted the provision.  Whenever the phrase "to the best of Obligors' knowledge" or words of similar import (including the use of such phrase in reference to the knowledge of any Obligor or the Borrowers) are used in any Loan Documents, it means actual knowledge of a Senior Officer of the Obligors (or the applicable Obligor or the Borrowers, respectively), or knowledge that a Senior Officer of the applicable Obligor or Obligors would have obtained if he or she had engaged in good faith and diligent performance of his or her duties, including reasonably specific inquiries of employees or agents and a good faith attempt to ascertain the matter to which such phrase relates. Unless otherwise expressly provided herein, each accounting term used herein shall have the meaning given it under GAAP.

23.  <u>Usury Laws</u>.  It is the intention of each Borrower and the Lender to conform strictly to all applicable usury laws now or hereafter in force, and any interest payable under this Agreement shall be subject to reduction to the amount not in excess of the maximum legal amount allowed under the applicable usury laws as now or hereafter construed by the courts having jurisdiction over such matters.  If the maturity of this Agreement is accelerated by reason of an election by the Lender resulting from an Event of Default, voluntary prepayment by the Borrowers or otherwise, then earned interest may never include more than the maximum amount permitted by law, computed from the date hereof until payment, and any interest in excess of the maximum amount permitted by law shall be canceled automatically and, if theretofore paid, shall at the option of the Lender either be rebated to the Borrowers or credited on the principal amount of the Loans, or if the Loans have been paid, then the excess shall be rebated to the Borrowers. The aggregate of all interest (whether designated as interest, service charges, points or otherwise) contracted for, chargeable, or receivable under this Agreement shall under no circumstances exceed the maximum legal rate upon the unpaid principal balance of the Loans remaining unpaid from time to time.  If such interest does exceed the maximum legal rate, it shall be deemed a mistake and such excess shall be canceled automatically and, if theretofore paid, rebated to the

Borrowers or credited on the principal amount of the Loans, or if the Loans have been repaid, then such excess shall be rebated to the Borrowers.

      24.   <u>Counterparts; Telefacsimile or Electronic Mail Execution</u>.  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement.  Delivery of an executed counterpart of this Agreement by telefacsimile or electronic mail shall be equally as effective as delivery of an original executed counterpart of this Agreement.  Any party delivering an executed counterpart of this Agreement by telefacsimile or electronic mail also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

*      *      *      *      *

IN WITNESS WHEREOF, each Borrower has executed and delivered this Agreement on the date first above written.

**BORROWERS**:

**LAKEPOINT LAND, LLC**

By: _____
Name:
Title:

**LAKEPOINT LAND III, LLC**

By: _____
Name:
Title:

**LAKEPOINT LAND IV, LLC**

By: _____
Name:
Title:

**LAKEPOINT SERVICES, LLC**

By: _____
Name:
Title:

**LAKEPOINT SPORTS SOUTH, LLC**

By: _____
Name:
Title:

**LP HOUSING LLC**

By: _____
Name:
Title:

[Signature Page to Credit Agreement]

**LAKEPOINT HOSPITALITY, LLC**


By: _____
Name:
Title:

**LAKEPOINT MERCHANDISE, LLC**


By: _____
Name:
Title:


**GUARANTOR**:

**LAKEPOINT LAND HOLDINGS, LLC**


By: _____
Name:
Title:

[Signature Page to Credit Agreement]

**<u>LENDER</u>**:

**LP INVESTMENTS I, LLC**


By: _____
Name:
Title:

**Schedule I**

Lender Allocations

| Lender | Principal Amount | Allocation |
|--------|------------------|------------|
| LP Investments I, LLC | $2,000,000.00 | 100.00% |
| | $2,000,000.00 | 100.00% |