# LIMITED LIABILITY COMPANY AGREEMENT
## OF
# LAKEPOINT LAND HOLDINGS, LLC

This Limited Liability Company Agreement of LakePoint Land Holdings, LLC is entered into among the members listed on <u>Schedule A</u> and is effective as of [●], 2018.

## SECTION 1
## THE COMPANY

1.1 <u>Formation</u>.  LakePoint Land Holdings, LLC, a Delaware limited liability company (the "<u>Company</u>"), was formed pursuant to the provisions of the Act by the filing of a Certificate of Formation (the "<u>Certificate</u>") with the Secretary of State of the State of Delaware on [●], 2018.

1.2 <u>Name</u>.  The name of the Company is LakePoint Land Holdings, LLC, and all business of the Company shall be conducted in such name or in any other name that is chosen by the Board.

1.3 <u>Purposes</u>.  The purpose of the Company is to engage in any activity in which a Delaware limited liability company legally may engage, subject to the terms of this Agreement, including the ownership, directly or indirectly, from time to time of equity or debt securities of LakePoint Land, LLC, a Georgia limited liability company ("<u>LPL</u>"), and its Affiliates. The Company shall initially own 100% of the equity interests of LPL.

1.4 <u>Principal Place of Business; Registered Agent; Registered Office</u>.  The principal place of business of the Company shall be at such place as agreed by the Board.  The Company shall maintain a registered agent and registered office as required by the Act.

1.5 <u>Term</u>.  The term of the Company commenced on the date the Certificate was filed in accordance with the Act, and shall continue until the date the Company is dissolved pursuant to <u>Section 10</u> of this Agreement or by operation of law.

1.6 <u>Definitions</u>.  The following capitalized words and phrases used in this Agreement have the indicated meanings:

"<u>Accepted Units</u>" has the meaning given it in <u>Section 8.1(b)</u>.

"<u>Act</u>" means the Delaware Limited Liability Company Act, as amended from time to time (or any corresponding provisions of succeeding law).

"<u>Affiliate</u>" means, with respect to any Person, (i) any Person directly or indirectly controlling, controlled by or under common control with such Person, (ii) any officer, director or employee of such Person, or (iii) any Person who is an officer, director, or employee of any Person described in clause (i) of this definition.  With respect to any ERISA Member, the term

32718663

"Affiliate" will include one or more successor trustees or fiduciaries or any trust for the beneficiaries of such ERISA Member.

"Agreement" means this Limited Liability Company Agreement of LakePoint Land Holdings, LLC, as amended from time to time.

"Allotment" has the meaning given it in Section 8.2(c).

"BHC Act" means the U.S. Bank Holding Company Act of 1956, as amended, and as it may be amended hereafter from time to time, and the rules and regulations promulgated thereunder.

"BHC Act Member" means any Member that (i) is a bank holding company, as defined in Section 2(a) of the BHC Act, or any affiliate (as such term is defined in 12 U.S.C. § 1841(k)) of such bank holding company, or a foreign bank subject to the BHC Act pursuant to the International Banking Act of 1978, as amended, or any affiliate of such foreign bank subject to the BHC Act, and (ii) has indicated its status as such at its time of admission to the Company.

"BHC Act Non-Voting Units" means any Unit that is designated as such pursuant to Section 5.10.

"Board" means the board of managers of the Company.

"Business Day" means any day other than a Saturday, Sunday, or a day on which banking institutions in Atlanta, Georgia are authorized or obligated by law or executive order to be closed.

"Capital Account" means, with respect to any Member, the capital account maintained for such Member in accordance with the following provisions:

(i)     To each Member's Capital Account there shall be added the cash amount or Gross Asset Value of any property contributed by such Member to the Company pursuant to this Agreement, such Member's distributive share of Profits and any items in the nature of income or gain that are allocated to such Member and the amount of any Company liabilities assumed by such Member or secured by any Company property distributed to such Member;

(ii)     From each Member's Capital Account there shall be subtracted the amount of cash and cash equivalents and the Gross Asset Value of any other property distributed to such Member pursuant to any provision of this Agreement, such Member's distributive share of Losses and any items in the nature of expenses or losses that are allocated to such Member, and the amount of any liabilities of such Member assumed by the Company or secured by any property contributed by such Member to the Company;

(iii)     If any Units are Transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the Transferred Units; and

(iv)    In determining the amount of any liability for purposes of the foregoing clauses (i) and (ii) of this definition of Capital Account, there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such Regulations.

"Carry Costs" has the meaning given it in Section 8.2(f).

"Certificate" has the meaning given it in Section 1.1.

"Class A Member" means each Member holding Class A Units and their respective permitted successors, transferees and assigns, in each case which are admitted as a Member in accordance with this Agreement.

"Class A Units" means Membership Rights in the Company having the economic and other rights set forth herein with respect to "Class A Units."

"Class B-1 Member" means each Member holding Class B-1 Units and their respective permitted successors, transferees and assigns, in each case which are admitted as a Member in accordance with this Agreement.

"Class B-1 Units" means Membership Rights in the Company having the economic and other rights set forth herein with respect to "Class B-1 Units."

"Class B-2 Member" means each Member holding Class B-2 Units and their respective permitted successors, transferees and assigns, in each case which are admitted as a Member in accordance with this Agreement.

"Class B-2 Units" means Membership Rights in the Company having the economic and other rights set forth herein with respect to "Class B-2 Units."

"Class B-3 Member" means each Member holding Class B-3 Units and their respective permitted successors, transferees and assigns, in each case which are admitted as a Member in accordance with this Agreement.

"Class B-3 Units" means Membership Rights in the Company having the economic and other rights set forth herein with respect to "Class B-3 Units."

"Class C Member" means each Member holding Class C Units and their respective permitted successors, transferees and assigns, in each case which are admitted as a Member in accordance with this Agreement.

"Class C Units" means Membership Rights in the Company having the economic and other rights set forth herein with respect to "Class C Units."

"Class D Member" means each Member holding Class D-1A Units, Class D-1B Units and Class D-2 Units and their respective permitted successors, transferees and assigns, in each case which are admitted as a Member in accordance with this Agreement.

"Class D-1A Member" means each Member holding Class D-1A Units and their respective permitted successors, transferees and assigns, in each case which are admitted as a Member in accordance with this Agreement.

"Class D-1A Units" means Membership Rights in the Company having the economic and other rights set forth herein with respect to "Class D-1A Units."

"Class D-1B Member" means each Member holding Class D-1B Units and their respective permitted successors, transferees and assigns, in each case which are admitted as a Member in accordance with this Agreement.

"Class D-1B Units" means Membership Rights in the Company having the economic and other rights set forth herein with respect of "Class D-1B Units."

"Class D-2 Member" means each Member holding Class D-2 Units and their respective permitted successors, transferees and assigns, in each case which are admitted as a Member in accordance with this Agreement.

"Class D-2 Units" means Membership Rights in the Company having the economic and other rights set forth herein with respect to "Class D-2 Units."

"Class E Member" means each Member holding Class E Units and their respective permitted successors, transferees and assigns, in each case which are admitted as a Member in accordance with this Agreement.

"Class E Units" means Membership Rights in the Company having the economic and other rights set forth herein with respect to "Class E Units."

"Class F Member" means each Member holding Class F Units and their respective permitted successors, transferees and assigns, in each case which are admitted as a Member in accordance with this Agreement.

"Class F Units" means Membership Rights in the Company having the economic and other rights set forth herein with respect to "Class F Units."

"Code" means the Internal Revenue Code of 1986, as amended from time to time (or any corresponding provisions of succeeding law).

"Combined Effective Marginal Tax Rate" means the highest combined marginal rate (expressed as a percentage) of United States federal (including, for the avoidance of doubt, the "Medicare tax" imposed by Code Section 1411), state and local income tax applicable to any direct or indirect member of the Company for the applicable Tax Estimation Period, without giving effect to the deductibility (or any limitation on the deductibility) of state and local taxes and other itemized deductions in computing United States federal taxable income, but taking into

account the character of the Company's income or gain allocated to such direct or indirect member.

"Company" has the meaning given it in Section 1.1.

"Company Sale" means (a) the sale of all or substantially all of the Company's assets or all or substantially all of each of its Subsidiaries' assets to any Person (other than one of the Members or any Affiliate of any Member), (b) a transaction (whether by stock sale, merger or otherwise) as a result of which the Rimrock Member and its Affiliates, collectively, no longer own more than fifty percent (50%) of the Units outstanding, or (c) any other transaction which directly or indirectly results in the events contemplated in clause (a) or clause (b), in each case in a single transaction or series of related transactions.

"Conditions" has the meaning given it in Section 8.1(d).

"Controlled Affiliate" has the meaning given it in Section 7.1.

"Cumulative Adjusted Taxable Income" means the Company's cumulative items of income or gain less cumulative items of loss or deduction under the Code computed from the effective date of this Agreement through the applicable date, except that (a) any allocation pursuant to Code Section 704(c) and the Regulations promulgated thereunder shall be disregarded and (b) the effects of any adjustment to basis under Code Sections 743 or 734 shall be excluded.

"Current Net Positive Allocable Income" has the meaning given it in Section 3.2.

"Depreciation" means, for each Fiscal Period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such Fiscal Period, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction for such Fiscal Period bears to such beginning adjusted tax basis; provided, however, that if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Period is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Board.

"Employee Non-Solicit" has the meaning given it in Section 8.3(c).

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Member" has the meaning given it in Section 5.11.

"Exercising Member" has the meaning given it in Section 8.1(c).

"Exit Facility" means that certain revolving exit facility in the original principal amount of $2 million (with $18 million of potential incremental revolving availability), issued in connection with that certain Senior Secured Credit Agreement dated as of the date hereof (as

amended or otherwise modified from time to time), by and between the Company and certain of its Subsidiaries (as borrowers) and LP Investments I, LLC (as lender).

"Fiscal Period" means the fiscal year of the Company. The first Fiscal Period commenced on the date the Certificate was filed in accordance with the Act, and each succeeding Fiscal Period shall commence on the day immediately following the last day of the immediately preceding Fiscal Period. Each Fiscal Period shall end on the earliest to occur after the commencement of such Fiscal Period of (i) December 31 or (ii) the date on which the Company is liquidated within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g).

"GAAP" means U.S. generally accepted accounting principles consistently applied.

"Gross Asset Value" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i)     The Gross Asset Values of all Company assets shall be adjusted to equal their respective gross fair market values as of the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g);

(ii)     The Gross Asset Value of any Company asset contributed by any Member shall be adjusted to equal the gross fair market value of such asset on the date of contribution;

(iii)     The Gross Asset Value of any Company asset distributed to any Member shall be adjusted to equal the gross fair market value of such asset on the date of distribution;

(iv)     The Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(m); provided, however, that Gross Asset Values shall not be adjusted pursuant to this clause (iv) to the extent that an adjustment pursuant to the foregoing clause (i) is made in connection with a transaction that would otherwise result in an adjustment pursuant to this clause (iv); and

(v)     The Company may, upon the occurrence of any of the events specified in Regulations Section 1.704-l(b)(2)(iv)(f)(5), increase or decrease the Capital Accounts in accordance with the rules of such regulation and Regulations Section 1.704-l(b)(2)(iv)(g) to reflect a revaluation of Company property.

If the Gross Asset Value of an asset has been determined or adjusted pursuant to paragraph (i) or (ii) above, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for purposes of computing Profits and Losses. The gross fair market value of any asset required to be determined under this Agreement shall be determined by the Board using reasonable and appropriate valuation methods, and such value shall be binding on the Members.

"Imputed Underpayment Amount" has the meaning given it in Section 3.3.

"Indemnitee" has the meaning given it in Section 9.3(a).

"IRS" means the Internal Revenue Service.

"Liquidating Event" has the meaning given it in Section 10.1.

"Management Person" means a member of management of LPL or any of its subsidiaries, or a director of or consultant to LPL or any of its subsidiaries.

"Member" means each Person listed and identified as a Member on Schedule A, and any Person that becomes an additional or substituted Member of the Company pursuant to the terms of this Agreement, so long as such Person has not ceased to be a Member of the Company pursuant to the terms of this Agreement.  "Members" means all such Persons.

"Membership Rights" means all legal and beneficial ownership interests in, and rights and duties as a Member of, the Company, including, without limitation, the right to receive distributions of cash and other property from the Company, and the right to receive allocations of items of income, gain, loss, deduction and credit and similar items from the Company.

"New Securities" has the meaning given it in Section 8.2(a).

"Non-Transferring Member" has the meaning given it in Section 8.1(a).

"Notice of Preemptive Rights Election" has the meaning given it in Section 8.2(c).

"Notice of ROFO Election" has the meaning given it in Section 8.1(b).

"Offered Units" has the meaning given it in Section 8.1(a).

"Oversubscribing Member" has the meaning given it in Section 8.1(c).

"Oversubscription Notice" has the meaning given it in Section 8.1(c).

"Parent" has the meaning given it in Section 7.1.

"Partnership Audit Rules" has the meaning given it in Section 6.3(c).

"Partnership Representative" has the meaning given it in Section 6.3(a).

"Percentage" means with respect to any Member, the percentage equal to the number of Units held by such Member divided by the aggregate number of Units held by all Members.

"Person" means any individual, corporation, partnership, limited partnership, limited liability company, trust, or other legal entity.

"Plan Asset Regulations" means the U.S. Department of Labor plan asset regulation, 29 C.F.R. § 2510.3-101, or any successor thereto, as modified by Section 3(42) of ERISA.

"Preemptive Rights Holders" means (i) in the case of an issuance or offer by the Company of (A) any Class A Units or Class B Units, as well as rights, options, or warrants to purchase Class A Units or Class B Units, or securities of any type whatsoever that are, or may become, convertible or exchangeable into or exercisable for Class A Units or Class B Units or (B) any securities (including Units or debt securities), as well as rights, options, or warrants to purchase such securities, or securities of any type whatsoever that are, or may become, convertible or exchangeable into or exercisable for Units or debt securities in an offering in which any holder of Class A Units or Class B Units has committed to participate, each Class C Member, Class D Member, Class E Member and Class F Member and (ii) in the case of any other issuance or offering, each Member.

"Preemptive Rights Offer Notice" has the meaning given it in Section 8.2(b).

"Pro Rata Offered Units" has the meaning given it in Section 8.1(b).

"Pro Rata Oversubscription Units" has the meaning given it in Section 8.1(c).

"Pro Rata Portion" has the meaning given it in Section 8.3(b).

"Profits" and "Losses," for each Fiscal Period, means an amount equal to the Company's taxable income or loss for such Fiscal Period, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(i)     Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be added to such taxable income or loss;

(ii)     Any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Profits or Losses pursuant to this definition shall be subtracted from such taxable income or loss;

(iii)     If the Gross Asset Value of any Company asset is adjusted pursuant to clause (i), (ii) or clause (iv) of the definition of Gross Asset Value, the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profits or Losses;

(iv)     Gain or loss resulting from any disposition of property with respect to which gain or loss is recognized for federal income tax purposes shall be computed by reference to the Gross Asset Value of the property disposed of, notwithstanding that the adjusted tax basis of such property differs from its Gross Asset Value; and

(v)     In lieu of the depreciation, amortization, and other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such fiscal year or other period.

Notwithstanding any other provision of this definition, any items that are specially allocated pursuant to <u>Section 4.4</u> shall not be taken into account in computing Profits or Losses.

"<u>Regulations</u>" means the federal income tax regulations, including any temporary or proposed regulations, promulgated under the Code as such regulations may be amended from time to time (including corresponding provisions of succeeding regulations).

"<u>Remaining Units</u>" has the meaning given it in <u>Section 8.1(c)</u>.

"<u>Rimrock Member</u>" means LP Investments I, LLC and its Affiliates.

"<u>ROFO Election Period</u>" has the meaning given it in <u>Section 8.1(a)</u>.

"<u>ROFO Offer Notice</u>" has the meaning given it in <u>Section 8.1(a)</u>.

"<u>ROFO Offer Price</u>" has the meaning given it in <u>Section 8.1(a)</u>.

"<u>ROFO Option Period</u>" has the meaning given it in <u>Section 8.1(b)</u>.

"<u>Subsidiary</u>" means any entity that is controlled, directly or indirectly, by the Company.

"<u>Tax Distribution</u>" has the meaning given it in <u>Section 3.2</u>.

"<u>Tax Estimation Period</u>" shall mean (a) January, February and March, (b) April and May, (c) June, July and August, and (d) September, October, November and December of each year during the term of the Company, or other periods for which estimates of individual federal income tax liability are required to be made under the Code, provided that the Company's first Tax Estimation Period began on the effective date of this Agreement.

"<u>Third-Party</u>" has the meaning given it in <u>Section 8.1(d)</u>.

"<u>Third-Party Transfer Closing Date</u>" has the meaning given it in <u>Section 8.1(f)</u>.

"<u>Transfer</u>" means, as a noun, any voluntary or involuntary transfer, sale, assignment, pledge, hypothecation or other disposition, including any testamentary disposition or transfer pursuant to any applicable laws of intestate succession, and, as a verb, voluntarily or involuntarily to transfer, sell, assign, pledge, hypothecate or otherwise dispose of.

"<u>Transferring Member</u>" has the meaning given it in <u>Section 8.1</u>.

"<u>Trust Affiliate</u>" has the meaning given it in <u>Section 7.1</u>.

"<u>Unit</u>" means a portion of the limited liability company interest of a Member in the Company, including any and all benefits to which such Member may be entitled as provided under the Act and in this Agreement, together with all obligations of such Member to comply with the terms and provisions of this Agreement.  Unless otherwise specified, "Units" means all Units held by a Member.  Units are issued in proportion to capital contributions and are being issued on the date hereof in accordance with <u>Section 2.1</u>.

"Voting Unit" means any Class A Unit, Class B-1 Unit, Class B-2 Unit, Class C Unit, Class D-1A Unit, Class D-1B Unit, Class D-2 Unit, Class E Unit or Class F Unit.

"Withheld Taxes" has the meaning given it in Section 3.3.

## SECTION 2
## MEMBERS' CAPITAL CONTRIBUTIONS

2.1 Initial Capital Contributions.   The Members made the initial contributions to the capital of the Company described on Schedule A attached to this Agreement and incorporated into this Agreement.

2.2 Member Units.   Each Member holds the number of Units set forth opposite such Member's name on Schedule A.

2.3 Additional Capital Contributions.   The Members shall have no obligation to make additional capital contributions to the Company.   Other than pursuant to the terms of the Exit Facility, no Member shall be obligated to lend money to the Company.

2.4 Liability of Members.   No Member shall be liable for any debts, liabilities, obligations or losses of the Company.   No Member shall guarantee, be the co-maker of, or otherwise assume personal or individual liability for any indebtedness or obligation of the Company without the prior written consent of all other Members (including the Member assuming such obligations).

## SECTION 3
## DISTRIBUTIONS

3.1 Distributions.   Prior to the dissolution of the Company, available distributable cash shall be distributed to the Members at such time as such cash is available as determined by Board, in accordance with the terms and priorities set forth in Schedule B.

3.2 Tax Distributions.   Subject to any restrictions contained in any loan or credit agreements to which the Company is a party, within 15 days following the end of each Tax Estimation Period, the Company shall distribute to the Members an amount of cash (a "Tax Distribution") equal to (a) the excess, if any, of (i) the Company's Cumulative Adjusted Taxable Income computed through the end of the Tax Estimation Period in question over (ii) the Company's Cumulative Adjusted Taxable Income computed from the effective date of this Agreement through the end of the immediately preceding Tax Estimation Period (but in no event shall the amount described in this clause (ii) be less than the greater of zero or the Company's greatest amount of positive Cumulative Adjusted Taxable Income as of the end of any preceding Tax Estimation Period) (the excess of (i) over (ii) referred to as, the "Current Net Positive Allocable Income"), multiplied by (b) the Combined Effective Marginal Tax Rate.   Additionally, in the event that based on the Company's tax returns the Board determines that the Company's Cumulative Adjusted Taxable Income computed through the end of any calendar year beginning on or after January 1, 2018 is more than the amount used for purposes of computing the amount

distributable pursuant to the previous sentence, the Company shall distribute to the Members within 90 days after the end of that calendar year an amount equal to (A) such excess, multiplied by (B) the Combined Effective Marginal Tax Rate for the last Tax Estimation Period during that calendar year.  Tax distributions pursuant to this Section 3.2 with respect to each Tax Estimation Period shall be made to the Members in proportion to the Current Net Positive Allocable Income in such Tax Estimation Period that is allocable to them.  Distributions made to a Member pursuant to this Section 3.2 shall be treated as an advance against, and shall reduce, the next distributions to which such Member otherwise would be entitled to receive pursuant to Section 3.1 of this Agreement.

3.3 Withholding.  The Company shall withhold and pay over to the Internal Revenue Service or other applicable taxing authority all taxes or withholdings, and all interest, penalties, additions to tax, and similar liabilities in connection therewith or attributable thereto ("Withheld Taxes") to the extent such withholding and/or payment is required by the Code or any other law, rule, or regulation.  All amounts withheld or paid pursuant to this Section 3.3 with respect to any allocation, payment or distribution to any Member shall be treated as amounts distributed to such Member pursuant to this Section 3 for all purposes of this Agreement. For purposes of this Section 3.3, any "imputed underpayment" within the meaning of Section 6225 of the Code (or any analogous payment under state, local or non-U.S. law) including any interest or penalties with respect to any such amount (collectively, an "Imputed Underpayment Amount") paid by the Company shall be treated as if it were a payment of taxes withheld with respect to the appropriate Members. The Company shall reasonably determine the portion of an Imputed Underpayment Amount attributable to each Member.

3.4  Restrictions on Distributions.  No distribution shall be made by the Company if prohibited by the Act.

## SECTION 4
## ALLOCATIONS

4.1 Capital Accounts.  There shall be established on the books and records of the Company a Capital Account for each Member in accordance with the definition of Capital Account.

4.2 Allocation of Profits and Losses.  After giving effect to any special allocations set forth in Section 4.3, the items of income, gain, loss and expense of the Company comprising Profits and Losses for each taxable year or other period shall be allocated to the Members for Capital Account purposes in such a manner such that, as of the end of such taxable year or other period and to the greatest extent possible, the Capital Account of each Member, as increased by the Member's share of "minimum gain" and "partner minimum gain" (as such terms are used in Regulation Section 1.704-2), shall be equal to the respective net amount, positive or negative, that would be distributed to such Member from the Company, determined as if, on the last day of such taxable year or other period, the Company were to (a) liquidate the assets of the Company for an amount equal to their Gross Asset Value, (b) satisfy all liabilities of the Company with the proceeds thereof, and (c) distribute any remaining proceeds in liquidation in accordance with Section 3.1.

11

4.3 <u>Special Allocations</u>.

(a) <u>Code Section 704(c); Tax Allocations</u>. Income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall, solely for tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its initial Gross Asset Value pursuant to any method allowable under Code Section 704(c) and the Regulations thereunder.  If the Gross Asset Value of any Company asset is adjusted after its contribution to the Company, subsequent allocations of income, gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Gross Asset Value pursuant to any method allowable under Code Section 704(c) and the Regulations thereunder.  Any elections or other decisions relating to allocations under this Section shall be determined by the Board, in its sole discretion, including an election under Section 754 of the Code.  Allocations pursuant to this Section are solely for purposes of federal, state, and local taxes and shall not be taken into account in computing any Member's Capital Account or share of Profits, Losses, other items, or distributions pursuant to any provision of this Agreement.

(b) <u>Allocations Attributable to Particular Periods</u>.  For purposes of determining Profits, Losses or any other items allocable to any period, such items shall be determined and allocated in a manner consistent with <u>Section 7.2</u>.

(c) <u>Other Items</u>.  Except as otherwise specifically provided in this Agreement, all items of Company income, gain, loss, deduction, credit and any other allocations not otherwise provided for shall be divided among the Members in the same proportion as they share Profits or Losses, as the case may be, for the applicable Fiscal Period.

4.4 <u>Regulatory Compliance</u>.  The provisions of <u>Section 3</u> and <u>Section 4</u>, and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulation section 1.704-1(b) and shall be interpreted and applied in a manner consistent with such Regulation.  In furtherance of the foregoing, Section 704 of the Code and the Regulations thereunder, including the provisions of such Regulations addressing qualified income offset, minimum gain chargeback requirements and allocations of deductions attributable to nonrecourse debt and partner nonrecourse debt (as defined in Regulation Section 1.704-2(b)(4)), are hereby incorporated by reference.  If, as a result of the provisions of Section 704 of the Code and such Regulations, items of Profit or Loss are allocated to the Members in a manner that is inconsistent with the manner in which the Members intend to allocate such items as reflected in <u>Section 4.2</u>, to the extent permitted under such Regulations, items of future income and loss shall be allocated among the Members so as to prevent such allocations from distorting the manner in which Company distributions will be divided among the Members pursuant to this Agreement.

**SECTION 5**
**MEMBERS; MANAGEMENT**

5.1 <u>Admission of Additional Members</u>.  Subject to the provisions of <u>Sections 7.1</u>, <u>8.1</u> and

8.2 and this Section 5.1, additional Persons may be admitted to the Company as Members with the consent of the Board.  The terms of such admission shall be determined by the Board at the time of admission.  The Board shall have the power to approve the issuance of Class B-3 Units in accordance with the terms and conditions of any incentive plan or employment or consulting agreement approved by the Board.  Each Person who is to be admitted as an additional Member must execute an amendment to this Agreement (which shall include an amended Schedule A) providing for such admission.  The admission of additional Members to the Company shall be effective upon the date specified therefor in the amendment to this Agreement providing for such admission.

5.2 Voting.

(a) Whenever the vote or consent of any class or classes, as applicable, of Members is permitted or required under this Agreement, such vote or consent may be given at a meeting of such Members, or provided in writing by such Members. On any matter submitted to a vote of any class or classes, as applicable, of Members, the affirmative vote or consent of more than fifty percent (50%) of the Units entitled to vote or consent on such matter shall be required for such matter to be approved.

(b) All Members holding Voting Units shall have the right to vote on any matter submitted to a vote of the Members.  Each Member holding Voting Units shall have the right to one vote for each Voting Unit held by such Member.

(c) Except as required by law, Class B-3 Members shall not be entitled to vote upon, approve or otherwise consent to actions of the Company.

(d) The Company shall not either directly or indirectly, by amendment, merger, consolidation or otherwise, do any of the following without (in addition to any other vote required by applicable law) the written consent or affirmative vote of Members holding at least a majority of the then outstanding Voting Units:

    i.    sell, lease or otherwise dispose of all or substantially all of the assets of the Company;

    ii.    purchase, lease, exchange, or otherwise acquire securities or assets of any other Person (other than (A) any wholly owned Subsidiary of the Company or (B) LPL, LakePoint Land III, LLC, LakePoint Land IV, LLC, LakePoint Services, LLC, LakePoint Sports South, LLC, LakePoint Housing, LLC, LakePoint Hospitality, LLC, or LakePoint Merchandise, LLC), involving aggregate consideration paid by the Company or its Subsidiaries (including by way of assumption of liabilities) in excess of $5,000,000;

    iii.    merge, consolidate with or into, engage in a share exchange with or otherwise consummate any business combination transaction with any other Person (other than transactions solely involving the merger or consolidation of a wholly owned Subsidiary of the Company with or into,

or a share exchange by a wholly owned Subsidiary of the Company with, the Company or another wholly owned Subsidiary of the Company);

iv.    commence any proceeding or file any petition seeking relief under any insolvency law, consent to the institution of or fail to contest in a timely and appropriate manner any such proceeding or filing under any insolvency law, apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator, or similar official for the Company or any of its Subsidiaries or assets; initiate or take any action for the liquidation, dissolution or winding up of the Company or any of its Subsidiaries; make a general assignment for the benefit of creditors; or take or authorize the taking of any action for the purpose of effecting any of the foregoing; or

v.    cause LPL or any of its Subsidiaries to do any of the foregoing.

5.3 <u>Management and Control of the Company</u>.

(a) Except for situations in which the approval of one or more Members is expressly required by this Agreement or by nonwaivable provisions of applicable law and subject to the provisions of this Agreement, the management, policies and control of the Company shall be vested exclusively in the Board, acting by a majority of its members. The Board may appoint officers of the Company from time to time. Such officers shall have such power and authority to carry on the business of the Company and to execute agreements, instruments and documents as are granted by the Board from time to time. The Board may cause the Company to retain agents and consultants. Agents and consultants shall receive such compensation from the Company for acting in such capacity as may be determined by the Board.

(b) The number of members of the Board shall be determined by the Members holding at least a majority of the Voting Units and shall initially be three. One member of the Board shall be the Chief Executive Officer of the Company, if the Company has a Chief Executive Officer, and the remaining members of the Board shall be determined by Members holding at least a majority of the Voting Units. Initially, the members of the Board shall be Chris Chester, Jeffrey Bemis, and Dan Berman. The members of the Board may be removed at any time by an action of Members holding at least a majority of the Voting Units, with or without cause. Upon the resignation, removal, or death of any member of the Board, Members holding at least a majority of the Voting Units shall be entitled to designate other individuals as members of the Board.

(c) The Board shall cause the Company to take such actions with respect to the equity securities in the Company's Subsidiaries such that the Company shall exercise any voting, sale, redemption, and other rights available to it with respect to such equity securities in a manner consistent with and giving effect to the rights of each of the Members hereunder, including so that all the Members participate in any exit transaction in accordance with the provisions of <u>Section 3</u>.

5.4 <u>Powers</u>.  The rights and powers of the Board to carry on the affairs of the Company shall include the right and power to perform all acts deemed by the Board to be necessary or appropriate to carrying out the business and purposes of the Company.  The Board shall have the power to sign any agreement or certificate or deliver any notice on behalf and in the name of the Company.

5.5 <u>Meetings</u>.

(a) Meetings of the Members shall be held from time to time as agreed upon by Members holding at least a majority of the Voting Units or as called by the Board upon 24 hours' telephonic or written notice to the Members (such notice may be waived by a Member in writing, either before or after such meeting, or by so indicating at such meeting).  A member of the Board shall preside at meetings of the Members, and a record shall be maintained at each such meeting.  The Members may adopt their own rules of procedure which are not inconsistent with this Agreement.

(b) The Board and the Members may participate in any meeting of the Members by means of conference telephone or similar communication if all persons participating in such meeting can hear each other for the entire discussion of the matters to be decided upon.  Participating in a meeting pursuant to this <u>Section 5.5(b)</u> shall constitute presence in person at such meeting.

(c) Any consent or action required or permitted to be granted or taken at a meeting of Members may be taken without a meeting if a written consent, setting forth the consent or action so granted or taken, is signed by Members holding at least a majority of the then-outstanding Voting Units.

5.6 <u>No Salaries</u>.  No Member shall receive any salary or other compensation, in addition to distributions to it in its capacity as a Member as contemplated by this Agreement, in consideration for its services to the Company in its capacity as a Member.

5.7 <u>No Annual or Other Meetings Required</u>.  No annual or other meetings of the Members shall be required, but the Members may meet from time to time as provided in <u>Section 5.5</u>.

5.8 <u>No Withdrawal or Dissolution</u>.  No Member shall at any time voluntarily withdraw from the Company.  No Member shall have the right to have the Company dissolved or to have such Member's contribution to the capital of the Company returned except as provided in this Agreement.  The Members shall take no action to dissolve the Company except as expressly contemplated by this Agreement. Each Member covenants not to apply to any court for a decree of dissolution of the Company, under Section 18-802 of the Act or otherwise.  Section 18-504 of the Act shall not apply to the Company or to any Member.

5.9 <u>No Dissenters Rights</u>.  No Member shall have any of the rights to dissent as contemplated by Section 18-210 of the Act.

5.10 <u>BHC Act Members</u>.

(a) That portion of any Units held for its own account by a BHC Act Member (together with its affiliates (as defined in 12 U.S.C. §1841(k) of the BHC Act)), that is determined at the time of admission of such BHC Act Member to be (in the aggregate) in excess of 4.99% of the aggregate of all Voting Units at that time, excluding, for purposes of calculating this percentage, portions of any other Units that are BHC Act Non-Voting Units pursuant to this Section 5.10 or any other provision of this Agreement, shall be a BHC Act Non-Voting Unit (whether or not subsequently transferred in whole or in part to any other Person except as provided herein).

(b) Upon the admission of any additional Member to or a withdrawal of any Member from the Company or other adjustment in the Units, a recalculation of the Units held by a BHC Act Member shall be made, and only that part of the Units held by such BHC Act Member (in the aggregate) that is determined, as of the date of such admission or withdrawal or other adjustment in the Units, to be in excess of 4.99% of the aggregate of all Voting Units at that time, excluding, for purposes of calculating this percentage, portions of any other Units that are BHC Act Non-Voting Units pursuant to this Section 5.10 or any other provision of this Agreement, shall be a BHC Act Non-Voting Unit (whether or not subsequently transferred in whole or in part to any other Person except as provided herein).

(c) Except as otherwise provided in this Section 5.10, BHC Act Non-Voting Units shall not be counted as Voting Units held by any Member for purposes of determining under this Agreement whether any vote or consent required hereunder has been approved or given by the requisite percentage of the Members; provided that each BHC Act Member will be permitted to vote such BHC Act Non-Voting Units with respect to matters as to which non-voting shares are permitted to vote pursuant to 12 C.F.R. §225.2(q)(2), as in effect from time to time.   Except as otherwise provided in this Section 5.10, a Unit which is held as a BHC Act Non-Voting Unit shall be identical in all regards to all other Units of the same class held by Members.

(d) Any BHC Act Non-Voting Units shall continue to be such in the hands of any assignee or other transferee; provided that any such BHC Act Non-Voting Units shall become a Voting Unit in the assignee's or other transferee's hands if transferred (i) to the Company (or a Subsidiary thereof), (ii) in a transaction in which no Person acquires more than 2% of the Voting Units then outstanding, (iii) in a single transaction to a third party who (or which) acquires at least a majority of the Units without regard to the transfer of such BHC Act Non-Voting Unit, (iv) in a widely distributed public offering of Voting Units, and (v) in a transfer of Voting Units to an underwriter for the purpose of conducting a widely distributed public offering.

5.11 ERISA Members.

(a) As of the date of this Agreement, less than 25% of the Units are held by ERISA Members.  For this purpose, an "ERISA Member" is a Member that (i) is an employee benefit plan or trust subject to Title I of ERISA or Section 4975 of the Code, or is an entity deemed to hold "plan assets" of one or more such employee benefit plans within the meaning of the Plan Asset Regulations, and (ii) has so indicated to the Company in writing.  The Company

will notify each of the ERISA Members in writing if at any time in the future 25% or more of the outstanding Units are held by ERISA Members.

(b) The Company will timely provide the ERISA Member with such information regarding its investment in the Company as may be requested by the ERISA Member (or any employee benefit plan whose assets are held by the ERISA Member) for purposes of completing the annual Form 5500 (or similar reports and filings required by the U.S. Department of Labor or the IRS) for the ERISA Member or plan, and the ERISA Member or plan will be permitted to disclose (without providing notice to, or obtaining consent from, the Company or the other Members) such information or other confidential information reasonably necessary to comply with ERISA or the Code and to complete the annual Form 5500 (and similar reports and filings required by the U.S. Department of Labor or the IRS).

5.12 Publicity.  Neither the Company nor any of its Affiliates shall use the name of any Member or any name derivative of or confusingly similar to any of the foregoing in any offering material, press release, brochure, notice or other publication without, in each instance, the written consent of the Member, provided, that the Company shall be permitted to (a) orally disclose such name to prospective investors in the Company if such information is provided on a confidential basis and (b) disclose such name to other Members of the Company if such information is provided on a confidential basis.  For the avoidance of doubt, it is hereby understood and agreed that nothing in this Agreement shall prevent the disclosure by the Company or any of its Affiliates of the identity of the Members or any of their Affiliates or the existence and terms of this Agreement, in each case, (i) to an existing or prospective Member, (ii) to lenders to the Company and its Subsidiaries or other counterparties or service providers in the ordinary course of the Company's business or (iii) to the extent required by applicable laws, rules or regulations, including any anti-money laundering or anti-terrorist laws, rules or regulations, or pursuant to a governmental request or legal process.

## SECTION 6
## TAX MATTERS

6.1 Classification.  The Members intend for the Company to be classified as a partnership for federal income tax purposes and shall not elect, pursuant to Section 301.7701-3 of the Regulations or otherwise, for it to be classified as anything other than a partnership.

6.2 Tax Returns.  The Board shall make all decisions relating to the Company's tax returns and any elections to be made under the Code.  The Company shall file its tax returns as a partnership for federal, state and local income and other tax purposes.

6.3 Partnership Representative.

(a) [LP Investments I, LLC] is hereby designated as the "partnership representative" (as defined in Code Section 6223(a), as in effect for taxable years beginning after December 31, 2017, and the Regulations thereunder) (the "Partnership Representative") of the Company.  An individual designated by the Partnership Representative shall be appointed by the Company to serve as the "designated individual" within the meaning of Regulations Section 301.6223-1(b)(3)(i).  The Partnership

Representative is specifically directed and authorized to take whatever steps that it, in its sole discretion, deems necessary or desirable pursuant to such designation, including filing any forms or documents with any relevant taxing authority and taking such other action as may from time to time be permitted or required under any applicable tax law. Except to the extent prohibited by law, all other Members hereby waive the right to participate in any administrative proceedings relating to the determination of partnership items at the Company level.  Expenses of such administrative proceedings undertaken by the Partnership Representative will be deemed to be Company expenses.

(b)    The Partnership Representative shall give prompt notice to the Members of (i) the receipt by the Partnership Representative of written notice that a federal, state or local taxing authority intends to examine the Company's income tax returns for any year; (ii) receipt by the Partnership Representative of written notice from any federal, state or local taxing authority of any proposed audit adjustment; and (iii) receipt of any request by the Partnership Representative from any federal, state or local taxing authority for waiver of any applicable statute of limitations with respect to any tax return of the Company. All reasonable expenses incurred by the Partnership Representative shall be paid or reimbursed by the Company.

(c)    [LP Investments I, LLC], in its capacity as Partnership Representative, shall have the rights, power and authority, and shall be subject to all of the obligations, for the making of any elections and the conduct of, and the decision to initiate (where applicable), any administrative and judicial proceedings involving the Company under the partnership audit provisions of Subchapter C of Chapter 63 of the Code and in effect for any relevant tax year (such provisions, together with applicable  Regulations and other IRS guidance, are referred to herein as the "Partnership Audit Rules"), including (i) an IRS examination of the Company commenced under Code Section 6231(a), (ii) a request for administrative adjustment filed by the Company under Code Section 6227, (iii) the filing of a petition for readjustment under Code Section 6234 (including choice of judicial forum) with respect to a final notice of partnership adjustment, (iv) the appeal of an adverse judicial decision, (v) the compromise, settlement or dismissal of any such proceedings on such terms as the Partnership Representative, in consultation with its tax advisors, deems appropriate, taking into account the collective interests of the Members and former Members affected thereby, (vi) if the Company is eligible, electing out of the Partnership Audit Rules under Code Section 6221(b), and (vii) the making of an election under Code Section 6226(a).  Each Member agrees to be bound by the decisions and elections made by the Partnership Representative and the Company under the Partnership Audit Rules.

6.4 Certain Covenants.

(a) The Company will use commercially reasonable efforts to furnish to each Member, within 120 days after the end of each fiscal year, or as soon as reasonably practicable thereafter, such information regarding the amount of such Member's share in the Company's taxable income or loss for such year, in sufficient detail to enable such Member to prepare its United States federal, state and other tax returns, including a Schedule K-1; provided, that no later than 75 days after the end of each fiscal year, the

18

Company will provide to such Member an estimate of the amounts expected to be included in such Schedule K-1 and any equivalent state income tax.

(b) If the IRS issues to the Company a notice of proposed partnership adjustment under Section 6231 of the Code, the Company will take into account a Member's tax status to reduce any proposed "imputed underpayment amount", provided the Member provides any information or documentation reasonably requested by the Company to establish such status. Any such reduction actually obtained by the Company attributable to the status of the Member will be taken into account in determining the portion, if any, of the imputed underpayment amount allocable to the Member, and the Company will ensure that Member will not bear economically the cost of any taxes that are imposed as a result of the tax status of another Member or that are imposed on the Member's distributive share of income that Member could receive without the imposition of such taxes.

(c) The Company, at the reasonable written request of a Member, will use its reasonable efforts to provide such information to the extent reasonably available to it in order for the Member to file tax returns and reports with respect to the Company. The Company also agrees that at the Member's request and expense it will use its reasonable efforts to make any filings and to take other actions to recover for the Member any taxes withheld or paid which are recoverable in each case with respect to the Member's interest in the Company, but only to the extent that such filings may be made or such withheld or paid taxes recovered by the Company and cannot legally be filed, recovered or obtained, as the case may be, by the Member. The requesting Member shall be responsible for all additional costs, if any, incurred by the Company in connection with providing any of the foregoing to the Member.

## SECTION 7
## TRANSFER OF INTERESTS BY MEMBERS

7.1 <u>Transfer of Units</u>.  No Member shall have the right to Transfer to any Person all or any part of such Member's Units without the prior written approval, both to such Transfer and to the substitution of the transferee as a Member as to the Transferred Units, of the Board, which approval may be given or withheld in the sole discretion of the Board.  Notwithstanding the foregoing, (a) each Member will be permitted to Transfer Units to (i) a controlled Affiliate of such Member if such Affiliate remains under the control of such transferor Member (a "<u>Controlled Affiliate</u>"), (ii) a Person that directly or indirectly controls more than 50% of the voting interests and economic interests of the Member (a "<u>Parent</u>"), and (iii) in the case of a Member that is a trust, a successor trustee or the fiduciary or any trust for the beneficiaries of such trust ("<u>Trust Affiliate</u>"), without the approval of the Company, and (b) a Member may Transfer Units to an Affiliate other than a Controlled Affiliate, a Parent, or a Trust Affiliate, subject to the approval of the Company, which approval will not be unreasonably withheld, conditioned or delayed.  In the case of any Transfer to an Affiliate as contemplated in the preceding sentence, the transferee Affiliate must agree in writing to execute such documents as may be required by the Board in connection with such Transfer, including the transferee's agreement to be bound by the terms of this Agreement.  The transferor Member shall cease to be a Member as to the Transferred Units immediately following the admission of the transferee as a

substitute Member as to such Units, but, in the case of a Transfer to an Affiliate, the transferor Member will not be released from its obligations under this Agreement and will remain liable for such obligations.   Notwithstanding the foregoing provisions regarding permitted transfers to Affiliates, a Member that is not an ERISA Member may not Transfer to an Affiliate that is an ERISA Member without the prior written approval of the Board, in its sole discretion. Notwithstanding any other provision of this Agreement, no Transfer of a Unit shall be permitted if such Transfer (A) would cause the Company to have more than 100 partners, as determined for purposes of Regulations Section 1.7704-1(h), or (B) would cause the Company to be treated as a publicly traded partnership within the meaning of Code Section 7704 and Regulations Section 1.7704-1.

7.2 <u>Distributions and Allocations in Respect to Transferred Units</u>.   If any Units are Transferred during any Fiscal Period in compliance with the provisions of this <u>Section 7</u>, Profits and Losses, each item thereof, and all other items attributable to the Transferred Units for such period shall be divided and allocated between the transferor and the transferee by taking into account their varying interests during the period in accordance with Code Section 706(d), using any conventions permitted by law and selected by the Board.  All distributions on or before the date of the Transfer shall be made to the transferor and all distributions thereafter shall be made to the transferee.   Neither the Company nor any Member shall incur any liability for making allocations and distributions in accordance with the provisions of this <u>Section 7.2</u>.

**SECTION 8**
**RIGHT OF FIRST OFFER; PREEMPTIVE RIGHTS; INFORMATION RIGHTS**

8.1 <u>Right of First Offer</u>.

(a)  In the event that a Member who holds more than five percent (5%) of the then outstanding Voting Units desires to Transfer all or part of its Units (the "<u>Offered Units</u>"), other than to an Affiliate pursuant to <u>Section 7.1(a)</u>, such Member (for purposes of this <u>Section 8.1</u>, such Member shall be referred to as the "<u>Transferring Member</u>") shall give prompt written notice (a "<u>ROFO Offer Notice</u>") to each Member holding at least five percent (5%) of the then outstanding Class A Units, Class B-1 Units and Class B-2 Units in the aggregate (calculated including holdings by each Member and its Affiliates) (each, a "<u>Non-Transferring Member</u>") of its desire to Transfer the Offered Units. The Transferring Member agrees not to consummate any such Transfer until the expiration of the twenty (20) Business Day period commencing on the date that the ROFO Offer Notice has been delivered to the Non-Transferring Members (the "<u>ROFO Election Period</u>"). The ROFO Offer Notice shall identify (i) the number and type of Offered Units, (ii) the purchase price per share at which the Transferring Member wishes to sell and form of consideration (the "<u>ROFO Offer Price</u>"), (iii) the identity of the proposed transferee, if known, and (iv) all other material terms and conditions of the proposed Transfer.

(b)  For a period of fourteen (14) Business Days (the "<u>ROFO Option Period</u>") following the receipt of the ROFO Offer Notice, each Non-Transferring Member shall have the right and option (but not the obligation) to purchase, at the ROFO Offer Price and on the same terms and conditions as set forth in the ROFO Offer Notice, up to such

20

portion of the Offered Units (each Non-Transferring Member's "<u>Pro Rata Offered Units</u>") which equals the proportion that the number of Class A Units, Class B-1 Units and Class B-2 Units held by such Non-Transferring Member bears to all Class A Units, Class B-1 Units and Class B-2 Units then outstanding. The rights of each Non-Transferring Member set forth in this <u>Section 8.1(b)</u> are exercisable by delivery, within the ROFO Option Period, by such Non-Transferring Member of an irrevocable written notice to the Transferring Member (the "<u>Notice of ROFO Election</u>") of such Non-Transferring Member's commitment to purchase all or a portion of its Pro Rata Offered Units (such Non-Transferring Member's "<u>Accepted Units</u>"). Failure by any Non-Transferring Member to give the Notice of ROFO Election within the ROFO Option Period shall be deemed an election by such Non-Transferring Member not to purchase its Pro Rata Offered Units.

(c) Each Non-Transferring Member that delivers, within the ROFO Option Period, a Notice of ROFO Election (an "<u>Exercising Member</u>") specifying its election to purchase all of its Pro Rata Offered Units, shall also have the right to purchase, at the ROFO Offer Price, a portion (its "<u>Pro Rata Oversubscription Units</u>") of the Offered Units that the other Non-Transferring Members have elected not to purchase, if any (the "<u>Remaining Units</u>") (any Exercising Member exercising its right to purchase its Pro Rata Oversubscription Units is referred to as an "<u>Oversubscribing Member</u>"). An Oversubscribing Member's Pro Rata Oversubscription Units shall equal the portion of the Remaining Units which equals the proportion that the number of Class A Units, Class B-1 Units and Class B-2 Units held by such Non-Transferring Member bears to all Class A Units, Class B-1 Units and Class B-2 Units held by all Oversubscribing Members prior to their acquisition of any Offered Units. The Company shall deliver a notice to all Exercising Members of the number of Remaining Units as promptly as practicable following the date upon which such Remaining Units are known. Each Exercising Member shall, if it desires to do so, become an Oversubscribing Member by specifying in the prior Notice of ROFO Election or another irrevocable written notice (each such notice delivered by an Oversubscribing Member, an "<u>Oversubscription Notice</u>") to the Transferring Members its election to purchase its Pro Rata Oversubscription Units prior to the expiration of the ROFO Election Period. The procedure set forth in this <u>Section 8.1(c)</u> will be repeated until elections to purchase all of the Offered Units have been exercised or each of the Oversubscribing Members no longer desires to exercise its right to purchase its Pro Rata Oversubscription Units.

(d) If any Non-Transferring Member has elected to purchase Offered Units hereunder, the Transfer of such Offered Units shall be consummated as soon as practical, and the parties will in good faith negotiate the sale agreement for such Offered Units after the delivery of the Notice of ROFO Election and/or Oversubscription Notice(s), if any, to the Transferring Member, but in any event within forty-five (45) days after the expiration of the ROFO Election Period, subject to receipt of any required material third-party or governmental approvals, compliance with applicable laws and the absence of any injunction or similar legal order preventing such transaction (collectively, the "<u>Conditions</u>"), in which case the purchase of the Accepted Units and the Pro Rata Oversubscription Units, as applicable, shall be delayed pending the satisfaction of the Conditions up to an additional ninety (90) days. The Transferring Member, the

Exercising Member and the Oversubscribing Member, as applicable, shall be obligated to use commercially reasonable efforts to satisfy the Conditions as soon as possible.

(e)  If all notices required to be given pursuant to this Section 8.1 have been duly given, and the Non-Transferring Members have not elected to purchase all of the Offered Units at the ROFO Offer Price and on the same terms and conditions as set forth in the ROFO Offer Notice, or any purchases of Pro Rata Offered Units or Pro Rata Oversubscription Units, as applicable, agreed to by any Exercising Members or Oversubscribing Members, as applicable, are not consummated in accordance with Section 8.1(d) (and any such failures to consummate such purchases are not as a result of any breach hereof by the Transferring Members), then the Transferring Members shall have the right, subject to the prior written approval of the Board pursuant to Section 7.1, to enter into and consummate, subject to Section 8.1(f), an agreement to Transfer to a third-party not Affiliated with any Member (a "Third-Party") the Offered Shares remaining unsold under this Section 8.1 at a price no less than the ROFO Offer Price and on terms and conditions no less favorable to the Transferring Member, economically or otherwise, than as set forth in the ROFO Offer Notice; provided that simultaneously with any such Transfer to a Third-Party, such Third-Party executes and delivers to the Company, for the benefit of the Company and all Members, a Joinder Agreement. If the Transfer to a Third-Party pursuant to this Section 8.1(e) is not consummated pursuant to the terms of the immediately preceding sentence and within the time periods described in the next paragraph (f), the Transferring Member will not effect the Transfer of any of the Offered Units without commencing *de novo* the procedures set forth in this Section 8.1.

(f)  The closing of the sale of any Third-Party Shares that are being Transferred under this Section 8.1 to any Third-Party shall take place at the Company's principal executive offices (or such other place as the Transferring Member and the applicable purchaser shall agree) on a date (the "Third-Party Transfer Closing Date") no later than one-hundred eighty (180) days following the date of delivery of the ROFO Offer Notice (or if such date is not a Business Day, the first day thereafter that is a Business Day) at 10:00 a.m., local time. On the Third-Party Transfer Closing Date, the parties shall take all actions necessary (including cooperation in obtaining any required governmental consents) to convey such Units to be Transferred in accordance with this Agreement, free of all liens and encumbrances, other than pursuant to this Agreement.

8.2 Preemptive Rights.

(a)  If the Company proposes to offer, sell or issue

i.    any Class A Units, Class B-1 Units or Class B-2 Units, as well as rights, options, or warrants to purchase Class A Units, Class B-1 Units or Class B-2 Units, or securities of any type whatsoever that are, or may become, convertible or exchangeable into or exercisable for Class A Units, Class B-1 Units or Class B-2 Units;

ii.   any securities (including Units or debt securities), as well as rights, options, or warrants to purchase such securities, or securities of any type

whatsoever that are, or may become, convertible or exchangeable into or exercisable for Units or debt securities in an offering in which any holder of Class A Units, Class B-1 Units or Class B-2 Units has committed to participate (excluding any borrowing, or incremental borrowings under the Exit Facility); or

iii.    any securities (including Units or debt securities), as well as rights, options, or warrants to purchase such securities, or securities of any type whatsoever that are, or may become, convertible or exchangeable into or exercisable for Units or debt securities (A) in an offering <u>not</u> approved by the Board or (B) that are <u>not</u> equity securities with a distribution priority senior to all then outstanding Units or junior to all then outstanding Units (the securities referenced in (i), (ii) and (iii), collectively, the "<u>New Securities</u>"),

then the Company shall, subject to the provisions of this <u>Section 8.2</u>, offer to the Preemptive Rights Holders the right to acquire such Member's pro rata share of such New Securities.

(b) The Company shall give written notice (the "<u>Preemptive Rights Offer Notice</u>") to each Preemptive Rights Holder, stating (i) the Company's bona fide intention to offer such New Securities, (ii) the number of such New Securities to be offered, and (iii) the price and terms, if any, upon which the Company proposes to offer such New Securities.

(c) By written notification to the Company within ten (10) days after the Preemptive Rights Offer Notice is given ("<u>Notice of Preemptive Rights Election</u>"), each Preemptive Rights Holder (or its designee) may (in its sole discretion) elect to purchase or otherwise acquire, at the price and on the terms specified in the Preemptive Rights Offer Notice, up to that portion of such New Securities which equals the proportion that the number Units held by such Preemptive Rights Holder and its Affiliates bears to the total number of Units then outstanding (such portion, its "<u>Allotment</u>").

(d) The closing of any sale pursuant to this <u>Section 8.2</u> shall occur within the later of (a) twenty (20) days of the date that the Preemptive Rights Offer Notice is given and (b) such outside date for closing set forth in the Preemptive Rights Offer Notice.

(e) If the Preemptive Rights Holders do not acquire all New Securities referred to in the Preemptive Rights Offer Notices as provided in <u>Sections 8.2(c)</u> and <u>8.2(d)</u>, the Company may, during the one hundred eighty (180) day period following the expiration of the ten (10) Business Day period provided in <u>Section 8.2(c)</u>, offer and sell the remaining unsubscribed portion of such New Securities at a price not less than, and upon terms no more favorable to the offeree than, those specified in the Preemptive Rights Offer Notice.  If the Company does not enter into an agreement for the sale of the New Securities within such period, or if such agreement is not consummated within one hundred eighty (180) days of the execution thereof, and the Company later wishes to issue such New Securities, then the Company will offer to each Preemptive Rights

Holder its pro rata share of such New Securities in accordance with this <u>Section 8.2</u>.

(f) In lieu of offering New Securities to each Preemptive Rights Holder at the same time that such New Securities are offered, as contemplated under <u>Section 8.2(a)</u>, the Company may, in its sole discretion, initially issue all of the New Securities, and, within a reasonable period of time following such issuance, provide a Preemptive Rights Offer Notice to each Preemptive Rights Holder offering the Preemptive Rights Holder the right to acquire its pro rata share of such New Securities in accordance with this <u>Section 8.2</u>, provided that the purchaser of such New Securities agrees in writing to take such New Securities subject to the provisions of this <u>Section 8.2(f)</u>. Any Preemptive Rights Holder that wishes to exercise its preemptive rights under this <u>Section 8.2</u> may purchase such Preemptive Rights Holder's pro rata share of the New Securities directly from the purchaser of the New Securities (or its Affiliate), on the same terms and conditions on which the purchaser of the New Securities (or its Affiliate) originally acquired the New Securities, plus Carry Costs. For this purpose, (i) the Preemptive Rights Holder's pro rata share of the New Securities will be based upon the number of Units owned by the Preemptive Rights Holder, over the total number of Units held by all Members (other than Class B-3 Units) prior to the issuance of New Securities pursuant to this <u>Section 8.2(f)</u>, and (ii) the "<u>Carry Costs</u>" will be equal to the actual interest expense incurred by the purchaser of the New Securities (or its Affiliate) from the date of investment to the date of Transfer of the New Securities to the Preemptive Rights Holder. New Securities offered to Preemptive Rights Holders under this <u>Section 8.2(f)</u> must be offered within sixty (60) days following the date on which securities have been sold to the purchaser of the New Securities.

(g) The provisions of this <u>Section 8.2</u> will not apply to the issuance of Class B-3 Units to a Management Person for consideration representing the Class B-3 Units' fair market value, as determined by the Board.

(h) The provisions of this <u>Section 8.2</u> will not apply to the issuance of up to $5 million of Class A Units (in the aggregate) by the Company (based on a $54.522 million pre-money valuation of the Company) to any Person prior to the third anniversary of the date of this Agreement.

8.3 <u>Drag-Along Rights</u>.

(a) The Rimrock Member and its Affiliates shall have the right to require the other Members (i) to agree to and to sell a Pro Rata Portion of their Units and rights to acquire Units in connection with a Company Sale, on the same terms and conditions (subject to appropriate adjustments as required to reflect the Members' rights to receive distributions pursuant to <u>Section 3.1</u> and <u>Section 10.2(b)</u>) as the Rimrock Member (or its Affiliates) propose to sell any Units (subject to <u>Section 8.3(d)</u>), as reflected in a written notice provided to the other Members by the Rimrock Member (or its Affiliates) at least ten (10) calendar days prior to the date on which the Company Sale shall be consummated (including a summary of the terms and conditions thereof) and (ii) to vote for a Company Sale (including any sale of all or substantially all of the assets of the Company or its Subsidiaries or a merger) proposed or endorsed by the Rimrock Member

(or its Affiliates) in writing and approved by the Board.

(b) "Pro Rata Portion" means the number of Units to be sold in the transaction, multiplied by a fraction, the numerator of which is the number of Units owned by a Unit holder (including rights to acquire Units), and the denominator of which is the total number of outstanding Units (including any Units issuable by the Company upon exercise of options, warrants or other rights to acquire Units, and Units issuable upon conversion of convertible securities).

(c) The obligations of the Members under this Section 8.3 are subject to the condition that, upon the consummation of such transaction, each Member will receive consideration per Unit in the same form as the Rimrock Member (or its Affiliates) (subject to Section 8.3(d)) and in the amounts necessary to reflect such Member's rights to receive distributions pursuant to Section 3.1 and Section 10.2(b). In any such transaction, such Member's Units will be subject to the same terms and conditions applicable to the Rimrock Member's (or its Affiliates') Units, including any representations and warranties, indemnification obligations, escrows and holdbacks (provided, that the amount of any escrows or holdbacks with respect to any Member shall be determined based on its relative share of the aggregate proceeds received by such Member with respect to its Units). In connection with such transaction, the other Members will execute any agreements, certificates, or other instruments required in connection with the transaction, including a purchase agreement and other related agreements, to the same extent as the Rimrock Member (or its Affiliates); provided that in no event will a Member be required to execute any non-compete agreement or any non-solicitation agreement other than an Employee Non-Solicit. An "Employee Non-Solicit" means (A) a non-solicitation agreement that applies only to employees of LPL and its subsidiaries, and (B) is binding on the Member, and (C) prohibits the Member from directing, encouraging or assisting any Affiliate of such Member to solicit any employees of LPL and its subsidiaries. Each Member will bear its pro rata share (based on its relative share of the aggregate proceeds received by such Member with respect to its Units) of expenses incurred in connection with the proposed transaction; such expenses will be offset against amounts distributable to the Member in connection with the transaction or otherwise. Each Member shall be severally (but not jointly) obligated to join on a pro rata basis (based on its relative share of the aggregate proceeds received by such Member with respect to its Units) in any indemnification obligation the Rimrock Member (or its Affiliates) have agreed to in connection with such Company Sale (other than any such obligations that relate specifically to such Member such as indemnification with respect to representations and warranties given by such Member regarding title to and ownership of Units); provided, that no Member shall be obligated in connection with such Company Sale to indemnify the prospective third party transferee in an aggregate amount in excess of the net cash proceeds actually paid to and received by such Member in such Company Sale.

(d) The proceeds of any transaction to which this Section 8.3 applies shall be allocated among the participants based upon the Units included in such transaction by each seller as if the proceeds of such transaction were paid to them pursuant to Section 10 in connection with the liquidation of the Company and the Units of such sellers included

in such transaction were the only outstanding Units at the time of such liquidation.

8.4 <u>Information Rights</u>. The Company will promptly transmit to each Member, upon availability to the Company, (i) the unaudited consolidated balance sheet that includes LPL and its subsidiaries as of the end of each fiscal quarter and the related unaudited consolidated statement of income for such fiscal quarter, (ii) the audited consolidated balance sheet that includes LPL and its subsidiaries as of the end of each fiscal year and the related audited consolidated statements of operations, changes in stockholders' equity and cash flows for such fiscal year, together with all related notes and schedules thereto (in all cases, prepared in accordance with US GAAP), accompanied by the audit report of the independent auditors of nationally recognized standing, in the case of each of clause (i) and clause (ii) to the extent available to the Company, and (iii) quarterly capital account statements for each Member.  All information provided pursuant to this <u>Section 8.4</u> will be subject to <u>Section 11.14</u>.  Upon reasonable request of a Member, the Company will provide the Member with the Member's current Capital Account balance.

## SECTION 9
## LIABILITY; INDEMNITY

9.1 <u>Members' Other Activities</u>.  Notwithstanding any provision of the Act to the contrary, any Member may engage independently or with others in other business ventures, or make or manage other investments, without the necessity of informing the Company or the other Members.  Neither the Company nor any Member shall have any right by virtue of this Agreement or the relationship created hereby or by virtue of the Act in or to such other ventures or activities or to the income or proceeds derived therefrom, and the pursuit of such ventures, even if competitive with the business of the Company, shall not be deemed wrongful or improper.

9.2 <u>Liability to Members and the Company</u>.

(a)  No Member (nor any member of the Board) shall be liable to the Company or to any other Member for any loss or damage caused by any action or omission of such Person in managing the business or affairs of the Company which does not result from gross negligence, intentional misconduct or knowing violation of law or a transaction for which such Person received an improper personal benefit.  The liability of each Member to the Company shall be limited to any distributions which such Member is required to return to the Company pursuant to the Act or made in violation of <u>Section 3.4</u> of this Agreement.

(b) Notwithstanding any other provision of this Agreement, neither any Member nor any member of the Board shall be liable to the Company or any other Member or Person for any breach of duty of loyalty and/or due care or any other fiduciary duty, other than as a result of any acts or omissions that are not in good faith or that involve intentional misconduct or are the result of gross negligence or a transaction for which such Person received an improper personal benefit.

9.3 <u>Indemnification of Members and the Board</u>.  To the fullest extent permitted by the

Act:

(a) The Company (and any receiver, liquidator or trustee of, or successor to, the Company) shall indemnify and hold harmless each Member and each member of the Board and their respective Affiliates (an "Indemnitee") from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, proceedings, costs, expenses and disbursements of any kind or nature whatsoever (including reasonable attorneys' fees and all costs and expenses of defense, appeal and settlement of any and all suits, actions and proceedings involving an Indemnitee and all costs of investigation in connection therewith) that may be imposed on, incurred by or asserted against any Indemnitee in any way relating to or arising out of, or alleged to relate to or arise out of, any action or inaction on the part of any Indemnitee that relates in any way to the Company or the business or assets thereof; provided that the indemnification obligations in this Section 9.3 shall not apply to the portion of any liability, obligation, loss, damage, penalty, cost, expense or disbursement that results from fraud, gross negligence, willful malfeasance, intentional and material breach of this Agreement, or conduct that is the subject of a criminal proceeding where the Indemnitee has reasonable cause to believe that such conduct was unlawful.  The termination of any proceeding by settlement, judgment, order, conviction, or upon a plea of nolo contendere or its equivalent shall not, by itself, create a presumption that such Indemnitee's conduct constituted fraud, gross negligence, willful malfeasance, intentional and material breach of this Agreement, or conduct that is the subject of a criminal proceeding (where the Indemnitee has reasonable cause to believe that such conduct was unlawful), except a judgment, order or conviction that expressly provides that such Indemnitee's conduct constituted fraud, gross negligence, willful malfeasance, intentional and material breach of this Agreement, or conduct that is the subject of a criminal proceeding (where such Indemnitee had reasonable cause to believe that such conduct was unlawful).

(b) If authorized by the Board, the Company shall pay expenses as they are incurred by the Indemnitee in connection with any action, claim, or proceeding that the Indemnitee asserts in good faith to be subject to the indemnification obligations set forth in this Agreement; provided, that such Indemnitee provides to the Company an undertaking from the Indemnitee to repay all amounts so paid by the Company to the extent that it is finally determined that the Indemnitee is not entitled to be indemnified therefor under the terms of this Agreement.

(c) The Board, notwithstanding any apparent conflict of interest, shall have the power to, and is hereby authorized and directed to, cause the Company to comply with the indemnification and expense payment provisions of this Agreement.

(d) The indemnification to be provided by the Company under this Agreement shall be paid only from the assets of the Company, and no Member shall have any personal liability in connection therewith or any obligation to make any capital contribution to fund such indemnification at any time.

(e) Notwithstanding any provision of this Agreement to the contrary, each Indemnitee shall be a third party beneficiary of this Section 9.3.

## SECTION 10
## DISSOLUTION AND WINDING UP

10.1 <u>Liquidating Event</u>.  The Company shall dissolve and commence winding up and liquidating only upon the action by written consent of Members holding at least a majority of the Voting Units determining to dissolve the Company (a "<u>Liquidating Event</u>").

10.2 <u>Winding Up</u>.  Upon the occurrence of a Liquidating Event, the Company shall continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets, satisfying the claims of its creditors and distributing the remaining proceeds to its Members in accordance with this <u>Section 10.2</u>.  During the period commencing on the date on which a Liquidating Event occurs and ending on the date on which the assets of the Company are distributed pursuant to this <u>Section 10.2</u>, Profits and Losses and other items of Company income, gain, loss, or deduction shall continue to be allocated in the manner provided in <u>Section 4</u>.  No Member shall take any action that is inconsistent with, or not necessary to or appropriate for, the winding up of the Company's business and affairs.  The assets of the Company shall be liquidated only to the extent determined to be appropriate by the Board and the proceeds thereof, together with such assets as the Board determines to distribute in kind (valued at the Gross Asset Value thereof), shall be applied and distributed in the following order:

(a) First, to creditors of the Company, including Members who are creditors in their capacities as creditors of the Company, in satisfaction of liabilities of the Company (whether by payment or by making of reasonable provision for payment); and

(b) The balance, if any, to the Members in accordance with <u>Section 3</u>.

If the Company is liquidated within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g) but no Liquidating Event has occurred, such liquidation shall not cause a dissolution of the Company for purposes of the Act, and the Company's assets shall not be liquidated, the Company's liabilities shall not be paid or discharged and the Company's affairs shall not be wound up.

10.3 <u>Negative Capital Accounts</u>.  No Member with a deficit balance in its Capital Account shall have any obligation to make any contribution to the capital of the Company with respect to such deficit, and such deficit shall not be considered a debt owed to the Company or to any other Person for any purpose whatsoever.

10.4 <u>Filings</u>.  Upon the dissolution and the completion of winding up of the Company, there shall be filed a certificate of termination in accordance with the Act and appropriate instruments under the laws of any other states or jurisdictions in which the Company has qualified to engage in business.

## SECTION 11
## MISCELLANEOUS

11.1 <u>Notices</u>.  Any notice, payment, demand, or communication required or permitted to

be given pursuant to any provision of this Agreement must be in writing and shall be (i) delivered personally, (ii) sent by postage prepaid, registered mail (airmail internationally), (iii) transmitted by e-mail, or (iv) delivered by nationally recognized overnight courier, addressed as follows, or to such other address as such Person may from time to time specify by notice to the Members:

   (a) If to the Company, to the Company at the address of the Company's principal place of business as provided by the Company to the Members; and

   (b) If to a Member, to the address provided by the Member to the Company in writing.

Any such notice, payment, demand, or communication shall be deemed to be delivered, given, and received for all purposes of this Agreement (i) on the date of receipt if delivered personally or by courier, (ii) five days after posting if transmitted by mail, or (iii) the date of transmission by e-mail, provided that the Person to whom the e-mail was sent acknowledges that such e-mail was received by such Person in legible form, or that such Person responds to the e-mail without indicating that any part of it was received in illegible form, whichever shall first occur.

  11.2 <u>Binding Effect</u>.  Except as otherwise provided in this Agreement, every covenant, term, and provision of this Agreement shall be binding upon and inure to the benefit of the Members and their respective successors, transferees and assigns.

  11.3 <u>Construction</u>.  Every covenant, term, and provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any Member. "Including" (and with correlative meaning "include") means including without limiting the generality of any description preceding such term.  "Or" is used in the inclusive sense of "and/or".  All Section references in this Agreement are to the corresponding Section of this Agreement, unless otherwise specified.

  11.4 <u>Time</u>.  Time is of the essence with respect to this Agreement.

  11.5 <u>Headings</u>.  Section and other headings contained in this Agreement are for reference purposes only and are not intended to describe, interpret, define, or limit the scope, extent or intent of this Agreement or any provision of this Agreement.

  11.6 <u>Severability</u>.  Every provision of this Agreement is intended to be severable.  If any term or provision of this Agreement is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity or legality of the remainder of this Agreement. Any provision of this Agreement held invalid, illegal or unenforceable shall be construed by modifying or limiting it so as to be valid, legal and enforceable to the maximum extent compatible with, and permissible under, applicable law.

  11.7 <u>Further Action</u>.  Each Member agrees to perform all further acts and execute, acknowledge and deliver any documents which may be reasonably necessary, appropriate or desirable to carry out the provisions of this Agreement.

  11.8 <u>Governing Law</u>.  The laws of the State of Delaware shall govern the validity of this

Agreement, the construction of its terms, and the interpretation of the rights and duties of the Members, without regard to conflict of laws principles.

11.9 <u>Waiver of Action for Partition</u>.  Each of the Members irrevocably waives any right that it may have to maintain any action for partition with respect to any of the Company's assets.

11.10 <u>No Third Party Beneficiaries</u>.   Except as otherwise expressly provided in this Agreement with respect to Indemnitees, none of the provisions of this Agreement shall be for the benefit for, or shall be enforceable by, any party other than the parties to this Agreement.

11.11 <u>Amendments</u>.

(a) This Agreement may be amended, modified or supplemented by one or more Members holding at least a majority of the Voting Units, <u>provided</u>, <u>however</u>, that any amendment, modification or supplement that has a disproportionate material adverse effect on the rights, obligations, powers or interests (economic or otherwise) of any Member or class of Units relative to any other Member or class of Units must be approved in writing by the affected Member (or if the amendment, modification or supplement to this Agreement has a disproportionate effect on more than one Member, then it must be approved by Members holding at least a majority of the affected Units).

(b) The Company will provide written notice to any Member of any amendments effected pursuant to this <u>Section 11.11</u> without the written consent of the Member within five (5) Business Days of the effectiveness of any such amendment.

11.12 <u>Power of Attorney</u>.

(a) Each of the Members hereby constitutes and appoints the Board as its true and lawful representative and attorney-in-fact, in its name, place and stead, to make, execute, sign, acknowledge and deliver or file (i) the Certificate and any required amendments thereto and any other instruments, documents and certificates which may from time to time be required by any law to effectuate, implement and continue the valid and subsisting existence of the Company, (ii) all instruments, documents and certificates that may be required to effectuate the dissolution and termination of the Company in accordance with the provisions of this Agreement and Delaware law, (iii) all other amendments of <u>Schedule A</u> of this Agreement contemplated by this Agreement including amendments reflecting the resignation of a Member, or the addition or substitution of any Member, and (iv) any other instrument, certificate or document required from time to time to admit a Member, to effect such Person's substitution as a Member, or to effect the substitution of the Member's assignee as a Member.  Copies of all such instruments, certificates and other documents shall be sent to all Members.

(b) The foregoing grant of authority (i) is a special power of attorney coupled with an interest in favor of the Board and each of them, and as such shall be irrevocable and shall survive the death or disability of a Member, and (ii) shall survive the assignment by a Member of the whole or any portion of the Units held by such Member, except that where the assignee of all of the Units of a Member thereof has furnished a power of attorney, this power of attorney shall survive such assignment for the sole

purpose of enabling the Board to execute, acknowledge and file any instrument necessary to effect any permitted substitution of the assignee for the assignor as a Member and shall thereafter terminate.

(c) The Board shall require a similar power of attorney to be executed by a transferee of a Member as a condition of its admission as a substituted Member.

11.13 <u>Entire Agreement</u>.  This Agreement contains the entire understanding and agreement among the Members with respect to the subject matter of this Agreement and supersedes any other prior oral or written understandings or agreements among the Members with respect to such matters.

11.14 <u>Confidentiality</u>.  Each of the Members agrees that it will keep confidential and will not disclose, divulge, or use for any purpose (other than to monitor its ownership of Units) any confidential information obtained from the Company or any of its Affiliates pursuant to the terms of this Agreement or the Company's or its Affiliates' agreements with the Company's Subsidiaries, unless such confidential information (i) is known or becomes known to the public in general (other than as a result of a breach of this <u>Section 11.14</u> by any of the Members), (ii) is or has been independently developed or conceived by such Member without use of the Company's or its Affiliates' confidential information, or (iii) is or has been made known or disclosed to such Member by a third party without a breach of any obligation of confidentiality such third party may have to the Company; <u>provided</u>, <u>however</u>, that each of the Members may disclose confidential information (A) to its respective attorneys, accountants and consultants to the extent necessary to obtain their services in connection with monitoring such Member's ownership of Units; (B) to any existing or prospective Affiliate, investor, prospective investor, management, partner, member, shareholder, or controlled subsidiary of such Member in the ordinary course of business, provided that such Member informs such Person that such information is confidential and directs such Person to maintain the confidentiality of such information; or (C) as may otherwise be required by law, provided that such Member promptly notifies the Company of such disclosure (unless such notification to the Company is expressly prohibited by law) and takes reasonable steps to minimize the extent of any such required disclosure.  Each of the Members is responsible for compliance with this <u>Section 11.14</u> by any party to whom it discloses information pursuant to clauses (A) or (B) of the immediately preceding sentence.

11.15 <u>Counterpart Execution</u>.  This Agreement may be executed in any number of counterparts with the same effect as if all of the Members had signed the same document.  All counterparts shall be construed together and shall constitute one agreement.

11.16 <u>Representations of the Company</u>.  The Company hereby represents and warrants to each Member as follows:

(a) <u>Schedule A</u> sets forth, as of the date hereof, a true and correct list of the aggregate initial capital contributions and Units of the Members.  Except as set forth on <u>Schedule A</u>, as of the date hereof, there are no outstanding warrants, options, rights, agreements, subscriptions, convertible or exchangeable securities or other commitments pursuant to which the Company is or may become obligated to issue or sell any of its equity interests.

(b) The Company is duly qualified to transact business and is in good standing in every jurisdiction in which the character of the business conducted by it or permitted to be conducted by it makes such qualification necessary, except where the failure to be so qualified would not have a material adverse effect on the business, operations or financial condition of the Company.

(c) Assuming due authorization, execution and delivery to the Company of this Agreement by the Members, this Agreement constitutes the legally valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws relating to or affecting creditors' rights generally (including without limitation fraudulent conveyance laws) and by general principles of equity (including without limitation concepts of materiality, reasonableness, good faith and fair dealing and the possible unavailability of specific performance or injunctive relief), regardless of whether considered in a proceeding in equity or at law.

(d) The execution and delivery of this Agreement, the consummation of the transactions contemplated hereby and the performance of the obligations thereunder by the Company will not conflict with or result in any material violation of or default under any provision of this Agreement, or any agreement or other instrument to which the Company is a party or by which it or its properties are bound, or any material law or regulation which is applicable to the Company.

(e) As of the date hereof, the Company and its Affiliates have not incurred (and shall not incur) any placement agent fees or similar payment obligations of any kind in connection with the making of an investment in the Company by any Member.

*[Signature Pages Follow]*

**IN WITNESS WHEREOF,** the parties have executed and delivered this Agreement, effective as of the date first above written.

**LAKEPOINT LAND HOLDINGS  LLC**

By:_____

Name:

Title:

**[●]**

By:_____

Name:

Title:

## __SCHEDULE A__

**LAKEPOINT LAND HOLDINGS, LLC**

MEMBERS

See attached.

## __SCHEDULE B__

**LAKEPOINT LAND HOLDINGS, LLC**

WATERFALL

See attached.

# LakePoint Land Holdings, LLC

## Detailed Capitalization Table

| Member Name | Membership Class | Total Capital Equity Investment | % Membership Outstanding | Membership Units | Accrued Preferred Return on Capital | Rate of Preferred Return (Per Annum) |
|---|---|---|---|---|---|---|
| LP Investments I, LLC | Class A | $ 4,552,000.00 | 8.34% | 11,479,394 | $ - | 0.0% |
| LP Investments I, LLC | Class B-1 | $ 3,000,000.00 | 2.18% | 3,000,000 | $ - | 7.0% |
| LP Investments I, LLC | Class B-1 | $ 60,000,000.00 | 43.61% | 60,000,000 | $ - | 7.0% |
| LP Investments I, LLC | Class B-2 | $ 10,000,000.00 | 7.27% | 10,000,000 | $ - | 0.0% |
| Management Incentive Units | Class B-3 | $ - | 9.17% | 12,609,176 | $ - | 0.0% |
| Lagoon Investments, LLC | Class C | $ 1,800,000.00 | 0.99% | 1,360,104 | $ 630,247.00 | 18.0% |
| L. Craig Ramsey | Class C | $ 1,272,001.85 | 0.70% | 961,142 | $ 611,606.35 | 18.0% |
| Creola Holdings, LLC | Class C | $ 1,000,000.00 | 0.55% | 755,614 | $ 785,589.00 | 36.0% |
| John Stegeman | Class C | $ 1,000,000.00 | 0.55% | 755,614 | $ 961,644.00 | 36.0% |
| Worthington Hyde Partners-IV, LP | Class C | $ 500,000.00 | 0.27% | 377,807 | $ 240,410.92 | 18.0% |
| LakePoint Investors, LLC | Class C | $ - | 0.00% | - | $ - | 18.0% |
| DB 2006 Family Trust | Class C | $ 395,588.70 | 0.22% | 298,912 | $ 190,207.83 | 18.0% |
| Neal Freeman | Class C | $ 300,000.00 | 0.16% | 226,684 | $ 144,246.55 | 18.0% |
| George and Alyne Sertl | Class C | $ 237,352.05 | 0.13% | 179,346 | $ 114,124.03 | 18.0% |
| Robert Stickel | Class C | $ 100,000.00 | 0.05% | 75,561 | $ 48,082.18 | 18.0% |
| Jeremy Schell | Class C | $ 100,000.00 | 0.05% | 75,561 | $ 48,082.18 | 18.0% |
| Steve Powers | Class C | $ 100,000.00 | 0.05% | 75,561 | $ 48,082.18 | 18.0% |
| Fernando Nasmyth | Class C | $ 100,000.00 | 0.05% | 75,561 | $ 48,082.18 | 18.0% |
| Bruce and Louise Plagman | Class C | $ 74,780.55 | 0.04% | 56,505 | $ 35,956.34 | 18.0% |
| Michael Morris | Class C | $ 74,780.55 | 0.04% | 56,505 | $ 35,956.34 | 18.0% |
| GKB LakePoint Invest, LLC | Class C | $ 62,700.30 | 0.03% | 47,377 | $ 30,147.53 | 18.0% |
| Betty T. Freeman Recep. Trust | Class C | $ 55,001.70 | 0.03% | 41,560 | $ 26,446.16 | 18.0% |
| Ron and Deborah Bailey | Class C | $ 39,557.70 | 0.02% | 29,890 | $ 19,020.35 | 18.0% |
| Bonny K. Snyder | Class C | $ 19,778.85 | 0.01% | 14,945 | $ 9,510.18 | 18.0% |
| Schuler Family Trust | Class C | $ 19,778.85 | 0.01% | 14,945 | $ 9,510.18 | 18.0% |
| Ralson and Kimberly Goetz | Class C | $ 9,892.35 | 0.01% | 7,475 | $ 4,756.29 | 18.0% |
| William A. Worthington | Class C | $ 9,892.35 | 0.01% | 7,475 | $ 4,756.29 | 18.0% |
| Katherine Lughes | Class C | $ 9,892.35 | 0.01% | 7,475 | $ 4,756.29 | 18.0% |
| Jessica Roles Plagman Hill | Class C | $ 7,909.20 | 0.00% | 5,976 | $ 3,802.82 | 18.0% |
| Tony Plagman | Class C | $ 7,909.20 | 0.00% | 5,976 | $ 3,802.82 | 18.0% |
| LakePoint Investors, LLC | Class D-1A | $ 358,572.25 | 0.20% | 270,942 | $ 172,409.40 | 18.0% |

| | | | | | | |
|---|---|---|---|---|---|---|
| LakePoint Investors, LLC | Class D-1B | $ 25,986,300.00 | 14.27% | 19,635,600 | $ 19,120,015.17 | 12.0% |
| LakePoint Sports Development Group, LLC | Class D-2 | $ - | 7.19% | 9,893,396 | $ - | 0.0% |
| Neal Freeman | Class E | $ 2,376,790.08 | 1.31% | 1,795,935 | $ 684,725.00 | 12.0% |
| Sports Parks of Georgia, LLC | Class F | $ 1,056,831.00 | 0.58% | 798,556 | $ - | 12.0% |
| Wilwat Properties, Inc. | Class F | $ 1,020,235.00 | 0.56% | 770,903 | $ - | 12.0% |
| TriCapita, LLC | Class F | $ 334,224.00 | 0.18% | 252,544 | $ - | 12.0% |
| Site Services Group, LLC | Class F | $ 301,977.00 | 0.17% | 228,178 | $ - | 12.0% |
| MCS Realty Services, Inc. | Class F | $ 237,203.00 | 0.13% | 179,234 | $ - | 12.0% |
| Smartegies, LLC | Class F | $ 196,013.01 | 0.11% | 148,110 | $ - | 12.0% |
| SSG Investment, LLC | Class F | $ 128,400.00 | 0.07% | 97,021 | $ - | 12.0% |
| Earl Ehrhart | Class F | $ 397,666.67 | 0.22% | 300,482 | $ - | 12.0% |
| W. Neal Freeman | Class F | $ 287,583.33 | 0.16% | 217,302 | $ - | 12.0% |
| Belt & Associates | Class F | $ 247,000.00 | 0.14% | 186,637 | $ - | 12.0% |
| Robert D. Zurcher | Class F | $ 129,470.00 | 0.07% | 97,829 | $ - | 12.0% |
| Jonathan D. Crumly, Sr. | Class F | $ 127,500.00 | 0.07% | 96,341 | $ - | 12.0% |
| | | | | | | |
| **Totals** | | **$ 118,034,581.89** | **100.00%** | **137,571,151** | **$ 24,035,975.56** | |

## SCHEDULE B

WATERFALL

Available distributable cash of the Company shall be distributed to the Members at such time as such cash is available in the following order of priority:

*First*, a percentage of all distributable cash equal to the percentage of all Units held by Class A Members, shall be distributed to the Class A Members, pro rata based on percentage of Class A Units held (the "Class A Distribution");

*Second*, after making the Class A Distribution, such remaining distributable cash shall be distributed to the Class B-1 Members, pro rata based on percentage of Class B-1 contributions, until each Class B-1 Member's accrued, unpaid Preferred Return has been paid in full;

*Third*, any remaining distributable cash shall be distributed to the Class B-1 Members, pro rata based on percentage of Class B-1 contributions, until each Class B-1 Member's Total Capital Equity Investment equals zero;

*Fourth*, until such time as each Class B-2 Member's Total Capital Equity Investment equals zero, any remaining distributable cash shall be distributed as follows: (a) seventy-five percent (75%) shall be distributed to the Class B-2 Members, pro rata based on percentage of Class B-2 contributions, and (b) twenty-five percent (25%) of such distributable cash shall be distributed to Class C, Class D, Class E, and Class F Members (collectively, the "Junior Class Members") in accordance with the Junior Class Waterfall (as defined below);

*Thereafter*, any remaining distributable cash shall be distributed as follows: (a) a percentage of such cash equal to the percentage of all Class B-3 Units held by Class B-3 Members as compared to all Class B-1 through F Units (in each case, only to the extent that such Units held have fully vested) shall be distributed to the Class B-3 Members, pro rata based on percentage of Class B-3 Units held (such distribution, the "Class B-3 Distribution"), (b) after taking into account the making of the Class B-3 Distribution, fifty percent (50%) of such cash shall be distributed to the Class B-1 and B-2 Members, pro rata based on percentage of Units held, and (c) after taking into account the making of the Class B-3 Distribution, fifty percent (50%) of such cash shall be distributed to the Junior Class Members in accordance with the Junior Class Waterfall.

The distributable cash payable to the Junior Class Members pursuant to the foregoing shall be distributed in the following order of priority (the "Junior Class Waterfall"):

*First*, such distributable cash shall be distributed to the Class C Members, pro rata based on percentage of each Member's balance of accrued, unpaid Preferred Return, until each Class C Member's accrued, unpaid Preferred Return has been paid in full;

*Second*, any remaining distributable cash shall be distributed to the Class C Members, pro rata based on percentage of contribution, until each Class C Member's Total Capital Equity Investment equals zero;

1

*Third*, any remaining distributable cash shall be distributed to the Class D-1A Members, pro rata based on percentage of contribution, until each Class D-1A Member's Total Capital Equity Investment equals zero;

*Fourth*, any remaining distributable cash shall be distributed to the Class D-1B Members, pro rata based on percentage of contribution, until each Class D-1B Member's Total Capital Equity Investment equals zero;

*Fifth,* any remaining distributable cash shall be distributed to the Class E Members, pro rata based on percentage of contribution, until each Class E Member's Total Capital Equity Investment equals zero;

*Sixth*, any remaining distributable cash shall be distributed to the Class D-1A, Class D-1B, Class E and Class F Members pro rata based on each such Member's percentage of: (a) the Class D-1A Members aggregate accrued, unpaid Preferred Return, (b) the Class D-1B Members aggregate accrued, unpaid Preferred Return, (c) the Class E Members aggregate accrued, unpaid Preferred Return, and (d) the Class F Member's Total Capital Equity Investment and Preferred Return on such investment. Such proportional distributions to the Class D-1A, Class D-1B, Class E and Class F Members shall be made until each such class's total per (a), (b), (c), and (d) above equals zero;

*Thereafter*, any remaining distributable cash shall be distributed to all Junior Class Members, pro rata based on percentage of Units held by such Junior Class Members.


For purposes of this Schedule 2, "Preferred Return" means the preferred return for a respective Unit as set forth on Schedule 1 to this Agreement.  For purposes of this Schedule 2, "Total Capital Equity Investment" means the total capital equity investment as set forth on Schedule 1 to this Agreement, as adjusted to reflect distributions pursuant to this waterfall.